G.D. SEARLE & CO. AND SUBSIDIARIES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12836-79.     Filed February 4, 1987.

254

*Robert J. Cunningham, Michael Waris, Jr., Joseph L. Andrus, Julian D. Nihil, Kim E. Cook,* and *Jane Panethiere,* for the petitioners.

*Joel V. Williamson, Charles S. Triplett,* and *Joseph R. Goeke,* for the respondent.

WILES, *Judge*: Respondent determined deficiencies in petitioners' consolidated corporate Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 1974 | $29,157,111 |
| 1975 | 28,678,504 |

By amendment to his answer, respondent conceded that the amount of the alleged deficiency for the year 1974 should be reduced to $19,413,557. On May 6, 1982, this Court severed from the case all issues other than the propriety of respondent's allocations under section 482[1] of gross income and related business expense deductions from Searle & Co. (hereinafter SCO) to petitioner G.D. Searle & Co. (hereinafter petitioner).[2] In the notice of deficiency, timely mailed on June 8, 1979, respondent allocated to petitioner from SCO the following amounts of gross income and related business expense deductions:

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years in issue.

[2] The parties subsequently stipulated that the severed issue involving the deduction of amortizable bond premium relating to debentures of G.D. Searle International Capital Co., a subsidiary of G.D. Searle & Co., is no longer in controversy. Petitioner has conceded that respondent's determination that its taxable income for 1974 and 1975 should be increased in the amounts of $292,077 and $314,262, respectively, is correct.

|                                    | 1974          | 1975           |
|------------------------------------|---------------|----------------|
| Gross income                       | $92,718,000   | $110,314,000   |
| Related business expense deductions| 38,980,000    | 46,678,000     |
| Net income                         | 53,738,000    | 63,636,000     |

These gross income adjustments determined by respondent represented an allocation to petitioner of more than 92 percent of SCO's gross income from operations in those years. SCO was allowed to retain only an amount equal to its manufacturing costs plus 30 percent of such costs.

These allocations present the following questions for our consideration:

(1) Whether respondent may disregard petitioner's nonrecognition transfers of certain income producing intangibles to SCO, its wholly owned subsidiary corporation, for the purposes of reallocating income derived from such intangibles to petitioner pursuant to section 482;

(2) If not, whether respondent's allocations of gross income and related business expense deductions from SCO to petitioner for the years 1974 and 1975 were arbitrary, capricious, or unreasonable;

(3) Whether an allocation under section 482 is required to clearly reflect petitioner's income.[3]

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The several stipulations of fact and the exhibits attached thereto are incorporated herein by this reference.

### I. *History and Background of G.D. Searle & Co.*

#### A. *Petitioner*

Petitioner is a Delaware corporation whose principal place of business at the time of filing the petition herein was Skokie, Illinois. During the years 1974 and 1975, petitioner and its consolidated subsidiaries maintained their books and records on the accrual method of accounting with taxable

---

[3] The Rule 155 computation under the Court's decision herein with respect to this issue will determine whether SCO qualified during 1975 as a possessions corporation within the meaning of sec. 931. Respondent conceded in his amended answer that SCO qualified as a sec. 931 possessions corporation during 1974 and, therefore, was not required to join with petitioner in filing a consolidated tax return for that year.

years beginning January 1 and ending December 31. Petitioner and its consolidated subsidiaries filed Forms 1120 for the taxable years 1974 and 1975 at the Kansas City Service Center, Kansas City, Missouri.

During the years 1974 and 1975, petitioner and its subsidiaries engaged in the invention, development, manufacture, marketing, and sale of ethical (i.e., prescription) and proprietary (i.e., nonprescription) pharmaceutical products; the manufacture and sale of a wide variety of hospital supply products; the manufacture and sale of compressed gases and related equipment for use in laboratories and industry; the development, manufacture, and sale of medical and scientific instruments; the manufacture and sale of food enzymes; and the manufacture and sale of eyeglasses and contact lenses. Petitioner and its subsidiaries and affiliates conducted activities in approximately 90 countries and in 1975 employed approximately 19,400 individuals.

Total consolidated sales (excluding intercompany sales) of petitioner and its worldwide subsidiaries and the U.S. pharmaceutical sales (including intercompany sales) of petitioner for the years 1960 through 1975 were as follows (000's omitted):

| Year | Consolidated sales | U.S. pharmaceutical sales |
|---|---|---|
| 1960 | $36,907 | $30,633 |
| 1961 | 44,778 | 36,494 |
| 1962 | 56,626 | 46,048 |
| 1963 | 71,417 | 59,036 |
| 1964 | 86,526 | 70,116 |
| 1965 | 88,970 | 70,721 |
| 1966 | 113,465 | 73,243 |
| 1967 | 132,707 | 81,700 |
| 1968 | 147,724 | 80,809 |
| 1969 | 163,936 | [1]85,779 |
| 1970 | 201,459 | [1]79,918 |
| 1971 | 226,891 | [2]47,520 |
| 1972 | 271,878 | [2]30,240 |
| 1973 | 471,681 | [2]31,698 |
| 1974 | 621,310 | [2]38,234 |
| 1975 | 711,800 | [2]46,734 |

[1]During 1969 and part of 1970, SCO sold all its pharmaceutical products to petitioner for resale to unrelated parties.

[2]These amounts include resales by petitioner of products purchased from SCO.

## B. *SCO*

SCO is a Delaware corporation whose principal place of business is Caguas, Puerto Rico. SCO was organized on January 13, 1969, as a wholly owned subsidiary corporation of petitioner. During 1974 and 1975, SCO maintained its books and records on the accrual method of accounting. Prior to August 1, 1974, SCO filed its tax returns on the basis of a fiscal year beginning on August 1 and ending on July 31 of each year. After August 1, 1974, SCO elected a short taxable year commencing on August 1, 1974, and ending on December 31, 1974. Since December 31, 1974, SCO has maintained its books and records and filed its tax returns on a calendar year basis. SCO filed Federal income tax returns on Forms 1120 for the taxable years 1974 and 1975 with the Office of International Operations, Philadelphia Service Center, Philadelphia, Pennsylvania. SCO also filed tax returns with the Commonwealth of Puerto Rico.

SCO was organized by petitioner for valid business reasons and to take advantage of the benefits provided by section 931 relating to income from sources within possessions of the United States. During 1974 and 1975, SCO was engaged in the manufacture and sale of ethical pharmaceutical products in the Commonwealth of Puerto Rico.

## II. *History and Background of SCO's Products*

### A. *Aldactone and Aldactazide*

The active chemical ingredient in Aldactone is spironolactone. Aldactazide is a combination drug containing the two active chemical ingredients spironolactone and hydrochlorothiazide. Spironolactone was developed by researchers working at petitioner during the early 1950's. The spironolactone patent (No. 3,013,012) was obtained by petitioner on December 22, 1961. For a period of 17 years following the issuance of U.S. patent No. 3,013,012, including during the years 1974 and 1975, U.S. patent law granted the owner of that patent the right to exclude others from making, having made, using or selling the invention, i.e., spironolactone, or pharmaceutical preparations, such as Aldactone and Aldactazide, that contained spironolactone, throughout the United States, including Puerto Rico. The

owner of a patent may grant to others by sale, license, or otherwise the right under the patent to make, use, or sell the product.

Hydrochlorothiazide was developed by Ciba Pharmaceutical Co. (hereinafter Ciba), during the late 1950's and patented by Ciba on December 29, 1964. Petitioner registered the trademarks Aldactone and Aldactazide on April 5, 1960, and October 25, 1960, respectively. Aldactone was first marketed by petitioner in the United States in 1959, and Aldactazide was first marketed by petitioner in the United States in 1961.

Aldactone and Aldactazide are primarily prescribed for the treatment of edema (i.e., excess fluid retention). Edema is caused by the adrenal cortex's excessive secretion of aldosterone, a hormone that causes salt and fluid retention. Most drugs that treat edema are diuretics that work by increasing a patient's natural fluid excretion and, in the process, cause potassium loss. Aldactone works by blocking the effects of aldosterone and thus causes no potassium loss. Aldactone was promoted during 1974 and 1975 for edematous states associated with congestive heart failure and liver disease.

Aldactone, usually in combination with other drugs, and Aldactazide are also prescribed for the treatment of hypertension (i.e., elevated blood pressure). The causes of hypertension are not entirely understood, but it is known that excessive salt intake or retention plays a part. Consequently, the salt-retaining hormone aldosterone is involved in hypertension as well as in edema. Hypertension is treated primarily with diuretics which lower blood pressure by causing salt and water excretion. As in the treatment of edema, the disadvantage of diuretics is that they cause potassium loss.

Aldactone and Aldactazide products, together, held the following annual percentage shares of the "Diuretics-oral" market category for the years 1968 through 1975:

| Year | Market share | Year | Market share |
|------|-------------|------|-------------|
| 1968 | 9.3 | 1972 | 16.0 |
| 1969 | 11.0 | 1973 | 19.7 |
| 1970 | 11.9 | 1974 | 21.7 |
| 1971 | 13.8 | 1975 | 22.0 |

Listed below are petitioner's and SCO's combined annual net sales and cost of goods sold in the United States of Aldactone and Aldactazide products for the years 1968 through 1975 (000's omitted):

| Year | Sales | Cost of goods sold |
|------|-------|--------------------|
| 1968 | $9,463 | $2,307 |
| 1969 | 12,652 | 3,365 |
| 1970 | 15,372 | 3,371 |
| 1971 | 19,822 | 3,712 |
| 1972 | 26,815 | 4,666 |
| 1973 | 35,954 | 6,036 |
| 1974 | 42,901 | 7,498 |
| 1975 | 55,916 | 8,943 |

## B. *Banthine and Pro-Banthine*

Banthine contains the active chemical ingredient methantheline bromide. Pro-Banthine contains the active chemical ingredient propantheline bromide. Methantheline bromide and propantheline bromide were discovered by researchers at petitioner in the late 1940's and early 1950's, respectively, and patented on November 17, 1953. Thiopropazate and the dihydrochloride salt were patented on October 9, 1956. Neither patent was in effect during the taxable years before the Court. Banthine was introduced in the U.S. market in 1950, and Pro-Banthine was introduced in 1953. Petitioner registered the following trademarks with respect to those products:

| Trademark | Date registered |
|-----------|-----------------|
| Banthine | Feb. 13, 1951 |
| Pro-Banthine | June 2, 1953 |
| Dartal | Dec. 17, 1957 |
| Pro-Banthine P.A. | Sept. 6, 1960 |
| Probital | Dec. 4, 1962 |

Banthine and Pro-Banthine primarily are prescribed for the treatment of peptic ulcers. Peptic ulcers are erosions of the mucous membrane of the esophagus, stomach, or duodenum caused by excessive secretion of hydrochloric acid by the stomach. That secretion is caused by impulses transmitted down the vagus nerve, facilitated by the release of the chemical substance acetylcholine. Prior to the discovery of Banthine and Pro-Banthine, the common treatment for peptic ulcers was surgery involving the cutting of the

vagus nerve. Banthine and Pro-Banthine work by inhibiting the action of acetylcholine and thereby blocking the transmission of impulses down the vagus nerve. The two drugs were the first orally active drugs of that type, and are known as anticholinergics.

Banthine and Pro-Banthine competed during 1974 and 1975 with other anticholinergic drugs and with generic drugs containing propantheline bromide. Banthine and Pro-Banthine products as a group held the following annual percentage shares of the "Antispasmodic-Synthetic" prescription market category for the years 1968 through 1975:

| Year | Market share | Year | Market share |
|------|------|------|------|
| 1968 | 38.6 | 1972 | 36.4 |
| 1969 | 39.0 | 1973 | 34.3 |
| 1970 | 38.9 | 1974 | 34.0 |
| 1971 | 36.9 | 1975 | 32.4 |

Listed below are petitioner's and SCO's combined annual net sales and cost of goods sold in the United States of Banthine and Pro-Banthine products for the years 1968 through 1975 (000's omitted):

| Year | Sales | Cost of goods sold |
|------|------|------|
| 1968 | $10,260 | $739 |
| 1969 | 10,354 | 736 |
| 1970 | 10,541 | 1,288 |
| 1971 | 10,565 | 1,073 |
| 1972 | 11,001 | 1,616 |
| 1973 | 10,744 | 1,496 |
| 1974 | 10,483 | 1,639 |
| 1975 | 11,772 | 2,046 |

## C. *Flagyl*

The active chemical ingredient in the product Flagyl is metronidazole. Metronidazole was developed and shown to be effective by researchers at Societe Des Usines Chimiques Rhone-Poulenc (hereinafter Rhone-Poulenc), a French pharmaceutical company, in the late 1950's. Rhone-Poulenc obtained a U.S. patent for metronidazole on July 5, 1960, which remained in effect during the taxable years in issue.

In 1960, petitioner acquired by license from Rhone-Poulenc the exclusive right to use and sell metronidazole products in the United States. Petitioner also acquired by license from Rhone-Poulenc the exclusive right to use and

later acquire the trademark Flagyl, which was registered by Rhone-Poulenc in the United States on September 8, 1959. To acquire those rights, petitioner agreed to pay Rhone-Poulenc royalties of 10 percent of petitioner's U.S. net sales of Flagyl products for use in humans and 5 percent of petitioner's U.S. net sales for use in animals. Petitioner at the same time separately agreed to purchase its entire requirements of metronidazole from Rhodia, Inc., a subsidiary of Rhone-Poulenc, for a price not to exceed 130 percent of Rhodia's cost of producing that chemical. Petitioner introduced Flagyl into the U.S. market in 1963.

Flagyl is prescribed for the treatment of trichomoniasis, an infection of the urogenital tract caused by a protozoan organism. Trichomoniasis can infect both men and women, but produces visible symptoms only in women. It can be treated topically in women by the administration of creams or ointments, or it can be treated systemically (i.e., treating the body as a whole) in both men and women by orally administered Flagyl tablets. The infection can unknowingly be passed back and forth between sexual partners unless both are treated concurrently with a systemic trichomonacide. Flagyl is the only systemic treatment for trichomoniasis and is, therefore, the only treatment for trichomoniasis in men. Flagyl is also prescribed for the treatment of intestinal and liver amebiasis. Flagyl acts directly on the protozoa throughout the body in eliminating trichomoniasis and amebiasis.

Flagyl products held the following annual percentage shares of the "Trichomonacides" prescription pharmaceutical market category for the years 1968 through 1975:

| Year | Market share | Year | Market share |
|---|---|---|---|
| 1968 | 41.7 | 1972 | 37.7 |
| 1969 | 39.8 | 1973 | 37.5 |
| 1970 | 37.3 | 1974 | 48.0 |
| 1971 | 36.1 | 1975 | 42.7 |

Listed below are petitioner's and SCO's combined annual net sales and cost of goods sold in the United States of Flagyl products for the years 1968 through 1975 (000's omitted):

| Year | Sales | Cost of goods sold |
|------|-------|--------------------|
| 1968 | $5,020 | $837 |
| 1969 | 5,595 | 832 |
| 1970 | 6,321 | 1,088 |
| 1971 | 7,102 | 840 |
| 1972 | 8,139 | 1,113 |
| 1973 | 9,554 | 1,068 |
| 1974 | 10,396 | 1,421 |
| 1975 | 12,395 | 1,538 |

## D. *Lomotil*

Lomotil contains the active chemical ingredients diphenoxylate hydrochloride and atropine sulfate. Diphenoxylate hydrochloride was developed in the late 1950's by Laboratoria Pharmaceutica Dr. C. Janssen, S.A. (hereinafter Janssen), a Belgian pharmaceutical company.

In 1957, pursuant to research sharing agreements between Janssen and petitioner, Janssen approached petitioner for assistance in obtaining the required Government approvals for marketing diphenoxylate hydrochloride in the United States. Janssen obtained a U.S. patent on the compound on August 4, 1959, which remained in effect during the taxable years in issue. Petitioner registered the Lomotil trademark on May 3, 1960. In 1962, Janssen and petitioner entered into a license agreement pursuant to which petitioner obtained the exclusive right to make,[4] use, and sell Lomotil products in the United States. In that agreement, petitioner agreed to pay Janssen a royalty of $25,000 per year plus 8 percent of petitioner's net sales of Lomotil for use in humans and 4 percent of petitioner's net sales of Lomotil for use in animals. Petitioner introduced Lomotil into the U.S. market in 1960.

Lomotil is prescribed for the treatment of diarrhea. Lomotil acts by decreasing the motility of the gastrointestinal tract and increasing the transit time of food through that tract, thereby permitting greater time for water absorption and bulking activity. The chemical atropine sulfate is an anticholinergic included in Lomotil in low,

---

[4]During the period in which it manufactured Lomotil, petitioner purchased the active chemical ingredients, diphenoxylate hydrochloride with atropine sulfate, from Mallinckrodt, Inc.

subtherapeutic doses to prevent intentional abuse or overdosage of diphenoxylate hydrochloride. Lomotil's major competitors during 1974 and 1975 were opium-based antimotility drugs and bulk water-absorbing agents.

Lomotil held the following annual percentage shares of the "Anti-Diarrheals without Anti-Infectice" market category for the years 1968 through 1975:

| Year | Market share | Year | Market share |
|------|--------------|------|--------------|
| 1968 | 43.0 | 1972 | 51.3 |
| 1969 | 47.2 | 1973 | 50.9 |
| 1970 | 49.9 | 1974 | 51.4 |
| 1971 | 52.3 | 1975 | 55.4 |

Listed below are petitioner's and SCO's combined annual net sales and cost of goods sold in the United States of Lomotil products for the years 1968 through 1975 (000's omitted):

| Year | Sales | Cost of goods sold |
|------|-------|--------------------|
| 1968 | $8,315 | $410, |
| 1969 | 10,456 | 557 |
| 1970 | 11,132 | 701 |
| 1971 | 13,328 | 973 |
| 1972 | 14,813 | 1,290 |
| 1973 | 15,441 | 1,041 |
| 1974 | 16,386 | 1,146 |
| 1975 | 18,859 | 1,113 |

E. *Ovulen and Demulen*

The active chemical ingredients in Ovulen are the synthetic progestrogen ethynodiol diacetate and the synthetic estrogen mestranol. Demulen also contains ethynodiol diacetate, but contains as its synthetic estrogen the chemical ethinyl estradiol. Ethynodiol diacetate was developed by petitioner's researchers in 1958 and was patented on July 15 of that year, and a process for making ethynodiol was patented on November 23, 1971. Mestranol and ethinyl estradiol are unpatented commodity-type chemicals which have been generally available for many years. Petitioner registered the trademark Ovulen on September 24, 1963, and the trademark Demulen on April 7, 1970. Ovulen was first introduced into the U.S. market in 1966. Demulen, the result of joint research by petitioner and G.D. Searle & Co., Ltd. (hereinafter Searle, U.K.), its United Kingdom subsid-

iary, was first introduced in Europe in 1969 and in the United States in 1970.

Ovulen and Demulen are combination oral contraceptives. Combination oral contraceptives have been marketed in the United States since petitioner introduced the oral contraceptive Enovid in 1960. By 1968, there were several oral contraceptive products competing with those sold by petitioner. All the combination oral contraceptives act by suppressing ovulation, without which conception and pregnancy cannot occur.

The major factor in the development of oral contraceptives in the 1960's and early 1970's was the concern with the possible side effects of those products. A strong interest in developing products with more potent estrogens or progestrogens that would be as effective in inhibiting ovulation as their predecessors but at lower doses prompted the development of Demulen, which contained half the estrogen of Ovulen.

Ovulen and Demulen products held the following annual percentage shares of the "Oral Contraceptive" market category for the years 1968 through 1975:

### MARKET SHARE

| Year | Ovulen | Demulen |
|------|--------|---------|
| 1968 | 18.5 | 0 |
| 1969 | 19.9 | 0 |
| 1970 | 18.2 | 2.4 |
| 1971 | 15.4 | 5.6 |
| 1972 | 14.1 | 5.7 |
| 1973 | 13.1 | 5.5 |
| 1974 | 14.3 | 5.9 |
| 1975 | 12.8 | 6.1 |

Listed below are petitioner's and SCO's combined annual net sales and cost of goods sold in the United States of Ovulen and Demulen products for the years 1968 through 1975 (000's omitted):

### SALES

| Year | Ovulen | Demulen |
|------|--------|---------|
| 1968 | $18,733 | 0 |
| 1969 | 20,378 | 0 |
| 1970 | 16,786 | $3,537 |
| 1971 | 17,835 | 6,666 |

| Year | Ovulen | Demulen |
|------|--------|---------|
| 1972 | Not available | Not available |
| 1973 | $20,081 | $8,373 |
| 1974 | 21,042 | 8,915 |
| 1975 | 23,398 | 11,193 |

COST OF GOODS SOLD

| Year | Ovulen | Demulen |
|------|--------|---------|
| 1968 | $3,155 | 0 |
| 1969 | 3,279 | 0 |
| 1970 | 2,767 | $612 |
| 1971 | 2,448 | 956 |
| 1972 | Not available | Not available |
| 1973 | 2,455 | 1,147 |
| 1974 | 2,562 | 1,095 |
| 1975 | 3,013 | 1,381 |

F. *Serenace*

Serenace contains the active chemical ingredient haloperidol. Haloperidol is a tranquilizer prescribed for use in the management of acute and chronic schizophrenia, the manic phase of manic-depressive psychosis, and various other psychoses. Haloperidol was invented in the late 1950's by Janssen, which, under an agreement with petitioner, permitted petitioner to analyze and develop it for the U.S. market. Petitioner concluded that haloperidol was too potent to obtain wide acceptance in the United States and was likely to be positioned primarily as an institutional drug. However, petitioner determined that it could sell the drug in some markets outside the United States.

In 1962, petitioner acquired by license from Janssen the exclusive right to make and sell haloperidol in certain countries, excluding the United States and Japan. To acquire that right, petitioner agreed to pay Janssen a royalty of $10,000 per year plus 8 percent of petitioner's net sales of haloperidol for use in humans and 4.5 percent of petitioner's net sales of haloperidol for use in animals. In 1965, the agreement was amended to include Japan in the licensed countries. On April 15, 1969, Janssen obtained a U.S. patent covering the compound haloperidol.

By a "Third Amendatory Agreement" between petitioner, Janssen, and SCO in 1970, SCO acquired the license under

Janssen's patent to manufacture haloperidol in Puerto Rico solely for export to Japan. Under the amendment, petitioner agreed to pay Janssen a paid-up royalty of $500,000 in addition to the royalties agreed upon in the original agreement. Petitioner never manufactured or sold haloperidol in the United States. Pursuant to its license from Janssen, SCO manufactured and sold haloperidol in Puerto Rico for export to Dainippon Pharmaceutical Co., Ltd. (hereinafter Dainippon), a Japanese pharmaceutical company, from March 1971 through 1975.

Listed below are SCO's annual net sales and cost of goods sold of Serenace for the years 1971 through 1975 (000's omitted):

| Year | Sales | Cost of goods sold |
|------|-------|--------------------|
| 1971 | $1,921 | $118 |
| 1972 | 3,778 | 226 |
| 1973 | 2,721 | 178 |
| 1974 | 3,282 | 268 |
| 1975 | 3,171 | 352 |

### III. Pharmaceutical Business of Petitioner and Its Subsidiaries

Petitioner and its subsidiaries conducted their pharmaceutical business on a worldwide basis, with pharmaceutical manufacturing facilities in 21 foreign countries at the end of 1975. Petitioner's U.S. pharmaceutical operations were conducted through the Domestic Pharmaceutical Division of petitioner until 1972, when operations were assumed by petitioner's Searle Laboratories Division.

Petitioner's pharmaceutical operations in the United States prior to 1975 were conducted solely in a Skokie, Illinois, facility constructed during the 1940's. The facility contained chemical and pharmaceutical manufacturing and distribution facilities, administrative offices, and pharmaceutical research and development facilities. In 1974, petitioner acquired a chemical fermentation plant at Harbor Beach, Michigan. The Harbor Beach facility, which became operational in 1975, was used for the production of the chemical androstenedione. Petitioner also constructed a facility in Phoenix, Arizona, in 1975, which was used for the manufacture of the product Metamucil.

Searle de Mexico, S.A. de C.V. (hereinafter Searle de Mexico) is a wholly owned subsidiary of petitioner, organized under the laws of Mexico. During the years 1968 through 1975, Searle de Mexico maintained two facilities in Mexico for the manufacture and sale of chemical and pharmaceutical products. One of the activities of Searle de Mexico was the manufacture and sale of steroid chemicals refined from the native barbasco root harvested in Mexico. Searle de Mexico never conducted any operations in the United States.

G.D. Searle & Co., Ltd. (hereinafter Searle U.K.), is a subsidiary of petitioner organized under the laws of the United Kingdom. During 1974 and 1975, it maintained in the United Kingdom two facilities for the manufacture and sale of chemical and pharmaceutical products as well as facilities for pharmaceutical research and development. Searle U.K. sold the products it produced primarily in Europe and throughout the British Commonwealth. Searle U.K. never conducted any operations in the United States.

## IV. *Historical Development of the Puerto Rican Operations of Petitioner and SCO*

### A. *Tax Incentives for Puerto Rican Operations*

Prior to 1948, Puerto Rico based its economic development on Government ownership and operation of key industries. In that year, however, the emphasis shifted to the encouragement of private investment. Exemption from Puerto Rican income, municipal, property, and other taxes, under grants of industrial tax exemption became the keystone of an industrial incentive program known as "Operation Bootstrap" that also included providing plants at low rent, cash grants to cover startup costs, employee training, and low interest loans. Through a series of legislative enactments in 1948, 1954, and 1963, Puerto Rico adopted laws granting qualifying companies total exemption from Puerto Rican taxes for varying periods of 10 or more years depending upon the geographic location of the company's operation in Puerto Rico.

The combination of U.S. and Puerto Rican tax incentives for doing business in Puerto Rico has been the prime

moving force behind remarkable economic growth in Puerto Rico. Puerto Rican total and per capita GNP have grown at nearly double the rate of growth in the United States since 1948. Employment in Puerto Rico's manufacturing sector nearly tripled between 1948 and 1975 despite significant declines in employment in the manual labor intensive industries such as textiles, apparel, and shoes.

## B. *Planning and Formation of SCO*

In 1968, petitioner was in need of additional manufacturing facilities to service its U.S. pharmaceutical business. Its Skokie, Illinois, facilities were old, outdated, and substantially overcrowded. In 1968, the crowding problem was so serious that GDS had been forced to institute shift work in both its chemical and pharmaceutical manufacturing and to hire contract manufacturers to package samples of its products. Use of multiple manufacturing shifts contravened basic company philosophy ·because control over product quality declined significantly during a second shift.

The Skokie location offered no opportunity for expansion of manufacturing facilities. Available land was severely limited and long-range company plans called for devoting what little additional space was available in Skokie to research facilities. Parking space was inadequate. Moreover, the facility was located practically in the center of downtown Skokie, thus making overly crowded manufacturing facilities an even more serious threat to neighborhood safety and increasing the difficulty of properly controlling pollution.

In the early 1960's, petitioner purchased land north of Chicago in Lake County, Illinois, as a possible site for manufacturing facilities. By late 1968, the overcrowding in the Skokie facility prompted petitioner to undertake architectural planning and preliminary site work related to moving all of its U.S. pharmaceutical manufacturing to the Lake County site. Management estimated that it would have taken 2 to 3 years beyond 1968 to construct an operational manufacturing facility on the Lake County site.

In 1968, petitioner began considering the establishment of manufacturing operations in Puerto Rico. Petitioner was aware of the basic tax advantages of doing business in

Puerto Rico through prior experience.[5] Petitioner also knew that several other competing U.S. pharmaceutical companies with operations in Puerto Rico had a much lower effective tax rate as a result of those tax incentives than did petitioner. Accordingly, petitioner formed a project study group to evaluate Puerto Rico as a possible site for future operations in order to provide additional manufacturing facilities and as a means of saving taxes.

The study group consisted of manufacturing, finance, and tax personnel of petitioner, as well as outside legal and tax advisors. The study group determined that Puerto Rico offered a labor supply that was plentiful, intelligent, easy to train, and cheap, relative to mainland standards. It also identified, with the assistance of officials of the Puerto Rican Government, a building in the Hato Rey section of San Juan that was being vacated by another pharmaceutical company and was available for lease. Because the building had been used for pharmaceutical manufacturing, it had in place the special air-conditioning, humidity control, dust collection, sewer, water, and related building services that would be required. As this building was readily adaptable to its needs, petitioner believed that it would be possible to begin manufacturing within 6 months.

Based upon the recommendation of its study group, petitioner decided to establish a manufacturing operation in Puerto Rico. SCO was organized on January 13, 1969, and was authorized to do business in Puerto Rico on February 21, 1969. Petitioner leased 60,000 square feet of the Hato

---

[5]In late 1958, more than 10 years prior to the organization of SCO, petitioner acquired Root Chemicals, Inc. (hereinafter Root Chemicals), a company that operated in Puerto Rico under a grant of industrial tax exemption. Root Chemicals owned a Mexican subsidiary, Productos Esteriodes S.A. (hereinafter PESA).

At the time petitioner acquired Root Chemicals and PESA, it anticipated that PESA would perform in Mexico the initial steps involved in manufacturing synthetic steroid chemicals from the Mexican grown barbasco root. It was further anticipated that PESA would sell and ship the intermediate chemicals to Root Chemicals in Puerto Rico for further manufacture and sale.

The products produced by Root Chemicals were not protected by patents and trademarks, but rather were non-unique commodity-type products competing directly in world markets with identical products produced by other companies. Moreover, the bulk steroid industry in 1960 was plagued by excess capacity and price deterioration. Some prices for bulk steroids reached the point at which it was impossible to obtain an adequate return on invested capital. Despite the fact that Root Chemicals enjoyed an exemption from Puerto Rican tax, it was unable to operate profitably and was closed in 1960, only 2 years following its acquisition, and its equipment was shipped to PESA in Mexico. PESA thereafter became the sole supplier of synthetic steroids to petitioner and its subsidiaries throughout the world. PESA later became part of Searle de Mexico.

Rey building on February 28, 1969, and an additional 20,000 square feet on July 1, 1970. Petitioner assigned these leasehold interests to SCO on July 1, 1970.

SCO was initially capitalized by a cash contribution from petitioner of $250,000. From the time of its initial issuance of shares to petitioner, and throughout 1974 and 1975, SCO was a wholly owned subsidiary of petitioner.

Petitioner's management described the basis for its decision to establish an operation in Puerto Rico in its 1969 Annual Report to Shareholders in the following terms:

> The move to Puerto Rico was prompted by shortages of manpower and production capacity in Skokie. Our preliminary study showed that Puerto Rico could provide both an adequate labor supply and substantial savings in floorspace costs. In addition, the transfer enabled us to bring certain work into Skokie that formerly had been contracted to suppliers. Finally, we hoped to lessen the burden of income tax and to invest part of this saving in new research and development programs that otherwise would not be possible.
>
> The transfers will not affect employment in Skokie where growth will continue. Our home facilities will be used for other production as well as providing backup capability.

Early in 1969 and immediately after making the decision to establish an operation in Puerto Rico, petitioner's management began an examination of the products to be transferred to SCO. Daniel C. Searle, president and chief operating officer of petitioner, established three guidelines for the choice of SCO's products: (1) The product should be firmly established in the marketplace and have patent and trademark protection; (2) the product should have the potential for significant long-term profitability; and (3) the product should be capable of manufacture in Puerto Rico from a technical standpoint.

Petitioner's Puerto Rican study group examined all the company's product lines for possible transfer to SCO. Of petitioner's seven major product lines, five were selected for transfer to SCO. Those products were: (1) Aldactone/Aldactazide; (2) Banthine/Pro-Banthine; (3) Lomotil; (4) Flagyl; and (5) oral contraceptives. Because of the special manufacturing precautions required for oral contraceptive products, petitioner decided to defer the transfer of those products until manufacturing and related support procedures had been fully worked out for the other products. The

transferred product lines were old well-established products that had been sold by petitioner in the United States for many years. They had each gained a substantial acceptance in the marketplace and were highly profitable, selling in 1968 at prices ranging from 4 to 20 times the direct cost of their manufacture. They were each protected by patents at the time of their transfer to SCO and each was strongly identified with a recognized and well-established trademark.

In 1968, the year before SCO was established, petitioner's U.S. total net sales of Aldactone and Aldactazide were more than 4 times its total direct costs of producing the drugs. By 1975, SCO's total net sales were more than 6 times the cost of production. Similarly, total net sales of Banthine and Pro-Banthine products were approximately 10 times its total direct production costs in 1968. Even after the patent on these products expired in 1970, SCO was able to maintain its sales on the strength of its trademarks. Total net sales of Flagyl in 1968 were 6 times its direct production costs and by 1975 the total sales were 8 times the cost of production. In 1968, total net sales of Lomotil were more than 20 times its total direct manufacturing costs. In 1969, Ovulen net sales were 6 times its direct costs of manufacturing and in 1975 that ratio was nearly 8 to 1.

## C. SCO's Puerto Rican Tax Exemption Grants

Two basic tax exemptions were granted to SCO with respect to its operations during the years 1969 through 1975. By virtue of these tax exemption grants, SCO, during the years 1969 through 1975, was exempt from all Puerto Rican income tax on its qualified income (income from its manufacturing activities and certain investment income), municipal and Commonwealth taxes on real and personal property, licens fees, and excise or other municipal taxes.

The first tax exemption grant covered the pharmaceutical manufacture of SCO's products. On January 10, 1969, on behalf of SCO (which was yet to be organized), petitioner filed an application for a tax exemption grant under the provisions of the Puerto Rico Industrial Incentive Act of 1963. The application covered Aldactone tablets, Aldactazide tablets, Flagyl tablets, Lomotil tablets and liquid, Enovid tablets (petitioner's first oral contraceptive

product), and Ovulen tablets. On February 12, 1969, petitioner filed an amendment to that application to include Banthine with or without Phenobarbital tablets, Banthine vials, Pro-Banthine with or without Phenobarbital tablets, Pro-Banthine P.A. tablets, Pro-Banthine with Dartal tablets, and Probital tablets. By notice dated April 2, 1969, SCO was substituted for petitioner in the above applications. On November 7, 1969, SCO's initial grant of tax exemption covering the pharmaceutical manufacture of the above products was approved and issued by the Governor of Puerto Rico. The effective date of the 10-year grant of exemption was August 1, 1969.

The original pharmaceutical tax exemption grant was amended by decrees dated September 29, 1971, March 21, 1973, and December 13, 1974. Those amendments reflected the addition to SCO's product line of Flagystatin and Demulen, and SCO's move to a new manufacturing facility in Caguas, Puerto Rico.

On February 8, 1971, SCO applied for its second basic tax exemption grant. That grant, covering SCO's proposed chemical manufacturing operations, was issued on December 30, 1971, and was effective November 1, 1971, for a period of 10 years. The grant covered the manufacture of the following chemical products in bulk: spironolactone, ethynodiol diacetate, propantheline bromide, haloperidol, and diphenoxylate hydrochloride. SCO's chemical manufacturing tax exemption grant was amended by decree dated August 8, 1973, and effective August 21, 1972, to permit the production of methantheline bromide. The grant of an industrial tax exemption did not require SCO to manufacture in Puerto Rico all of the products with respect to which such exemption was granted.

D. *Initiation of Pharmaceutical Manufacturing by SCO*

Petitioner's management next turned its attention to making SCO operational. It selected James S. Lawhead who had been an employee of petitioner since 1947 to become SCO's president and general manager. Mr. Lawhead held a master's degree in organic chemistry and prior to joining petitioner had been employed as a research and development chemist for two drug companies. He joined petitioner

as a development chemist and for 10 years conducted investigative studies on organic synthesis. Thereafter, Mr. Lawhead assumed various supervisory positions and, in 1967, became the Director of Manufacturing Operations. In 1969, Mr. Lawhead was offered the opportunity to manage SCO because the officers of petitioner believed that his many years of experience made him eminently qualified to head the Puerto Rican operations. After accepting the position, Mr. Lawhead hired SCO's other executives, drawing both on petitioner's employee resources in Skokie and on Puerto Rican residents.

Preparation of the Hato Rey facility for the manufacture of SCO's products was under the direction of Mr. Lawhead and SCO's Director of Engineering, with support from petitioner's engineering department. SCO purchased approximately 25 percent of the initial manufacturing equipment needed at Hato Rey from petitioner at petitioner's net book value. The remainder of SCO's equipment was purchased new by SCO from unrelated U.S. vendors. Because SCO had not yet commenced operations, petitioner's purchasing department acquired the equipment on SCO's behalf.

Pharmaceutical manufacturing operations were instituted at SCO during 1969 and 1970 one product at a time. SCO manufactured its first tablets in June 1969, and sold its first products in August 1969. Set forth below are the month and year in which SCO first sold each of the products it manufactured.

| Product | First sale |
| --- | --- |
| Aldactone tablets | August 1969 |
| Aldactazide tablets | August 1969 |
| Pro-Banthine with Dartal tablets | December 1969 |
| Pro-Banthine with Phenobarbitol tablets | April 1970 |
| Pro-Banthine tablets (half-strength) | April 1970 |
| vials | May 1970 |
| Banthine with Phenobarbitol tablets | May 1970 |
| Pro-Banthine P.A. tablets | July 1970 |
| Banthine tablets | September 1970 |
| vials | September 1970 |
| Flagyl tablets | February 1970 |
| vaginal inserts | March 1970 |
| Lomotil tablets | May 1970 |
| liquid | August 1970 |
| Ovulen | October 1971 |
| Demulen | October 1971 |

## E. *Transfers of Intangible Property to SCO*

During the years 1969, 1970, and 1971, petitioner and SCO entered into six agreements providing for the assignment and transfer by petitioner to SCO of its entire right, title, and interest in the following intangible property relating to SCO's products. Those agreements are as follows:

| Date | Intangibles transferred | Products covered |
|---|---|---|
| June 2, 1969 | Patents, related technical data, copyrights, and trademarks | Aldactone, Aldactazide |
| Oct. 1, 1969 | Patents, related technical data, copyrights, and trademarks | Banthine, Pro-Banthine, Dartal and all formulations and combinations containing the same. |
| Jan. 2, 1970 | Metronidazole license from Rhone-Poulenc, related technical data, and copyrights | Flagyl |
| Apr. 1, 1970 | Diphenoxylate hydro-;chloride license from Janssen, related technical data, copyrights and trademarks | Lomotil |
| Mar. 3, 1971 | Haloperidol license from Janssen, related technical data, and trademarks | Serenace[6] |
| Aug. 2, 1971 | Patents, related technical data, copyrights, and trademarks | Ovulen, Demulen |

The language of the June 2, 1969, agreement relating to Aldactone and Aldactazide is typical of the language contained in each of the six agreements. The agreement provides with respect to patents as follows:

SEARLE [petitioner] hereby assigns to SPR [SCO] all right, title, and interest in and to the Scheduled Patents. By virtue of said assignment, SEARLE grants to SPR the sole and exclusive right to make, use and sell under Scheduled Patents in the United States of America, its territories and possessions, including the District of Columbia and the Commonwealth of Puerto Rico * * * for the term of said Scheduled Patents as well as for the term of any extension or renewal thereof and to license and to sell or otherwise transfer to any other person or persons all or any part of SPR's rights under said Scheduled Patents on such terms and conditions as SPR may decide.

---

[6]Haloperidol was produced in Puerto Rico from 1971 through 1975 but had not been previously manufactured by Searle. Production of this product was restricted to the bulk chemical, all of which was sold to a third party customer in Japan.

The agreement contained similar language of assignment regarding technical data, trademarks, and copyrights relating to Aldactone and Aldactazide.

Petitioner and SCO filed, in the appropriate U.S. Government registration offices, acknowledgements of the transfers of ownership of the U.S. patents, trademarks, and copyrights assigned pursuant to the six agreements. With respect to the contractual rights transferred, petitioner obtained from the other parties to the contracts their written consent to petitioner's assignment of those contractual rights to SCO. Upon entering into these agreements, SCO became the holder of legal title to the patents, trademarks, copyrights, contract rights, and related technical data.

Following their transfer to SCO and prior to the taxable years in question, three of the transferred patents expired. Those patents were: (1) U.S. patent No. 2,659,732 covering methantheline bromide and propantheline bromide, the active chemical ingredients in the Banthine and Pro-Banthine product lines; (2) U.S. patent No. 2,705,712 covering the chemical precursor to spironolactone, the active chemical ingredient of the products Aldactone and Aldactazide (a separate patent covering spironolactone remained in force through the end of 1975); and (3) U.S. patent No. 2,766,235, covering thiopropazate hydrochloride, an active chemical ingredient in combination products containing Dartal.

Between 1971 and 1974, SCO registered in its own name numerous copyrights relating to its products. More than 75 U.S. copyright registrations were obtained by SCO during 1974 and 1975. The documents for which SCO sought copyrights in 1974 and 1975 were prepared by or at the direction of petitioner's employees. The actual process of filing for copyrights was also performed or monitored by employees of petitioner as provided for in the Marketing Agreement.

## F. *Marketing Agreement*

As SCO's manufacturing operations were being expanded, the procedures for SCO's sales of its products were being established. From August 1969, until approximately October 1, 1970, SCO sold the products it produced to petitioner.

Petitioner resold those products to unrelated wholesalers, hospitals, and clinics. Effective October 1, 1969, petitioner and SCO entered into a distributor appointment agreement appointing petitioner as nonexclusive distributor of SCO's products.

In September and October 1970, SCO began to sell its products directly to unrelated wholesalers in the United States. At that time, SCO entered into manufacturer-wholesaler agreements with each of its more than 400 drug wholesaler customers. Those wholesaler-manufacturer agreements established the terms and conditions upon which SCO would sell its products to its customers. SCO's agreements with its wholesaler customers were renewed annually.

Effective September 1, 1970, petitioner and SCO entered into a marketing and sales promotion agreement (hereinafter the Marketing Agreement) whereby petitioner agreed to provide marketing and sales promotion services on behalf of SCO.[7] Under the Marketing Agreement, SCO agreed to pay to petitioner, for services rendered, a marketing fee equal to the greater of (1) 25 percent of SCO's net sales to customers in the United States, or (2) petitioner's cost of providing services to SCO plus 25 percent of such cost.

## V. SCO's Manufacturing Activities

### A. Acquisition of Chemical Manufacturing Facility at Caguas

Early in 1970, SCO began the process of developing its chemical manufacturing capability. The term "chemical manufacturing" refers to the manufacture of active ingredients for pharmaceutical products. A search was undertaken by SCO's management for parcels of land suitable for construction of a chemical facility. On July 29, 1970, SCO acquired 4.84 cuedras of land from Phytogen Products, Inc., a subsidiary of Johnson & Johnson, Inc., together with an existing chemical manufacturing plant and chemical production equipment, for a combined purchase price of $1,100,000. The facility was located in Caguas, Puerto Rico, approximately 25 miles from SCO's Hato Rey plant.

---

[7] On Oct. 1, 1971, the Marketing Agreement was amended to include Ovulen and Demulen in the products to be marketed by petitioner for SCO.

Following its acquisition of the chemical manufacturing facility from Phytogen Products, Inc., SCO remodeled the facility in order to make it suitable for performing certain manufacturing steps for the active chemicals used in SCO's pharmaceutical operations. The remodeling was directed by SCO's director of engineering with assistance from petitioner's engineering staff, and was performed by a local Puerto Rican construction company pursuant to an agreement with SCO. Set out below is the date on which SCO first manufactured each chemical that it manufactured in commercial quantities in its chemical manufacturing facility between 1971 and 1975:

| Bulk chemical | Date of first manufacture |
| --- | --- |
| Propantheline bromide | September 1970 |
| Methantheline bromide | March 1971 |
| Haloperidol | March 1971 |
| Spironolactone | April 1971 |

SCO also used the Caguas facility for the recovery of spironolactone, hydrochlorothiazide, and propantheline bromide from pharmaceutical products that SCO's Quality Control Department determined could not be sold.

B. *Construction of Pharmaceutical Manufacturing Facilities at Caguas*

In late 1970 and early 1971, in addition to remodeling the chemical manufacturing facility, SCO constructed an adjacent pharmaceutical manufacturing plant for the production of oral contraceptives at the Caguas site. In order to accommodate the expansion and construction of the new facility, SCO acquired on May 19, 1971, two contiguous parcels of land totaling 5.84 cuedras. The design and construction of the facility were performed by the same Puerto Rican construction company that remodeled the existing chemical manufacturing facility. The work was supervised by SCO's Director of Engineering with some assistance from petitioner.

In 1972 and 1973, SCO expanded its facilities at Caguas by constructing a pharmaceutical manufacturing and packaging plant, plus additional office and warehouse space. Following completion of the construction in 1973, SCO consolidated all its operations at the Caguas site. SCO vacated the Hato Rey facility and terminated its lease of

that facility. Of the 200 individuals employed at the Hato Rey facility, all except 7 made the move to Caguas.

The total cost and depreciated book value of SCO's property, plant, and equipment as of the end of 1973, 1974, and 1975, are set out below:

| Year | Total cost | Depreciated book value |
|------|------------|------------------------|
| 1973 | $11,586,828 | $10,446,521 |
| 1974 | 11,882,975 | 10,189,196 |
| 1975 | 12,268,000 | 9,951,000 |

## C. *Management and Personnel*

The original management of SCO consisted of five individuals, four of whom were former employees of petitioner. Of those five, the president, secretary-treasurer, and assistant secretary resided in Puerto Rico and had as their principal place of work during 1974 and 1975 SCO's facilities in Caguas, Puerto Rico.

During 1974 and 1975, operating executives of SCO included the Director of Chemical Operations, the Director of Pharmaceutical Operations, the Director of Engineering, the Director of Materials Management or Materials Control, the Director of Quality Control, the Director of Finance, the Director of Personnel, and the Director of Public Relations. All those management personnel resided in Puerto Rico and had their principal place of work in Puerto Rico.

During 1974 and 1975, SCO's board of directors consisted of five individuals, three of whom were employees of petitioner in Skokie. The remaining two directors were employees of SCO in Puerto Rico.

As of December 31, 1974, SCO had 426 employees, 28 of whom were executives, officers, or managers. As of December 31, 1975, SCO had 454 employees, 29 of whom were executives, officers, or managers. Of the executives, officers, or managers mentioned, 21 in 1974 and 23 in 1975 were Puerto Rican. All the non-management employees in 1974 and 1975 were Puerto Rican.

## D. *Manufacturing and Related Activities*

### 1. *Products Manufactured and Sold*

SCO's manufacturing operations were instituted gradually one product at a time and one manufacturing step at a time

during 1969 and 1970. SCO manufactured its first tablets in June 1969 and sold its first products in August 1969. By September 1970, SCO was engaged in the pharmaceutical manufacture of the full line of Aldactone, Aldactazide, Lomotil, Flagyl, Banthine, and Pro-Banthine products.

During 1974 and 1975, SCO manufactured and sold directly, and almost exclusively, to unrelated wholesalers, the following products in the following package sizes:

National drug

| Code No. | Product | Package size |
|---|---|---|
| 0014-1011-31 | Aldactazide tablets | Bottle of 100 tablets |
| 0014-1011-51 | Aldactazide tablets | Bottle of 500 tablets |
| 0014-1011-55 | Aldactazide tablets | Bottle of 2500 tablets |
| 0014-1011-66 | Aldactazide tablets | Carton of 10 boxes, each box containing 100 individually blister sealed tablets |
| 0014-1001-31 | Aldactone tablets | Bottle of 100 tablets |
| 0014-1001-51 | Aldactone tablets | Bottle of 500 tablets |
| 0014-1001-55 | Aldactone tablets | Bottle of 2500 tablets |
| 0014-1001-66 | Aldactone tablets | Carton of 10 boxes, each box containing 100 individually blister sealed tablets |
| 0014-1504-05 | Banthine vials | Box of 5 vials |
| 0014-1504-25 | Banthine vials | Box of 25 vials |
| 0014-1504-31 | Banthine vials | Box of 100 vials |
| 0014-1501-31 | Banthine tablets | Bottle of 100 tablets |
| 0014-1501-51 | Banthine tablets | Bottle of 500 tablets |
| 0014-1511-31 | Banthine with Phenobarbital tablets | Bottle of 100 tablets |
| 0014-0071-71 | Demulen tablets | Box of six 21 tablet dispensers |
| 0014-0071-13 | Demulen tablets | Box of twelve 21 tablet dispenser refills |
| 0014-0071-08 | Demulen tablets | Box of forty-eight 21 tablet dispenser refills |
| 0014-0071-63 | Demulen tablets | Box of 10 containers, each holding one 21 tablet dispenser and two 21 tablet dispenser refills |
| 0014-0071-09 | Demulen-28 tablets | Box of six 28 tablet dispensers, each containing 21 Demulen tablets and 7 placebos |
| 0014-0071-14 | Demulen-29 tablets | Box of twelve 28 tablet dispenser refills |
| 0014-0071-15 | Demulen-28 tablets | Box of 10 containers, each holding one 28 tablet dispenser and two 28 tablet dispenser refills |

| Code No. | Product | Package size |
|---|---|---|
| 0014-1801-31 | Flagyl tablets | Bottle of 100 tablets |
| 0014-1801-41 | Flagyl tablets | Bottle of 250 tablets |
| 0014-1801-52 | Flagyl tablets | Bottle of 1000 tablets |
| 0014-1811-10 | Flagyl tablets | Box of 10 vaginal inserts |
| 0014-0061-31 | Lomotil tablets | Bottle of 100 tablets |
| 0014-0061-51 | Lomotil tablets | Bottle of 500 tablets |
| 0014-0061-55 | Lomotil tablets | Bottle of 2500 tablets |
| 0014-0061-66 | Lomotil tablets | Carton of 10 boxes, each containing 100 individually blister sealed tablets |
| 0014-0066-02 | Lomotil liquid | Two ounce bottle |
| 0014-0401-06 | Ovulen tablets | Box of six 20 tablet dispensers |
| 0014-0401-12 | Ovulen tablets | Box of twelve 20 tablet dispenser refills |
| 0014-0401-07 | Ovulen-21 tablets | Box of six 21 tablet dispensers |
| 0014-0401-13 | Ovulen-21 tablets | Box of twelve 21 tablet dispenser refills |
| 0014-0401-08 | Ovulen-21 tablets | Box of forty-eight 21 tablet dispenser refills |
| 0014-0401-63 | Ovulen-21 tablets | Box of 10 containers, each holding one 21 tablet dispenser and two 21 tablet dispenser refills |
| 0014-0401-64 | Ovulen-21 tablets | Box of 100 containers, each holding one 21 tablet dispenser and two 21 tablet dispenser refills |
| 0014-0401-09 | Ovulen-28 tablets | Box of six 28 tablet dispensers, each containing 21 Ovulen tablets and 7 placebos |
| 0014-0401-14 | Ovulen-28 tablets | Box of twelve 28 tablet dispenser refills |
| 0014-0401-84 | Ovulen-28 tablets | Box of 10 containers, each holding one 28 tablet dispenser and two 28 tablet dispenser refills |
| 0014-0624-05 | Pro-Banthine 30 mg. vials | Box of 5 vials |
| 0014-0624-25 | Pro-Banthine 30 mg. vials | Box of 25 vials |
| 0014-0624-31 | Pro-Banthine 30 mg. vials | Box of 100 vials |
| 0014-0601-31 | Pro-Banthine 15 mg. tablets | Bottle of 100 tablets |
| 0014-0601-52 | Pro-Banthine 15 mg. tablets | Bottle of 1000 tablets |
| 0014-0601-55 | Pro-Banthine 15 mg. tablets | Bottle of 2500 tablets |
| 0014-0601-66 | Pro-Banthine 15 mg. tablets | Carton of 10 boxes, each containing 100 individually blister sealed tablets |

| Code No. | Product | Package size |
|----------|---------|--------------|
| 0014-0611-31 | Pro-Banthine 7.5 mg. tablets | Bottle of 100 tablets |
| 0014-0611-51 | Pro-Banthine 7.5 mg. tablets | Bottle of 500 tablets |
| 0014-0651-31 | Pro-Banthine P.A. 30 mg. tablets | Bottle of 100 tablets |
| 0014-0631-31 | Pro-Banthine with Phenobarbital tablets | Bottle of 100 tablets |
| 0014-0631-52 | Pro-Banthine with Phenobarbital tablets | Bottle of 1000 tablets |
| 0014-0631-66 | Pro-Banthine with Phenobarbital tablets | Bottle of 2500 tablets |
| 0014-0631-66 | Pro-Banthine Phenobarbital tablets | Carton of 10 boxes, each containing 100 individually blister sealed tablets |
| 0014-0661-31 | Probital tablets | Bottle of 100 tablets |
| 0014-0661-51 | Probital tablets | Bottle of 500 tablets |
| 0014-0641-51 | Pro-Banthine with Dartal tablets | Bottle of 500 tablets |

During 1974 and 1975, SCO also manufactured the active chemicals spironolactone, propantheline bromide, and methantheline bromide for use as raw materials in its pharmaceutical manufacturing operations. During 1974 and 1975, SCO also manufactured and sold to Dainippon the chemical haloperidol, the active chemical in the product Serenace. SCO also engaged in manufacturing operations leading to the chemical recovery of the active compounds spironolactone, hydrochlorothiazide, and propantheline bromide from otherwise unusable lots of pharmaceutical products. During 1974 and 1975, SCO did not perform the chemical manufacturing relative to Flagyl, Ovulen, Demulen, or Lomotil products.

## 2. Production Planning and Scheduling

SCO's production planning and scheduling was the responsibility of SCO's Director of Materials Control and his staff. Pursuant to the Marketing Agreement, petitioner's marketing staff provided SCO with quarterly sales forecasts of

sales of SCO's products. The first step in SCO's production planning and scheduling process was to revise the forecasts in view of SCO's experience and expectations and to take into account SCO's chemical and product inventories. Having thus modified the sales forecast, SCO's materials management group prepared a quarterly production forecast of SCO's product needs. Based upon that production forecast, SCO's materials management personnel prepared periodic production schedules detailing the days on which the various required manufacturing and packaging operations would be carried out.

### 3. *Inventory Control and Purchasing*

SCO maintained an inventory of more than 200 different types of raw materials necessary to its operations. Such materials were purchased from more than 65 separate suppliers. SCO's materials management personnel were responsible for maintaining adequate supplies of each of those raw materials.

Based upon their prepared production schedules, SCO's materials management employees prepared purchase requisitions for needed materials. Those requisitions specified for each purchase the amount to be purchased and the required delivery date. Each requisition also typically specified the vendor and often the purchase price of the material. In certain situations, an SCO purchase requisition could be prepared by petitioner's employees at Skokie, but only upon the telephone direction of a responsible person at SCO.

For most of the more than 200 raw materials purchased by SCO, purchase orders were prepared and submitted to suppliers by employees in SCO's purchasing department. Those materials included all supply items purchased from Puerto Rican vendors,[8] chemicals purchased from Searle de Mexico and Searle U.K., chemical solvents, and packaging components. With respect to about 30 chemical raw materials, printed package inserts, and some packaging compo-

---

[8]It was necessary for vendors of some raw materials to be approved by the U.S. Food and Drug Administration (hereinafter the FDA). The process of gaining approval for a new supplier of a raw material involved the joint efforts of SCO and petitioner. SCO quality control employees visited a new vendor's manufacturing facilities, inspected and tested the vendor's operations and products, and submitted a report of their findings to petitioner. Based upon a favorable recommendation by SCO, petitioner's regulatory affairs employees submitted requests for approval of that vendor from the FDA.

nents purchased from U.S. and "non-Searle" foreign vendors, purchase requisitions were sent by SCO's purchasing department to petitioner's purchasing department in Skokie. Petitioner's purchasing department kept on hand a limited number of SCO purchase order forms, pre-signed by SCO's purchasing manager. Generally, petitioner's purchasing department would complete the SCO purchase order, based upon the SCO prepared purchase requisition, from an approved vendor list and mail it to the vendor. In some cases, petitioner's purchasing agents would negotiate price and shipping arrangements with the supplier, although the ability to negotiate such matters was severely limited due to the fact that many of SCO's necessary raw materials were available only from one or two approved sources.

In cases where petitioner submitted an SCO purchase order to a materials vendor, copies of the purchase order were sent by petitioner to SCO. The supplier's invoice was sent to SCO either by petitioner or by the vendor directly, and SCO paid the vendor directly for the material. In nearly all cases, the materials were shipped direct from the vendor to SCO. A small number of chemical raw materials were shipped first to petitioner at Skokie and combined with other materials being shipped to SCO for reasons of shipping efficiency and economy. After raw materials were received by SCO, they were stored in SCO's raw materials warehouse in Caguas, Puerto Rico. SCO held legal title to and bore the risk of loss with respect to all raw materials used in its operations.

SCO purchased from petitioner, on a regular basis, printed labels for its product.[9] Such labels were printed by petitioner in its own print shop. On occasion, SCO would purchase from petitioner limited amounts of packaging components or generic chemicals to satisfy temporary shortages experienced by SCO. Such purchases were of materials originally supplied to petitioner by unrelated parties and were sold to SCO at prices charged to petitioner by those unrelated parties. All SCO's other labeling materials, which included package inserts, labels, and boxes, were purchased by SCO from unrelated vendors. Some of the

---

[9]Respondent has not alleged that the prices at which SCO purchased printed labels from petitioner were other than arm's- length prices.

unrelated vendors were vendors who supplied similar materials to petitioner.

## 4. *Chemical Sourcing*

Among the raw materials required by SCO in its manufacturing operations were the active chemical ingredients contained in its pharmaceutical products. SCO acquired the active chemicals for some of its products from unrelated parties. SCO purchased other active chemicals from Searle de Mexico, Searle U.K.,[10] and petitioner. SCO manufactured still others in its own chemical manufacturing facility in Caguas, Puerto Rico.

The major chemical raw materials used in SCO's products are listed below:

| *Pharmaceutical product* | *Active chemical ingredients* | *Principal chemical reactants used in manufacturing active chemical ingredients* |
|---|---|---|
| Aldactone | Spironolactone | Aldadiene |
|  |  | Thiolacetic aid |
| Aldactazide | Spironolactone | Aldadiene |
|  |  | Thiolacetic acid |
|  | Hydrochlorothiazide | Purchased by SCO |
| Banthine | Methantheline bromide | Diethylaminoethylchloride hydrochloride (DEC) |
|  |  | Xanthanoic acid |
| Banthine with Phenobarbital | Methantheline bromide | DEC |
|  |  | Xanthanoic acid |
|  | Phenobarbital | Purchased by SCO |
| Demulen | Ethynodiol diacetate | Purchased by SCO |
|  | Ethinyl estradiol | Purchased by SCO |
| Ovulen | Ethynodiol diacetate | Purchased by SCO |
|  | Mestranol | Purchased by SCO |
| Flagyl | Metronidazole | Purchased by SCO |
| Lomotil | Diphenoxylate hydrochloride with atropine sulfate | Purchased by SCO |
| Pro-Banthine | Propantheline bromide | Diisopropylamino-ethylchloride hydrochloride (DIPC) |
|  |  | Xanthanoic acid |
| Pro-Banthine with Phenobarbital | Propantheline bromide | DIPC |
|  |  | Xanthanoic acid |

[10]Neither Searle de Mexico nor Searle U.K. owned any U.S. patents relating to the manufacture, use, or sale of the chemicals that they supplied to SCO. Respondent has not proposed an adjustment in this case to the prices paid by SCO to Searle de Mexico or Searle U.K. for raw materials.

| Pharmaceutical product | Active chemical ingredients | Principal chemical reactants used in manufacturing active chemical ingredients |
| --- | --- | --- |
|  | Phenobarbital | Purchased by SCO |
| Pro-Banthine with Dartal | Propantheline bromide | DIPC Xanthanoic acid |
|  | Thiopropazate dihyclrochloride | Purchased by SCO |
| Serenace | Haloperidol | Chlorofluorobutyrophenone (CFB) Chlorophenylhydroxypiperidin (CPP) |

In terms of dollar cost, SCO's most significant raw material purchases generally were its purchases of active chemical ingredients. Listed on page 288 are the principal chemical raw materials, the primary suppliers, and the dollar amounts of those chemical raw materials purchased by SCO for use in its chemical and pharmaceutical manufacturing operations during 1974 and 1975. In addition to the chemicals listed on page 288, SCO purchased other generic chemical materials and ingredients from a variety of unrelated suppliers for use in its chemical and pharmaceutical manufacturing operations.

The active chemical ingredient in Aldactone and Aldactazide is spironolactone. Spironolactone is a steroid derived, during 1974 and 1975, from the barbasco root, a plant indigenous to the southern portion of Mexico. The Mexican Government imposes prohibitively high export duties on the export of unrefined barbasco root in order to stimulate employment in Mexico. Accordingly, it was necessary to refine the barbasco root in Mexico. During the years in issue, Searle de Mexico refined the barbasco root and manufactured the last-stage intermediate chemical, Aldadiene, for sale to SCO. SCO, using the Aldadiene as a starting material, performed the last of 15 steps in the manufacture of the chemical Spironolactone in its facility in Caguas, Puerto Rico. Immediately before the transfer of the products Aldactone and Aldactazide to SCO, petitioner also had manufactured spironolactone from Aldadiene it acquired from Searle de Mexico, although in earlier years petitioner had performed the additional Aldadiene manufacturing step in Skokie, Illinois.

| Chemical purchased | Pharmaceutical product to which chemical related | Principal supplier | Amount purchased in 1974 | Amount purchased in 1975 |
|---|---|---|---|---|
| Aladdien Aldactazide | Aldactone | Searle de Mexico | $3,936,000 | $4,225,000 |
| Thiolacetic Acid Aldactazide | Aldactone | Evans Chemetics | Not available | 36,828 |
| Hydrochlorothiazide | Aldactazide | CIBA Pharmaceutical Co. | Not available | 894,735 |
| Metronidazole | Flagyl | Rhodia, Inc. | Not available | 1,179,188 |
| Diphenoxylate Hydrochloride with Atropine Sulfate | Lomotil | Mallinckrodt, Inc. | Not available | 195,154 |
| Ethynodiol Diacetate | Ovulen Demulen | Searle de Mexico | $1,007,000 | 536,000 |
| Mestranol | Ovulen | Searle de Mexico | 68,000 | 0 |
| Ethinyl Estradiol | Demulen | Searle de Mexico | 13,764 | Not available |
| Diisopropylaminoethyl-chloride hydrochloride (D.I.P.C.) | Pro-Banthine | G.D. Searle & Co. | Not available | Not available |
| Xanthanoic Acid | Pro-Banthine Banthine | Mallinckrodt, Inc. | Not available | $313,779 |
| Diethylaminoethyl-chloride hydrochloride (D.E.C.) | Banthine | Michigan Chemicals, Inc. | Not available | Not available |
| Chlorophenylhydroxy-pipiridine (CPP) | Serenace (haloperidol) | G.D. Searle & Co., Ltd. (U.K.) | Not available | Not available |
| Chlorofluorobuytyro-phenone (CFB) | Serenace (haloperidol) | G.D. Searle & Co., Ltd. (U.K.) | Not available | Not available |
| Thiopropazate Hydrochloride | Pro-Banthine with Dartal | Mallinckrodt, Inc. | Not available | $23,688 |
| Phenobarbital | Pro-Banthine with Phenobarbital | Mallinckrodt, Inc. | Not available | 13,234 |

Aldactazide also contained the active chemical hydrochlorothiazide. Hydrochlorothiazide was, in 1974 and 1975, a patented product of Ciba, a company unrelated to petitioner and SCO. SCO purchased its supplies of hydrochlorothiazide from Ciba on a purchase order basis, the same method by which petitioner had obtained the chemical prior to the transfer of the product Aldactazide to SCO.

The active chemicals in the products Banthine and Pro-Banthine, Methantheline bromide and Propantheline bromide, respectively, were manufactured by SCO in its chemical manufacturing facility in Caguas. The chemicals were manufactured from late stage intermediate chemicals purchased from petitioner and unrelated parties. During the period that petitioner manufactured methantheline bromide and propantheline bromide prior to its transfer of the Banthine and Pro-Banthine products to SCO, petitioner purchased the same intermediate chemicals from unrelated parties.

The active chemical ingredient in the product Flagyl, metronidazole, was purchased by SCO from Rhodia, Inc. Metronidazole had similarly been purchased by petitioner from Rhodia, Inc., prior to the transfer to SCO of the product Flagyl. The active chemical in the product Lomotil, diphenoxylate hydrochloride, was purchased by SCO from Mallinckrodt, Inc. (hereinafter Mallinckrodt). Diphenoxylate hydrochloride similarly had been purchased from Mallinckrodt by petitioner prior to the transfer of the product Lomotil to SCO. Diphenoxylate hydrochloride is a narcotic which is subject to extensive manufacturing and prescribing controls. However, because the diphenoxylate hydrochloride in Lomotil was combined with the anticholinergic atropine sulfate, Lomotil was classified as an "exempt narcotic" subject to less stringent controls than those applied to disphenoxylate hydrochloride alone. By purchasing the diphenoxylate hydrochloride already in combination with atropine sulfate from Mallinckrodt, a supplier approved by the Bureau of Narcotics and Dangerous Drugs, petitioner thereby avoided the necessity of complying with the strict regulatory requirements applicable to the manufacturers of narcotics and the expenses resulting from such compliance.

The active chemical ingredients in SCO's oral contraceptive products, Ovulen and Demulen, are the synthetic progestogen ethynodiol diacetate and the synthetic estrogens mestranol (Ovulen) and ethinyl estradiol (Demulen). Those chemicals were synthetic steroids acquired by SCO from Searle de Mexico. During 1974 and 1975, the only raw material from which those chemicals could be manufactured was the Mexican barbasco root. As with the Aldactone/ Aldactazide chemical, because of Mexican Government restrictions, it was necessary to refine the barbasco root in Mexico. Accordingly, during the period that petitioner manufactured Ovulen and Demulen, petitioner purchased the raw active chemical ingredients for the chemicals ethynodiol diacetate, mestranol, and ethinyl estradiol from Searle de Mexico. Petitioner performed the final steps of the chemical manufacture of those chemicals in its facility at Skokie, Illinois. After the commencement of SCO's manufacturing operations, the complete chemical manufacture of ethynodiol diacetate, mestranol, and ethinyl estradiol was performed by Searle de Mexico.

The active chemical ingredient in the product Serenace, haloperidol, was manufactured by SCO in its chemical manufacturing facility in Caguas, Puerto Rico. SCO used as starting materials in those chemical manufacturing operations two intermediate chemicals manufactured and sold to SCO by Searle U.K.

5. *Chemical Manufacturing*

During the years 1974 and 1975, SCO manufactured the active chemical ingredients for use in the pharmaceutical manufacture of its Aldactone, Aldactazide, Banthine, Pro-Banthine, and Serenace products. The chemical manufacturing process began with the issuance, by SCO's manager of chemical manufacturing, of a production ticket for the particular lot of chemical to be manufactured. The chemical processes involved consisted of additions to and reactions with late or last-step chemical intermediates purchased by SCO. The resulting solutions were filtered, washed, distilled or crystallized, dried, recrystallized, and milled. The processes required from 3 to 8 workdays per lot, depending upon the chemical manufactured. The mixing of reactants

often took place in the presence of solvents or catalysts, and were sometimes heated under controlled pressure. Some of the chemical manufacturing procedures conducted by SCO involved exposure to chemical drug substances having potentially harmful side effects so that special equipment and precautions were necessary.

SCO's chemical manufacturing department worked a 40-hour week. The department consisted of a manager, 2 supervisors, and approximately 12 production workers. The manager of the department, as well as the 2 production supervisors, had college degrees in science. The production workers involved in the chemical manufacturing operations generally were high school graduates. Certain of SCO's operations require operators to have as much as 2 years on-the-job training.

The active chemicals produced by SCO were thoroughly tested by SCO's quality control department for the satisfaction of each chemical's quality control tests. Chemicals that satisfied those tests were placed in SCO's warehouse for use in its pharmaceutical manufacturing operations. Materials failing those tests were rejected and returned to chemical manufacturing for reworking, recovery of active ingredients, or destruction.

### 6. *Pharmaceutical Manufacturing and Packaging*

The term "pharmaceutical manufacturing" refers to the production of the final dosage forms of pharmaceutical products in tablet, liquid, or vial form and the packaging of said products. With reference to tablets, pharmaceutical manufacturing includes the mixing and compressing of active and inert ingredients.

During the years in issue, SCO manufactured pharmaceutical products in several different dosage presentations. Those presentations included tablets, coated tablets, liquid, and sterile ampuls. Regardless of the dosage presentation, the pharmaceutical manufacturing process of each lot of pharmaceutical product, ingredient, or bulk chemical began with the issuance of a production ticket by SCO's manager of pharmaceutical manufacturing. Production tickets for new lots of products were issued according to the production schedules prepared by SCO's materials management staff.

SCO's pharmaceutical manufacturing department consisted of approximately 188 persons. Of those, approximately 144 were production workers. SCO's production workers generally had high school degrees, some technical education, and on-the-job training.

SCO's tableted products were manufactured by weighing and mixing the various active chemicals and inert additives. Those materials were moistened and blended, compressed by machine into tablets and, for Banthine and Pro-Banthine products, coated with a sugar solution to mask their disagreeable taste. The production tickets were periodically reviewed, equipment was cleaned and inspected, samples of the chemical mixtures and finished tablets were taken, and visual and laboratory tests were performed to determine the quality of the products manufactured.

The products that passed SCO's quality control testing were released for packaging. Those that were rejected were assigned for pharmaceutical rework, chemical recovery, or destruction. Rework material was ground and included in subsequent lots of tablets. Chemical recovery was used to extract the active chemical ingredients from rejected tablets for later use.

The finished tablets were packaged by SCO in a variety of presentations, including bottles of various sizes and blister packages for oral contraceptive products. With the following two exceptions, SCO packaged all of the pharmaceutical products that it manufactured during 1974 and 1975. During 1974 and 1975, Sharp Corp. packaged blister-pack presentations of SCO's products other than oral contraceptives. In addition, during those 2 years, samples of SCO's products were packaged by petitioner. SCO paid petitioner the following fees for sample packaging services:

| Year | Fees |
|------|------|
| 1974 | $1,425,000 |
| 1975 | 1,599,000 |

Purchase orders for such services were issued by SCO's purchasing department and such contract packagers billed SCO directly for their services.

In addition to tablets, SCO manufactured Lomotil in liquid form and Banthine and Pro-Banthine in sterile ampul form.

The Lomotil liquid was manufactured by mixing, heating, and dissolving the active ingredients in a liquid solution. The process required 2 days to complete, after which the manufactured material was tested, placed into bottles, and packaged for shipping. The Banthine and Pro-Banthine sterile ampuls are used for direct injection by a physician into a patient's blood stream. Because of the method of delivery, the sterility of the product is of paramount importance. The active chemical ingredients were purified by being put in solution, filtered, recrystallized, and sieved. The ampuls and stoppers were then heat sterilized, filled and sealed in a special sterile room, and packaged for shipping.

Subsequent to final packaging of SCO's products and release of those packaged products for shipment by SCO's quality control department, the final packaged products were warehoused by SCO at its Caguas, Puerto Rico, facility. These goods were warehoused until such time as they were required to fill orders of SCO's customers. Generally, SCO attempted to maintain no more than a 6-week supply of finished goods in its warehouse awaiting sale to its customers. SCO maintained no warehouse facilities outside of Puerto Rico.

### 7. Production Tickets

A production ticket is a document listing the step-by-step procedures for the manufacture of the particular chemical or pharmaceutical product to which it relates. The production ticket contains instructions for operators to follow in their activities, and specifies the ingredients, materials, pressures, temperatures, reaction times, equipment, and quality control tests necessary for the manufacture of any particular active ingredient or finished product. The production ticket provides space for the operator, his supervisor, and quality control employees of SCO to sign and countersign at each stage of the process indicating that proper procedures have been followed. Some of SCO's chemical manufacturing processes require the production ticket to be signed as many as 60 times each by the operator and the supervisor. A completed production ticket, together with all supporting documentation, is referred to as a "batch record."

The production tickets issued for each lot of a product were prepared from master copies of such production tickets. Master copies of the production tickets were maintained both by SCO in Caguas and by petitioner in Skokie.

The manufacturing procedures contained in SCO's production tickets were the same as or similar to those used by petitioner when the products were manufactured in Skokie. SCO consequently used the same production tickets as were previously written and utilized by petitioner, with some modifications. Modifications to production tickets relating to SCO's chemical manufacturing activities were under the direction and supervision of SCO's chemical development personnel. Modified chemical manufacturing production tickets were written by SCO employees in the SCO chemical development laboratory, and reviewed and approved by SCO chemical manufacturing and quality control personnel.

Modifications to production tickets relating to pharmaceutical manufacturing were under the direction and control of SCO's pharmaceutical manufacturing personnel. SCO employees originated any necessary changes, and SCO employees evaluated and approved the changes. Approval by petitioner of the modifications to production tickets was not required before SCO could initiate such modifications in its manufacturing processes. However, petitioner's regulatory affairs personnel reviewed such modifications to determine whether the submission of a supplemental New Drug Application (hereinafter NDA) to the FDA was warranted. During 1974 and 1975, there were no changes in SCO's procedures significant enough to require the filing of NDA supplements.

In 1975, petitioner and SCO undertook a revision of the format of all their pharmaceutical production tickets. The change was first suggested by SCO's Director of Quality Control. Upon his suggestion, a joint task force was formed consisting of petitioner's and SCO's quality control, manufacturing, and regulatory affairs personnel. The group agreed on a basic format, which was tested using one of petitioner's existing products manufactured in Skokie. SCO then provided substantive information for the revision of its production tickets to an employee in petitioner's quality control division. That employee prepared the information in

a uniform format, caused the new production tickets to be printed in Skokie's print shop, forwarded copies of those tickets to SCO for approval, and later traveled to Puerto Rico to train SCO's production workers and supervisors in the proper completion of the tickets.

8. *Quality Control*

As of December 31, 1974 and 1975, SCO employed 39 and 49 people, respectively, in its quality control department, including 8 pharmacists and chemists. In the normal course of its operations, SCO performed all required quality control tests on raw materials and in-process products without assistance from petitioner. The tests included laboratory testing and assays of the physical and chemical qualities of all incoming raw and in process materials, and visual and manual testing of all packaging and labeling materials. In order to evaluate the raw materials, specimens of a statistical sample of all incoming raw materials were taken. These raw material specimens were subjected to laboratory testing and assay work. Packaging and labeling materials, including components, were examined visually and manually to determine conformity with specifications. Based upon the results of its quality control tests, SCO's quality control department released for use or rejected the shipment of the raw material tested. SCO's quality control department also sampled and tested the products manufactured by SCO at each stage of the manufacturing process. Each lot of product produced by SCO was sampled and tested by employees of SCO's quality control department prior to its release for sale to customers.

SCO's quality control department reviewed recordkeeping, batch records, and packaging records maintained by SCO's personnel relative to manufacturing operations and related activities. Routinely, SCO's Director of Quality Control determined when to release each lot of finished goods for shipment to customers. When finished goods were released for shipment, all completed batch records and records of quality control tests relating to that lot were filed at SCO's facility in Caguas, Puerto Rico, together with the retention samples of the product. Copies of these records were forwarded to the quality control employees of GDS in Skokie, Illinois. In addition, selected retention samples were

forwarded to the employees of GDS's quality control department in Skokie.

With one exception, SCO also normally performed all quality control tests on finished products. SCO's quality control department did not have the facilities to perform stability testing on its finished products. That testing, to ensure that a drug does not lose its potency before the assigned expiration date, was performed by petitioner in Skokie.

Petitioner employed 97 persons in its production quality control department as of December 31, 1975. While petitioner did not routinely perform quality control tests on materials and products of SCO, it did from time to time provide assistance, advice, or instruction to SCO quality control employees at SCO's request. Petitioner also performed approximately 20 analytical tests per year on SCO's raw materials. SCO reimbursed petitioner for the cost of the quality control assistance and testing performed at its request.

Some of the analytical test procedures used by SCO's quality control employees were prepared and approved by petitioner's personnel. Those procedures complied with the procedures prescribed in the U.S. Pharmacopoeia, a national drug compendium. SCO developed other test procedures it used in Caguas, Puerto Rico.

SCO developed and implemented Good Manufacturing Practice (hereinafter GMP) training programs with the assistance of petitioner. SCO had its own GMP manual, which was drafted by SCO employees in conjunction with quality control employees of petitioner. SCO employees also participated in drafting similar manuals with petitioner for petitioner's use in Skokie.

## 9. *Product Recalls*

A recall of a prescription pharmaceutical product is initiated by a company or by the FDA whenever a defect is discovered in a product that has been forwarded to the marketplace. When such a recall is initiated by the company, itself, it is referred to as a voluntary recall.

Prior to 1975, SCO had never recalled any of its products. In that year, however, SCO experienced recalls of seven lots

of its products. These recalls resulted from a variety of manufacturing and packaging defects, each limited to a single lot.

Recalls of prescription pharmaceutical products are considered very serious in the pharmaceutical industry and the recalls of SCO's products in 1975 were considered as such by personnel of SCO and petitioner. Recalls can be characterized based upon the seriousness of the problem with the recalled product. Category 1 recalls are life threatening. Category 2 recalls affect the therapeutic outcome but are not life threatening. Category 3 recalls are less serious and would not tend to affect the therapeutic outcome. The recalls of SCO's products in 1975 would have been characterized as either category 2 or category 3 recalls. However, the number of recalls experienced by SCO caused great concern to SCO and petitioner's management.

The first recall experienced by SCO in 1975 involved the discovery that certain Aldactazide tablets had reddish spots caused by raspberry flavoring particles, which necessitated the recall of an entire lot of tablets. The second recall involved a lot of Probital tablets which had hollow cores and did not contain any active ingredient. The third recall involved a decision to reduce the shelf life of Pro-Banthine P.A. from 5 years to 2 years, and to recall products outstanding which had a shelf life of over 2 years shown on their labeling. The fourth and fifth recalls involved the bottling of Lomotil tablets in Aldactazide bottles. This required the recall of one lot of Lomotil tablets and one lot of Aldactazide tablets. The sixth recall involved Flagyl tablets which had a peppermint odor similar to the peppermint flavor used in manufacturing Aldactone and Aldactazide tablets. This recall involved an investigation of the source of the peppermint used in manufacturing Aldactone and Aldactazide tablets and analysis of the product to discover whether residue of the peppermint remained in the Flagyl tablets. The seventh recall involved a lot of Flagyl tablets which were too thin as a result of the malfunctioning of a tablet press.

Recalls of SCO's products were initiated jointly by personnel of petitioner's quality control staff and SCO. The products recalled by SCO were initially returned to peti-

tioner. Some of the recalled products were then destroyed by petitioner and some were returned to SCO.

Petitioner's regulatory affairs personnel were responsible for the liaison with the FDA relative to recalls of SCO products. SCO employees participated in the investigation and accompanied FDA inspectors through on-site inspections in Puerto Rico. The FDA prepares drug defect reports relative to prescription pharmaceutical products about which complaints are received. Preparation and submission of these reports relative to SCO's products were handled by petitioner's personnel who were also responsible for the followup, reply, and statement as to corrective actions taken relative to said problems.

SCO's management viewed the series of recalls in late 1975 as a very serious matter. Mr. Lawhead concluded that the recalls, and the manufacturing problems leading up to those recalls, evidenced deep-seated problems in SCO's manufacturing operations. As a result, he recommended to his immediate supervisors in Skokie that an audit team comprised of non-SCO employees be sent to SCO to conduct an in-depth review of SCO's operations. Petitioner's management agreed with this proposal and three experienced employees of petitioner were sent to SCO's facility in Caguas, Puerto Rico, and conducted a thorough on-site audit of SCO's operations from October 1975 through February 1976. The audit resulted in certain recommendations for the improvement of SCO's operations.

## VI. *Sale and Distribution of SCO's Products*

### A. *Identity of SCO's Customers*

From August 1969 until approximately October 1, 1970, SCO sold its products to petitioner. Petitioner resold SCO's products to unrelated wholesalers, hospitals, and clinics. During September and October 1970, SCO began to sell its products directly to unrelated drug wholesalers located in the United States. Effective September 1, 1970, petitioner and SCO entered into a Marketing and Sales Promotion Agreement. At the same time that SCO began to sell its products to unrelated parties, SCO entered into manufacturer-wholesaler agreements with each of its more

than 400 drug wholesaler customers. The agreements which were renewed annually provided that title to SCO's products would pass to the customer upon delivery to a common carrier in Puerto Rico.

During 1974 and 1975, approximately 97 percent of SCO's sales were made by SCO directly to unrelated customers, primarily independent drug wholesalers. Generally, SCO's independent wholesale customers were also customers of petitioner as well as of most other pharmaceutical companies. SCO also sold products to petitioner for petitioner's resale to certain tax-supported hospitals. All SCO sales to petitioner were at SCO's standard prices to wholesalers.

SCO published and distributed to its customers its own retail and wholesale price lists. During the years 1969 through 1975, the prices at which SCO's products were sold to wholesalers were recommended by employees of petitioner. During 1974 and 1975, there were seven changes in SCO's price list on the basis of recommendations by petitioner's employees.

## B. *Orders of SCO's Products*

Orders for SCO's products were made on SCO's own order forms and addressed to SCO, P.O. Box 5110, Skokie, Illinois. SCO's forms listed only SCO's products. Such order forms were a different color from petitioner's order forms, but SCO's and petitioner's order forms used during 1974 and 1975 were similar in format and were mailed to the same address by customers.

Upon receipt of an SCO order form, the information from the form was immediately entered into petitioner's computer by one of petitioner's employees located in Skokie.[11] Orders thus entered were communicated without change to a computer terminal at SCO in Puerto Rico via a dedicated communication network. Generally, order processing was done the same day that the orders were received in Skokie.

SCO received the orders via the communications network, generally on the morning after the order was received at Skokie. SCO filled the order for its products from inventory

---

[11]Petitioner's computer system had a net book value of $608,592 as of Dec. 31, 1975. Petitioner employed 8 clerks at an average salary of $11,000 for the processing of petitioner's and SCO's orders and for communication with SCO. Petitioner employed an additional 27 employees in customer relations and customer service related to its and SCO's products.

in its warehouse located at its Caguas, Puerto Rico, facility. The order was then shipped by SCO, via public air carrier, directly to the customer that placed the order. Orders generally were filled by SCO within 2 days of their receipt. When an order was prepared for shipment, the items to be shipped were entered by SCO employees into the computer terminal in Puerto Rico and transmitted to petitioner in Skokie via the communications network. Invoices were prepared on a line-by-line basis in petitioner's computer. The information then was transferred back to SCO's computer terminal and its invoices were printed on the attached printer. SCO sent a copy of the invoice to the purchaser, generally within 2 days of shipment of the order. The SCO invoices directed that payment be made to SCO in Puerto Rico. In the event a product was temporarily out of stock, SCO communicated that fact to its customers on the invoice, which directed the customer to reorder.

## C. *Billing Procedures*

Purchasers of SCO's products were billed directly by SCO. SCO's sales invoices were payable 50 days net from the date of the invoice and directed customers to make payment to SCO in Puerto Rico. SCO extended credit to its customers and bore exclusively the resulting risk that customers would pay late or not pay at all. SCO monitored its accounts receivable by means of a monthly accounts-receivable aging report prepared from information entered into petitioner's computer system by SCO's accounting personnel. If an account became delinquent, employees of SCO sent correspondence to the customer requesting payment. Copies of that correspondence were sent to employees of petitioner, who on occasion assisted with collection or billing problems. SCO bore the risk that its customers would make late payments for its products or that its customers would, for any reason, refuse or be unable to pay. If payment of an overdue receivable was not forthcoming, SCO put a credit hold on a customer's account. In 1974 and 1975, SCO wrote off as bad debts approximately $50,000 and $51,163, respectively.

### D. *Other Distribution Procedures*

Under the terms of purchase printed on SCO's order forms and invoices and contained in its manufacturer-wholesaler agreements, title to all products sold by SCO passed to the purchaser at the time the products were delivered to the common carrier in Puerto Rico.

Under the terms of its agreements with its wholesalers, SCO obtained insurance on behalf of its customers, covering loss or damage to goods shipped from Puerto Rico while in transit. Negotiations with respect to that insurance were conducted by personnel of petitioner. Petitioner received the bills for such insurance and forwarded them to SCO. In the event of loss or damage to goods sold by SCO while in transit, petitioner, acting pursuant to the Marketing Agreement, assisted the wholesaler in filing and pursuing insurance claims, if requested to do so by the wholesaler.

Under the terms of SCO's manufacturer-wholesaler agreements, the return of goods was permitted under a published, uniformly applied policy. That policy was identical to the one contained in petitioner's manufacturer-wholesaler agreements. Goods could be returned by wholesalers, hospitals, and retailers if they were defective or if they had aged not more than 1 year past their expiration date. Qualifying returned SCO goods were sent by wholesalers to petitioner and generally were forwarded by petitioner to SCO. SCO reimbursed petitioner or the wholesaler for the amounts credited to customers returning SCO's products. Petitioner's activities with respect to returned goods were provided for in the Marketing Agreement.

### VII. *Petitioner's Marketing Operations*

### A. *Introduction*

During the years 1974 and 1975, petitioner maintained a marketing and sales administration and customer service staff in Skokie as well as a field sales force operating throughout the United States. Petitioner's Skokie marketing staff and field sales force marketed petitioner's pharmaceutical products and provided marketing services to SCO under the Marketing Agreement.

It is the practice of leading pharmaceutical firms such as petitioner to establish a brand name or trademark name for their chemical compounds once they are placed on the market. The value of a trademark lies in the knowledge and experience physicians associate with a product. Thus, trademarks of products with market acceptance have substantial value. All of the products marketed by petitioner had trademarks which were used in identifying those products to physicians and other health care professionals.

## B. *Marketing of SCO's Products*

The September 1, 1970, marketing agreement between petitioner and SCO required petitioner to perform marketing services on behalf of SCO in the United States and foreign installations of the U.S. Government. Marketing services were defined to include sales representation, sales administration, professional education, market and promotion planning, and advertising.

### 1. *Sales Representation*

The method of sales representation typically employed in the pharmaceutical industry is the direct contact, or "detailing," method. Sales representatives call on physicians and other health care professionals to discuss (or give "details" about) their companies' pharmaceutical products and to urge the health care professionals to prescribe, recommend, or utilize those products. This method of promotion recognizes that physicians are the ones who most directly affect buying decisions relating to ethical pharmaceutical products.

Petitioner's principal method of marketing ethical pharmaceutical products involved the direct contact, or detailing, method. In addition, petitioner's marketing operations included printed advertising and the distribution of printed literature, promotional activities at conventions and medical schools, and other promotional activities.

During 1974 and 1975, petitioner's sales force consisted of approximately 405 sales representatives, 37 district sales managers, 6 regional sales managers, and a national sales director. New sales representatives were hired by the district sales manager and were typically in their mid-20's.

They were selected on the basis of three standardized tests, two of which related to personality and one of which related to intelligence. Although petitioner did not require its sales representatives to have college degrees, approximately 72 percent of its representatives during 1974 and 1975 had either 2-year or 4-year college degrees and approximately 3 percent had graduate degrees.

During 1974 and 1975, initial training of new sales representatives was conducted by the district sales managers in the field. Each new sales representative received 4 weeks of product training during which he learned the specific medical attributes of petitioner's and SCO's products as well as the medical attributes of competitors' products. Such training generally included oral and written examinations. Additionally, the district sales manager or an experienced sales representative spent approximately 6 months with the new representative calling on physicians in the field. At the end of approximately 12 months of employment, the new sales representative attended a 2-week training session in Skokie, where 1 week was spent introducing the new representative to the activities of petitioner's various departments, and 1 week was spent reviewing basic selling skills. After approximately 24 months of employment, the sales representative attended a 1-week training session in Skokie. Experienced sales representatives also received periodic training.

The principal activity of petitioner's sales representatives during 1974 and 1975 was calling on physicians. Sales representatives spent more than 60 percent of their time in this activity. The purpose of such visits was to explain the function of one or two pharmaceutical products and to deliver descriptive materials and samples. The sales representatives were conversant with the physicians about technical medical questions concerning petitioner's and SCO's products. If a sales representative was unable to answer a physician's question, he would obtain the necessary information from or relay the question to petitioner's medical department. A typical sales representative of petitioner during 1974 and 1975 saw between five and seven physicians each working day and spent an average of 3 to 5 minutes with each physician.

The balance of the sales representatives' time was spent primarily in contacting retail pharmacies, wholesalers, hospitals, and hospital and clinical pharmacies in order to check on product stock and to urge the customers to maintain supplies of petitioner's and SCO's products. A minor amount of time also was spent in arranging symposia and film presentations for health care providers.

The descriptive materials regarding SCO's products delivered to physicians by petitioner's sales representatives were all copyrighted by "Searle & Co., San Juan, Puerto Rico 00936." The materials identified the products involved by name; the boxed-in word "SEARLE," followed by a smaller "Searle & Co. San Juan, Puerto Rico 00936" was printed underneath. Beneath those words was printed: "Address medical inquiries to: G.D. Searle & Co. Medical Department, Box 5110 Chicago, Illinois 60680." Petitioner's sales representatives identified themselves to physicians as "Searle sales representatives" or simply, "Searle men."

The work of petitioner's sales representatives was monitored by petitioner through a reporting system that processed and tabulated reports by the sales representatives of each call on a physician or other health care provider. Upon each visit to a doctor or other health care professional, the sales representative marked a card recording the visit and the product or products discussed. That information was transmitted to petitioner's marketing administration staff in Skokie for recording and tabulation. That information indicated that in 1974 and 1975, 77 percent and 90 percent, respectively, of the total sales effort by petitioner's sales force was with respect to SCO's products.

In 1974 and 1975, petitioner's sales representatives made a total of 764,521 and 769,482 calls, respectively, with respect to petitioner's and SCO's products, as follows:

| | Number of calls | |
| --- | --- | --- |
| Type of call | 1974 | 1975 |
| M.D.'s (office based) | 393,913 | 450,165 |
| Interns and residents | 68,332 | 76,894 |
| Hospital staff | 90,945 | 96,829 |
| Total physicians | 553,190 | 623,888 |
| Hospital calls | 53,292 | 52,868 |
| Hospital dispensaries | 4,538 | 3,685 |
| Retail | 137,824 | 72,545 |

| Type of call | Number of calls | |
|---|---|---|
| | 1974 | 1975 |
| Wholesaler calls | $8,737 | $8,419 |
| Wholesaler meetings | 582 | 423 |
| Films | 6,358 | 6,472 |
| Symposia | - - - | 1,182 |
| Total calls | 764,521 | 769,482 |

## 2. *Marketing and Sales Administration*

In addition to the selling function performed by the sales representatives, petitioner performed other marketing and sales administration services on behalf of SCO. In the area of sales administration, petitioner's marketing staff aligned sales territories, administered salaries, constructed exhibits, and distributed sales material. It also trained salesmen and administered special markets. In the area of professional education, petitioner arranged symposia and professorships, developed learning systems, and arranged an in-house publication. In the area of market and promotion planning, petitioner developed market plans for existing products, developed and scheduled advertising and sales material, provided sales forecasts, insured that all marketing materials complied with Federal, State, and local law and regulations (including FDA regulations) as well as its own worldwide corporate standards, performed advertising research and advertising media selection, and developed lists for direct mail marketing. In the area of advertising, petitioner's staff dealt directly with advertising agencies, directed advertising development, and was responsible for media approval. Petitioner's marketing staff also performed long-range market planning. As of December 31, 1975, petitioner had 67 employees on its marketing staff in Skokie.

## 3. *SCO's Marketing Fee Payments to Petitioner*

In 1974 and 1975, SCO paid petitioner marketing fees as provided for in the marketing agreement. This agreement called for fees based upon 25 percent of SCO's net sales in the United States, or petitioner's cost of performance plus 25 percent, whichever was greater. The marketing fees actually paid with respect to 1974 and 1975 were computed on the basis of 25 percent of SCO's net U.S. sales, since that

figure exceeded the amount petitioner determined to be its cost of performance plus 25 percent in those years. During the years 1970 through 1975, SCO paid petitioner the following marketing fees pursuant to the marketing agreement (000's omitted):

| Year | Marketing fee | Year | Marketing fee |
|------|--------------|------|--------------|
| 1970 | $6,144 | 1973 | $25,057 |
| 1971 | 14,524 | 1974 | 27,522 |
| 1972 | 22,103 | 1975 | 33,243 |

Petitioner incurred the following annual marketing expenses relative to SCO's products based upon the method employed by petitioner to compute its cost of performance as provided in the marketing agreement (000's omitted):

| Year | Petitioner's marketing expenses |
|------|--------------------------------|
| 1974 | $11,123 |
| 1975 | 14,861 |

### 4. SCO's Other Marketing Expenses

In addition to the payment of the marketing fee to petitioner, SCO also paid marketing expenses to certain unrelated parties. These expenses included payments to journals for advertising space, payments to advertising agencies for services rendered, and expenses of professionals speaking at symposia. Such promotion was arranged by petitioner's employees in accordance with the terms of the marketing agreement. The amounts paid by SCO to unrelated parties for marketing and promotion in the United States during 1974 and 1975 are set forth below:

| Year | Direct advertising and other promotion expenses |
|------|------------------------------------------------|
| 1971 | $3,032 |
| 1972 | 4,494,000 |
| 1973 | 3,717,000 |
| 1974 | 3,512,000 |
| 1975 | 5,589,000 |

In addition, SCO paid marketing fees to G.D. Searle Inter-American Co. of $232,000 in 1974 and $311,000 in 1975, and to Searle Caribbean (the corporate successor of G.D. Searle Inter-American Co.) of $40,000 in 1975 with respect to their marketing of SCO's products in Puerto Rico.

The amounts paid by SCO to petitioner for sample packaging expenses were based upon petitioner's costs. SCO's sample expenses including payments to petitioner for packaging are as follows:

| Year | Sample expenses |
|------|-----------------|
| 1971 | $1,095,000 |
| 1972 | 1,692,000 |
| 1973 | 1,849,000 |
| 1974 | 2,540,000 |
| 1975 | 2,402,000 |

## VIII. *Research and Development Activities*

### A. *Introduction*

The pharmaceutical industry is research intensive and most, if not all, leading pharmaceutical firms make extensive investments in research and development in order to discover new products to market. As used in this context, the term "research" refers to activities such as the creation of new compounds, screening compounds for potential product development, and studying initial toxicological effects. The term "development" refers to activities related to compounds that have been screened in research and either appear to have marketing potential or are already being sold. Development includes short- and long-term toxicology studies, development and improvement of manufacturing processes, production of clinical trial materials and performance of clinical trials. Clinical trials are studies of the effectiveness and safety of a drug in humans. The term "control" refers to the performance of analytical assays on research materials, purchased materials, and manufactured items.

As early as the 1930's, petitioner's management had made the decision to invest heavily in research and development in order to develop products which could be marketed on a nationwide basis. During 1970 through 1975, the worldwide pharmaceutical research of petitioner and its consolidated subsidiaries was directed towards seven general therapeutic areas. These included the study of cardiovascular-renal diseases, gastrointestinal disorders, sexual disorders and reproduction, immunology and inflama-

tory diseases, infectious diseases, metabolic diseases, and research on the central nervous system for the treatment of depression, convulsions, narcotic addiction, psychosis, and pain. In addition, other areas of pharmaceutical research included disease progression and therapeutic control. This research involved efforts to refine the manufacturing process of steroids, such as the raw materials used in the manufacture of Aldactone, Aldactazide, Ovulen, and Demulen products. Petitioner's research ultimately resulted in obtaining U.S. patents on a microbiological process to provide the basic steroid chemicals used as early intermediates in the manufacture of spironolactone, in lieu of intermediates from barbasco root. However, during 1974 and 1975, all Aldactone and Aldactazide products manufactured by SCO used spironolactone.

There is a clear correlation in the pharmaceutical industry between extensive research and development expenditures and the introduction of new ethical products. However, in economic terms, a specific investment made in research and development necessarily involves a substantial degree of risk. In general, petitioner performed research on approximately 10,000 new drug compounds in order to isolate one compound which would ultimately be marketed. The average time span for taking a new drug compound from initial identification through the regulatory process to FDA approval was 8 years, during the period 1969 through 1975. Petitioner's approximate cost of development of an ethical pharmaceutical product that obtained FDA approval during the period 1969 through 1975 was $50 million. This cost included the amounts expended on products that did not successfully complete the regulatory review process to the marketplace.

Pharmaceutical firms typically patent their newly discovered chemical compounds in order to exclude competing firms from marketing these compounds. A patent claim is the description of the invention contained in and protected by the patent. A patent may contain more than one claim. For a period of 17 years following the issuance of a new-composition-of-matter patent, U. S. patent law grants the owner of that patent the right to exclude others from making, having made, using, or selling the invention

throughout the United States, including Puerto Rico. Thus, the value of a patent lies in the exclusion of competitors from the market.

Patented pharmaceutical compounds must be submitted to the FDA to obtain its approval prior to their marketing in interstate commerce. The owner of a new-composition-of-matter patent may grant to others by sale, license, or otherwise the right, under the patent, to make, use, or sell the invention. Foreign pharmaceutical firms, having obtained U.S. patents for newly discovered chemical compounds, often enter into licensing agreements with U.S. pharmaceutical firms which are capable of obtaining NDA approval for the compounds and successfully marketing those compounds in the U.S. market. During the years 1974 and 1975, only a small fraction of patented pharmaceutical compounds were ultimately marketed for sale in the United States.

## B. *Research and Development Facilities*

### 1. *Petitioner's Facilities*

During 1974 and 1975, petitioner maintained a pharmaceutical, chemical, and biochemical research, development, and control facility in Skokie, Illinois. In addition, Searle U.K., a wholly owned subsidiary of petitioner, also maintained a research and development facility at High Wycombe, England, during 1974 and 1975. Searle U.K. used these facilities primarily to engage in research in the field of molecular biology. Petitioner and Searle U.K. engaged in research and in product development activities relating to their own pharmaceutical products and those of petitioner's other subsidiaries. The pharmaceutical research and product development activities conducted by petitioner and Searle U.K. benefited petitioner and its worldwide subsidiaries and affiliates, including SCO.

During the years 1969 through 1975, petitioner maintained its historically high level of expenditures in pharmaceutical research and development. In 1974 and 1975, the member firms of the Pharmaceutical Manufacturer's Association invested 11.7 percent and 11.6 percent, respectively, of their sales of pharmaceutical products in research and development. Petitioner and its consolidated subsidiaries

invested 13.1 percent and 11.8 percent, respectively, of worldwide pharmaceutical sales dollars in pharmaceutical research in those same years.

Petitioner's research and development staff in Skokie, Illinois, had the following number of employees in 1974 and 1975:

| Year | Nonexempt | Exempt[12] | Total |
|------|-----------|------------|-------|
| 1974 | 313 | 340 | 653 |
| 1975 | 311 | 364 | 675 |

The expenses incurred by petitioner at its Skokie, Illinois, pharmaceutical and related chemical research and development facility with respect to research and development activities from 1953 to 1975 are set forth below and are based upon the expense allocations used in petitioner's books and records. Under petitioner's method of accounting, pharmaceutical and chemical quality control expenses and regulatory affairs expenses are included in research and development, and the numbers set forth below include expenses attributable to those activities. As of 1971, the research and development amounts set forth below also include expenses related to petitioner's biochemical research and development activity, an activity unrelated to its pharmaceutical and chemical manufacturing business (000's omitted):

| Year | Research and development expenses |
|------|-----------------------------------|
| 1953 | $1,565 |
| 1954 | 1,803 |
| 1955 | 2,069 |
| 1956 | 2,505 |
| 1957 | 3,095 |
| 1958 | 3,406 |
| 1959 | 4,309 |
| 1960 | 4,120 |
| 1961 | 4,302 |
| 1962 | 4,855 |
| 1963 | 5,078 |
| 1964 | 5,571 |
| 1965 | 7,862 |

[12] Nonexempt employees are employees covered by the Fair Labor Standards Act and therefore, must be paid for overtime. Exempt employees are not covered by the Fair Labor Standards Act. The distinction between exempt and nonexempt categories is based upon level of compensation and type of work. Exempt employees included research and development scientists and administrators.

| Year | Research and development expenses |
|------|-----------------------------------|
| 1966 | $8,316 |
| 1967 | 9,150 |
| 1968 | 11,881 |
| 1969 | 13,104 |
| 1970 | 15,911 |
| 1971 | 17,403 |
| 1972 | 18,476 |
| 1973 | 18,627 |
| 1974 | 24,203 |
| 1975 | 27,672 |

In 1974 and 1975, the amount of pharmaceutical research and development related expenses incurred by petitioner at its Skokie, Illinois, facility, not including biochemical and other nonpharmaceutical research and development expense, were $24,107,000 and $25,235,000. The pharmaceutical research and development expenditures of petitioner and its consolidated subsidiaries for the years 1974 and 1975 were $33,020,000 and $36,228,000, respectively, based upon the books and records of petitioner and its consolidated subsidiaries.

In 1974 and 1975, the pharmaceutical research and development related expenses incurred by petitioner at its Skokie facility, represented 15.9 percent and 13.8 percent, respectively, of the combined pharmaceutical sales of petitioner and SCO to third parties. Petitioner invested 63 percent and 54 percent of its U.S. pharmaceutical sales dollars in pharmaceutical research and development in 1974 and 1975, respectively. Petitioner's investment in pharmaceutical research and development activities at its Skokie, Illinois, facility exceeded its cost of goods sold in 1974 and was approximately 95 percent of its cost of goods sold in 1975.

### 2. SCO's Facilities

SCO maintained, at its facilities in Caguas, Puerto Rico, a pharmaceutical technology laboratory and a chemical development laboratory. Three employees of SCO in pharmaceutical technology and eight in chemical development engaged

in process trouble shooting and process improvement regarding the manufacturing processes and activities relative to SCO's products. In 1974 and 1975, the research and development expenses of SCO, generally consisting of reimbursement to petitioner, represented approximately 1 percent of SCO's net sales in each year.

C. *Regulatory Requirements*

The Food, Drug and Cosmetic Act of 1938, as amended, 21 U.S.C. sections 301-392 (1982), requires the submission to and approval by the FDA of an application prior to the introduction into interstate commerce of any new drug, including patented drugs. The application is referred to as a "new drug application" (hereinafter referred to as an NDA) for non-antibiotic drugs. A critical part of the large U.S. pharmaceutical companies' research and development function is the ability to obtain NDA's for new drug products. This ability is often considered a measure of the success of their research and development activities.

Following the enactment of the 1962 amendments to the act, NDA's have been required to contain acceptable scientific data, including the results of animal studies and human clinical tests, which demonstrate the safety of the drug and its effectiveness for its intended use. Prior to the 1962 amendments, however, it was necessary only to demonstrate the drug's safety in order to obtain FDA approval. The FDA has the authority to require additional studies after the submission of the NDA. After NDA approval, significant changes in manufacturing, labeling, and packaging necessitate the submission of an NDA supplement and the approval thereof prior to implementation.

The starting point for new pharmaceutical product research is the synthesis of a new chemical compound or series of compounds. After synthesis, the new compound is tested in animals for pharmacologic activity and toxicity. If animal tests of pharmacologic activity are promising and there are no signs of toxicity, the compound is then submitted for initial clinical testing.

An Investigational New Drug Application (hereinafter referred to as IND) is required to be filed with the FDA prior to the commencement of that stage of the research relative

to a new drug product in which clinical studies on humans are undertaken to determine tolerance and the therapeutic effect of the drug. Subsequent to 1962, IND's were required to be filed prior to seeking NDA's and as a prerequisite to obtaining authorization to modify labeling information relative to products already marketed to establish new therapeutic uses for said product.

Clinical studies are generally carried out in three phases. The first stage involves testing the compound's safety in a very limited number of normal volunteers. The second phase involves testing the product's safety and therapeutic effectiveness in a limited number of patients suffering from the condition the compound is intended to benefit. The third phase involves broader testing of the efficacy and safety of the compound in patients under conditions of actual practice.

After completion of clinical studies sufficient to demonstrate the compound's safety and efficacy, an NDA is submitted to the FDA. The submission and review of an NDA is a lengthy and difficult process. If an NDA is approved by the FDA, the applicant is permitted to market the drug in the United States. During 1974 and 1975, an accepted average in the pharmaceutical industry was that 1 drug out of every 10 submitted for clinical testing would obtain NDA approval.

D. *Petitioner's Regulatory Affairs Services Related to SCO's Products*

Listed below are the dates that NDA's were filed by petitioner and approved with respect to each product manufactured and sold by SCO during the years 1974 and 1975:

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Aldactazide tablets | 12-616 | 09/13/60 | 01/04/61 |
| Aldactone tablets | 12-151 | 09/22/59 | 01/21/60 |
| Banthine tablets and Banthine with Phenobarbital tablets | 7-390 | 03/15/50 | 05/08/50 |
| Pro-Banthine tablets and Pro-Banthine P.A. tablets | 8-732 | 11/15/52 | 01/05/53 |
| Pro-Banthine with Phenobarbital tablets | 9-014 | 03/27/53 | 04/27/53 |

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Pro-Banthine with Dartal tablets | 11-368 | 01/09/58 | 08/05/58 |
| Banthine vials | 8-091 | 06/07/51 | 08/07/51 |
| Pro-Banthine vials | 8-843 | 02/19/53 | 04/17/53 |
| Lomotil tablets | 12-462 | 05/27/60 | 08/30/60 |
| Lomotil liquid | 12-699 | 11/18/60 | 01/17/61 |
| Flagyl tablets and vaginal inserts | 12-623 | 09/16/60 | 07/18/63 |
| Ovulen tablets, Ovulen-21 tablets | 16-029 | 03/13/64 | 03/23/66 |
| Demulen tablets | 16-927 | 04/14/70 | 04/24/70 |
| Demulen-28 tablets | 16-936 | 05/06/70 | 12/08/70 |
| Ovulen-28 tablets | 16-705 | 09/15/67 | 10/02/67 |

During 1974 and 1975, petitioner filed no NDA's with the FDA.

All animal and human testing, as well as the preparation of all correspondence, associated with obtaining the IND's and NDA's with respect to SCO's products, was performed or contracted for by petitioner or one of its subsidiaries other than SCO.

In order to implement the 1962 amendments to the Food, Drug, and Cosmetic Act, the FDA commissioned a study of the efficacy of certain drugs that were on the market prior to 1962 by the National Academy of Sciences/National Research Council (NAS-NRC). The NAS-NRC study began in 1968 and included SCO's Aldactone, Aldactazide, Pro-Banthine, and Lomotil products. That study resulted in the issuance of so-called Drug Efficacy Study Implementation (DESI) notices with respect to ethical drugs which had been marketed prior to 1962 and which were determined after study of the drug by NAS-NRC to be efficacious. The proper procedure for a person other than the holder of the NDA to seek FDA approval of the marketing of an identical product subsequent to the issuance of the DESI notice with respect to that product, was to file an abbreviated NDA. Under such circumstances, it was not generally necessary to file with the FDA evidence of the drug's safety and efficacy in the form of animal laboratory and human clinical studies. Any modification of the dosage of a product with respect to which a DESI notice had been issued would require such party to file a full NDA. Set forth below is a list of the SCO products with respect to which DESI notices were issued

prior to January 1, 1976, together with the date on which the DESI notice was issued.

| Product description | Date of DESI notice |
|---|---|
| Aldactazide | 02/06/73 |
| Banthine | 06/18/71 |
| Banthine with Phenobarbital | 07/27/72 |
| Pro-Banthine | 06/18/72 |
| Pro-Banthine with Phenobarbital | 07/27/72 |
| Pro-Banthine with Dartal | 06/22/71 |
| Lomotil | 07/08/72 |

No DESI notice was issued with respect to Aldactone prior to 1976.

At the time each of SCO's products was transferred to SCO, it was necessary to file an NDA supplement with the FDA. Set forth below are the dates that NDA supplements were filed by petitioner and approved with respect to the initial pharmaceutical manufacture and sale of SCO's products by SCO:

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Aldactazide tablets | 12-616 | 03/31/69 | 09/19/69 |
| Aldactone tablets | 12-151 | 03/31/69 | 09/19/69 |
| Banthine tablets and Banthine with Phenobarbital tablets | 7-390 | 04/25/69 | 12/12/69 |
| Pro-Banthine tablets | 8-732 | 04/18/69 | 12/08/69 |
| Pro-Banthine with Phenobarbital tablets | 9-014 | 04/18/69 | 12/12/69 |
| Pro-Banthine with Dartal tablets | 11-368 | 04/18/69 | 09/29/69 |
| Banthine ampuls | 8-091 | 04/25/69 | 08/07/70 |
| Pro-Banthine ampuls | 8-843 | 04/18/69 | 08/07/70 |
| Lomotil tablets | 12-462 | 03/31/69 | 04/02/70 |
| Lomotil liquid | 12-699 | 03/31/69 | 09/09/69 |
| Flagyl tablets | 12-623 | 03/17/69 | 09/24/69 |
| Ovulen tablets,Ovulen-21 tablets | 16-029 | 04/25/69 | 10/24/69 |
| Demulen tablets | 16-927 | 01/28/71 | 10/01/71 |
| Demulen-28 tablets | 16-936 | 01/28/71 | 10/01/71 |
| Ovulen-28 tablets | 16-705 | 01/28/71 | 10/01/71 |
| Ovulen-Fe-28 tablets[1] | 16-706 | 04/25/69 | 11/05/69 |

[1]Ovulen-Fe-28 tablets were never manufactured or sold by SCO or petitioner.

At the time SCO established its chemical manufacturing operations at Caguas, Puerto Rico, it was necessary to file

NDA supplements with the FDA. Set forth below are the dates on which NDA supplement applications were filed by petitioner and approved with respect to SCO's chemical manufacturing operations.

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Aldactazide tablets | 12-616 | 12/17/70 | 05/14/71 |
| Aldactone tablets | 12-515 | 12/17/70 | 05/14/71 |
| Banthine tablets and Banthine with Phenobarbital tablets | 7-390 | 05/21/71 | 06/14/71 |
| Banthine ampuls | 8-091 | 05/21/71 | 06/14/71[1] |
| Demulen tablets | 16-927 | 05/25/71 | 10/01/71[1] |
| Demulen-28 tablets | 16-936 | 05/25/71 | 10/01/71[1] |
| Lomotil liquid | 12-699 | 12/29/70 | 05/06/71[1] |
| Lomotil tablets | 12-462 | 12/29/70 | 05/06/71[1] |
| Ovulen tablets[1] Ovulen-21 tablets | 16-029 | 05/25/71 | 10/01/71[1] |
| Ovulen-28 tablets | 16-705 | 05/25/71 | 10/01/71 |
| Pro-Banthine tablets | 8-732 | 08/14/70 | 10/28/70 |
| Pro-Banthine ampuls | 8-843 | 08/14/70 | 10/28/70 |
| Pro-Banthine with Dartal tablets | 11-368 | 08/14/70 | 10/28/70 |
| Pro-Banthine with Phenobarbital tablets | 9-014 | 08/14/70 | 10/28/70 |

[1]SCO did not manufacture for sale prior to 1976 the chemicals with respect to which these NDA supplements were filed.

At the time SCO moved its pharmaceutical manufacturing operation from its leased facility in Hato Rey to Caguas, it was necessary again to file NDA supplements with the FDA. Set forth below are the dates on which NDA supplement applications were filed by petitioner and approved with respect to each of SCO's products at the time of the transfer of SCO's pharmaceutical manufacturing operations from Hato Rey, to Caguas, Puerto Rico:

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Aldactazide tablets | 12-616 | 05/30/72 | 03/01/73 |
| Aldactone tablets | 12-151 | 05/30/72 | 03/01/73 |
| Banthine tablets and Banthine with Phenobarbital tablets | 7-390 | 05/30/72 | 02/28/73 |
| Pro-Banthine tablets | 8-732 | 05/30/72 | 04/02/73 |
| Pro-Banthine with Phenobarbital tablets | 9-014 | 05/30/72 | 04/02/73 |

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Pro-Banthine with Dartal tablets | 11-368 | 05/30/72 | 02/28/73 |
| Banthine ampuls | 8-091 | 05/30/72 | 04/02/73 |
| Pro-Banthine vials | 8-843 | 05/30/72 | 04/02/73 |
| Lomotil tablets | 12-462 | 05/30/72 | 02/28/73 |
| Lomotil liquid | 12-699 | 05/30/72 | 02/28/73 |
| Flagyl | 12-623 | 05/30/72 | 02/12/73 |
| Ovulen tablets, Ovulen-21 tablets | 16-029 | 01/28/71 | 10/01/71 |

At the time DESI notices with respect to SCO's products were published in the Federal Register, it was also necessary to file NDA supplements with the FDA. Set forth below are the dates on which NDA supplement applications were filed by petitioner and approved with respect to SCO's products following publication of DESI notices:

| Product | NDA No. | Date filed | Date approved |
|---|---|---|---|
| Aldactazide tablets | 12-616 | 04/06/73 | 10/21/74 |
| Banthine tablets and Banthine with Phenobarbital tablets | 7-390 | 09/10/71 | 12/07/71 |
| Banthine ampuls | 8-091 | 09/10/71 | 12/07/71 |
| Lomotil liquid | 12-699 | 11/14/72 | 05/17/73 |
| Lomotil tablets | 12-462 | 11/14/72 | 05/17/73 |
| Pro-Banthine tablets | 8-732 | 09/10/71 | 12/10/71 |
| Pro-Banthine ampuls | 8-843 | 09/10/71 | 12/10/71 |

In conformity with FDA requirements of parties holding NDA's, petitioner filed periodic reports on FD Form 2252 with respect to its products, as well as SCO's products. Petitioner also submitted two studies to the FDA in 1976 as part of NDA supplements for purposes of lengthening the expiration date of Demulen-28 tablets. These studies were long term and were ongoing in 1974 and 1975.

In addition to the NDA supplements listed above, petitioner submitted other NDA supplements with respect to SCO's products throughout the years 1969 through 1975. These NDA supplements dealt with various matters including expiration dates and changes in labeling and package inserts.

During 1974 and 1975, petitioner filed 10 IND's. In addition, petitioner continued clinical studies during 1974 and 1975 on 9 IND's submitted in previous years to explore

new products or new claims for existing products. Four of
these IND's related to SCO's products and are as follows:

| Date filed | IND No. | Product | Subject matter |
|---|---|---|---|
| 06/03/74 | 10-706 | Aldactazide | Aldactazide in premenstrual tension |
| 09/12/74 | 10-968 | Flagyl | Flagyl I.V. |
| 07/16/75 | 11-716 | Aldactazide | Aldactazide in essential hypertension |
| 09/08/75 | 11-832 | Demulen | Searle 1/35 |

All NDA supplements and IND's filed with respect to
SCO's products during the period from 1969 through 1975
were filed by employees of petitioner. Petitioner was the
holder and owner of all NDA's related to SCO's products.

A company selling ethical pharmaceuticals is required to
obtain FDA approval of all product labeling, package inserts,
and promotional material. Product labeling must be submit-
ted to the FDA any time a substantial change occurs. The
regulatory approval of these documents was obtained by
employees of petitioner.

E. *Other Research and Development Activities Related to
SCO's Products*

1. *Petitioner's Activities*

In addition to the regulatory affairs services performed
by petitioner relative to SCO's products, petitioner also
performed other research and development activities includ-
ing: (i) The development of new dosage forms of SCO's
products, (ii) the development of combinations of SCO
products with other drug entities, such as the attempted
development of the product Flagystatin, a combination of
Flagyl with the generic drug nystatin, (iii) the development
of improved chemical and pharmaceutical processes and
formulations for existing products, (iv) long term animal
toxicology studies relating to the safety of the SCO prod-
ucts, and (v) stability testing on certain SCO products.
Petitioner also arranged for unrelated persons to perform
clinical studies relating to new indications for SCO's prod-
ucts and animal safety studies relating to the long term
safety of such products.

## 2. *SCO's Activities*

SCO maintained a laboratory in its Caguas, Puerto Rico, facilities for the purpose of developing and improving the chemical and pharmaceutical manufacturing procedures related to its products. During the period from 1972 through 1975, two modifications of the process for manufacturing the spironolactone chemical were developed in the SCO chemical development laboratory. These process improvements reduced the risk of pollution in that manufacturing process.

During 1973 through 1975, employees in SCO's chemical development laboratory also made improvements in the manufacturing processes relating to the chemical propantheline bromide. Prior to the development of these improved procedures, 60 percent of the lots of propantheline bromide manufactured by SCO were rejected by SCO's quality control department. As a result of the SCO developed process improvements, the rejection rate was reduced from 60 percent to zero and the production yield was increased by 29 percent or 50 kilograms per lot. The SCO chemical development group developed processes for the recovery of the active chemicals propantheline bromide, spironolactone, and hydrochlorothiazide from rejected lots of pharmaceutical products containing those chemicals. These processes enabled SCO to avoid the considerable expense that would have resulted from the otherwise necessary destruction of unusable pharmaceutical products. SCO chemical development personnel also developed procedures for purifying talc for use in SCO's pharmaceutical manufacturing operations. None of the modifications and improvements developed by SCO's chemical development group required the filing of NDA supplemental applications to facilitate their use.

## F. *Research and Development of New Pharmaceutical Products*

In 1969 and 1970, petitioner anticipated that it would manufacture and sell in the United States several new products then the subject of its new product research and development activities. Extensive clinical data had been gathered for these products and, based either on overseas

sales or on projections of U.S. demand, petitioner expected that it would derive significant profits from these new products. Petitioner's new product research focused on these products from 1969 through 1975. However, only one of these new products, Cu-7, was introduced into the U.S. market prior to 1976.

### 1. *Aspartame*

During the mid-1960's, petitioner discovered that a compound comprised of two amino acids, and later known as Aspartame, had an exceptionally sweet taste. One of the two amino acids is synthesized naturally in the human body and the other is found in a large number of everyday high-protein foods, such as milk. Unlike saccharin or cyclamates, Aspartame is metabolized as a protein and used by the body in the same way as the amino acids found in other foods. During 1969 and 1970, petitioner prepared information for a food additive petition to be submitted to the FDA. The initial approval to market Aspartame was obtained in July 1974. Petitioner anticipated that Aspartame would be a major product and would generate significant income. Taste tests had indicated that the taste of Aspartame was preferable to that of saccharin or the cyclamates. Moreover, petitioner had entered into an agreement with General Foods Corp. providing for the inclusion of Aspartame in certain of the food and drink products made by General Foods, thereby providing a huge market for Aspartame.

Petitioner acquired a 135-acre site in Augusta, Georgia, and started in 1973 to construct a plant to produce large quantities of Aspartame. Cost estimates for this plant were as high as $80 million. Nearly $20 million was expended before construction was suspended in 1974. Petitioner projected that this one plant would generate sales revenues of over $100 million per year, and operating profits of approximately $30 to $35 million a year, and was consequently prepared to risk construction prior to obtaining FDA approval. During 1973 and 1974, in anticipation of the pending market introduction of Aspartame, petitioner produced an inventory of Aspartame valued at $8 million. This inventory included 300 million Aspartame tablets produced

during 1973 at petitioner's Skokie facility. During 1974, petitioner anticipated that it would soon obtain approval to use Aspartame in soft drinks which would have opened up a lucrative market for the product. Following initial FDA approval of Aspartame, two individuals raised objections to its sale. This caused the FDA to set up a public board of inquiry to review the objections. Petitioner agreed not to market Aspartame pending this review. The board of inquiry was delayed, however, as a result of an unrelated FDA investigation during 1975 of part of petitioner's research activities. Aspartame was not sold in the United States prior to the end of 1975.

### 2. *Norpace*

Norpace was developed by petitioner in the late 1950's for the treatment of abnormal rhythms of the heart, "cardiac arrhythmia." Although the product was developed to the point where, in the early 1960's, petitioner felt it had adequate material for an NDA, the product was shelved because petitioner's marketing division felt at that time that the market was too small and the major competing product, Quinidine, was less expensive than Norpace would be. Petitioner did license Norpace to Roussel-Uclaf which sold the product in Europe in the 1960's and early 1970's. Subsequently, in the late 1960's, when the demand for antiarrhythmic drugs increased significantly and the price of Quinidine increased, petitioner decided to seek approval to market Norpace in the United States. During 1969 and 1970, petitioner gathered the substantial clinical data that had been developed in Europe and discussed with the FDA the filing of an NDA for Norpace. Petitioner anticipated that Norpace would generate substantial income. The U.S. antiarrhythmic market was expanding, Norpace was more effective than its major competitor, Quinidine, and had fewer side effects. An NDA was filed in 1970. In that same year the FDA decided to require extensive additional controlled clinical tests. Petitioner voluntarily withdrew its NDA in 1971. As of the end of 1975, Norpace had not been introduced in the United States.

### 3. *Depepsen*

During the 1960's, petitioner developed Depepsen, a compound intended to accelerate the healing and prevent the recurrence of peptic ulcers. At that time, the market for products treating peptic ulcers, including gastric and duodenal ulcers, was very large, and as of the end of 1969, no medication comparable to Depepsen was available. By the end of 1969, petitioner had accumulated a considerable amount of animal and clinical data indicating that Depepsen was an effective agent in the treatment of gastric ulcers. In broad scale clinical trials, however, petitioner was unable to demonstrate clearly Depepsen's efficacy in the treatment of duodenal ulcers. As a result of uncertainty as to whether the FDA would approve Depepsen for use in duodenal ulcers and because the cost of manufacturing Depepsen would be high, petitioner decided, in the early 1970's, not to pursue further the development of Depepsen.

### 4. *Cu-7*

In March 1970, petitioner signed an agreement under which it obtained a license to sell the intrauterine device Cu-7. While other intrauterine devices were being sold on the U.S. market at the time, petitioner believed that Cu-7 had considerably greater efficacy, and was almost as effective in preventing contraception as oral contraceptives. Based on an opinion of the FDA that Cu-7 should be classified as a device and not a drug, petitioner anticipated that it would introduce Cu-7 in the summer of 1971. However, in April 1971, the FDA reclassified Cu-7 as a medical drug rather than a device, requiring an NDA and the submission of more data than would be required for approval to market a device. As a result, final approval to market Cu-7 in the United States was not obtained until February 1974. Almost immediately after its introduction in 1974, Cu-7 was temporarily withdrawn by petitioner because of sterility and packaging problems, and it was not reintroduced until 1975.

## G. *Petitioner's Research and Development of Synthetic Steroid Chemicals*

In the early 1960's, petitioner began a research effort to develop synthetic steroid chemicals. It was hoped that such synthetic steroids would provide an alternative basic chemical to the barbasco root and be used as starting materials for the active chemical ingredients in Aldactone, Aldactazide, and the various oral contraceptive products as well as other steroid-based products produced by petitioner and its subsidiaries. This research effort led to the development of a laboratcry-scale chemical fermentation process for the synthesis of the chemical androstenedione (hereinafter AD). This laboratory-scale process was patented by petitioner's research scientists in 1972 and 1973.

In 1974, petitioner leased a chemical fermentation facility in Harbor Beach, Michigan, for the purpose of conducting work relating to the scaling up of the manufacturing process leading to the production of AD. In January 1975, petitioner purchased the Harbor Beach, Michigan, chemical fermentation plant. During 1975, petitioner manufactured AD at the Harbor Beach facility and sold the chemical to Searle de Mexico and Searle U.K. A portion of petitioner's synthetic steroid chemical development research was charged to SCO.

The AD process provided SCO with an alternative source of the key raw material for the manufacture of Aldactone and Aldactazide products and relieved pressure on the market for barbasco root. The availability of this alternative source reduced the Mexican Government's leverage to increase prices for the root. However, during 1974 and 1975, none of the Aldactone or Aldaztazide manufactured and sold by SCO used spironolactone derived from AD. Rather, all Aldactone and Aldactazide manufactured by SCO used spironolactone derived from the traditional barbasco root process.

## H. *SCO's Payments for Research and Development*

The following amounts were paid by SCO to petitioner with respect to research performed for each of the calendar years 1974 and 1975.

| Year | Amount of R & D expense billed to SCO |
|---|---|
| 1974 | $902,000 |
| 1975 | 1,278,000 |

The monthly research and development expense invoices issued by petitioner to SCO reflect charges for time spent by employees of petitioner's regulatory affairs department in filing NDA's, IND's, and NDA supplements with respect to SCO's products. Petitioner was the holder of all NDA's with respect to SCO's products.

## IX. *Regulatory Oversight and Legal Matters*

### A. *Introduction*

In order to ensure that approved current good manufacturing practices are followed in the pharmaceutical industry and that the requirements and representations contained in the NDA are being fulfilled, the FDA periodically inspects the manufacturing facilities of sellers of pharmaceutical products, such as SCO. In addition to the FDA, other governmental regulatory and purchasing agencies inspected SCO's facilities from time to time. These agencies included the Bureau of Narcotics and Dangerous Drugs, the Drug Enforcement Agency, the Veteran's Administration, the Defense Personnel Service Center, the Consumer Product Safety Commission, and various agencies of the Government of the Commonwealth of Puerto Rico.

Complaints received from physicians, pharmacists, wholesalers, or patients, directly or through sales representatives, relative to the undesirable action or inaction of SCO's products, including complaints regarding adverse reactions were routed to petitioner's medical communications department. Medical doctors or other employees in petitioner's medical communications department and regulatory affairs department would investigate the complaint, notify SCO of the complaint and obtain SCO's assistance in the investigation, and would file any required reports with the FDA either on FDA Form 1639 or as part of the periodic reporting requirements of the FDA.

## B. *1975 FDA Investigation*

In 1970, petitioner submitted a report to the FDA of an 80-week study on rats relative to the product Flagyl. The report did not indicate that the product was a carcinogen. In 1972, the FDA learned of an independent investigator's report which indicated that Flagyl was a carcinogen in mice. As a result, the FDA reanalyzed petitioner's 1970 study. During this reanalysis, the FDA discovered numerous errors in petitioner's original submission. FDA personnel determined that these errors were serious and asked petitioner to submit a corrected copy of the study. The study was resubmitted in 1974. Upon receipt of the resubmitted study, the FDA became concerned with some of the corrections to the original study and commenced an investigation of petitioner with respect to Flagyl in May of 1974. That investigation continued until May of 1975, at which time the FDA had not developed all the information it deemed necessary to validate the original study. In December of 1974, petitioner submitted preliminary results of a 78-week study in rats, which indicated Aldactone was tumorigenic. A complete report on that study was submitted to the FDA in March of 1975. The FDA analyzed this report and found certain inconsistencies. As a result of these inconsistencies and the FDA's own evaluation of petitioner's studies relative to Aldactone, the FDA convened a Cardio-Renal Advisory Committee to determine whether any action should be taken because of the information contained in the 78-week rat study relative to the toxicity of Aldactone. The differences between the analyses of the 78-week rat study of Aldactone by petitioner and by the FDA were such that the Cardio-Renal Advisory Committee, as well as the FDA, were concerned and an inspection of petitioner was undertaken. Although the results of this investigation were not completely satisfactory, it was terminated prior to July of 1975.

On July 10, 1975, the U.S. Senate Subcommittee on Health chaired by Senator Kennedy held hearings on preclinical studies. The FDA's investigations of petitioner relative to Flagyl and Aldactone and certain allegations by FDA personnel of fraudulent practices were aired at those hearings. As a result, during 1975 and 1976, the FDA conducted a major investigation of certain of the preclinical

research conducted by or at the direction of petitioner during the period from January 1, 1968, through July 1975. A portion of the research which was the subject of the investigation had been paid for by SCO.

As a part of its investigation, FDA teams were at Skokie constantly from October 6, 1975, through December 19, 1975. Some investigative activity continued over into early January 1976. These inspection teams reviewed records, inspected facilities, and interviewed petitioner's employees involved in pathology/toxicology research. The focus of the investigation was on research practices in general, including how research was organized, how data was recorded, and how raw data compared with reports. In preparing for this on-site review, petitioner located, organized, and catalogued preclinical research records relating to more than 25 products and compounds, not all of which were then marketed by petitioner or SCO. Eight of those products and compounds were SCO's products.

Because of the vast number of preclinical studies done by petitioner from 1968 to 1975, it was not feasible for the FDA to do a complete investigation of all these studies. Therefore, the FDA on-site investigation teams sampled petitioner's preclinical studies and selected for detailed review various studies relating to the following products:

(i)   Aldactone
(ii)  Aspartame
(iii) Cu-7
(iv)  Flagyl
(v)   Norpace
(vi)  Ovulen
(vii) Synchro-Mate

Aldactone, Flagyl, and Ovulen were products of SCO in 1974 and 1975. Cu-7 and Synchro-Mate were products of petitioner in 1974 and 1975. Norpace and Aspartame were not sold by either petitioner or SCO in 1974 and 1975. The FDA investigation teams reviewed records of 25 separate animal toxicity studies relating to the seven products. Of these 25 studies, 9 related to products manufactured and sold by SCO. Thirteen of the studies related to Aspartame and Norpace.

The possible administrative sanctions which could have resulted from the FDA's investigation of petitioner's preclinical studies of Aldactone, Flagyl, and other products in 1975 ranged from mere changes in the labeling of the products in order to reflect changes in the safety profile of the products, to preliminary steps to withdraw the NDA for Aldactone, Flagyl, or any of the other products under investigation which could ultimately result in removal of the product from the market. Negative findings by the FDA could have adversely affected the perception of physicians and health care professionals as to the integrity of petitioner's research activities. Consequently, such negative findings could have adversely affected sales of the pharmaceutical products of SCO and petitioner, especially the sales of any specific products deemed carcinogenic or unsafe. The FDA's allegations of inconsistencies in the preclinical study information submitted by petitioner with respect to Flagyl and Aldactone and the ensuing investigation were given priority by petitioner in 1975. This priority led to the formation of a task force responsible for coordinating the activities in preparation of the FDA investigation and monitoring the on-site investigation. Beginning on July 11, 1975, the day after the hearings before Senator Kennedy, approximately 300 of petitioner's personnel began to collect petitioner's preclinical, animal and safety records, and documents which were not filed centrally within petitioner's research and development section. In preparation for the on-site FDA investigation, petitioner selected technical staff personnel and organized them as escorts for the on-site FDA investigation teams. These personnel were briefed on the central file and mechanized information retrieval system which had been set up for purposes of the investigation, instructed on how to behave with the FDA inspection teams, how to monitor the FDA's activities, and how to meet the needs of the FDA teams for interviews and tours of the facility. A total of nine FDA inspection teams were provided space and escort service by petitioner's personnel during the period October through December 1975. In addition, outside legal counsel as well as petitioner's own legal department participated in the investigation.

The FDA on-site inspection of petitioner's research records concluded on January 13, 1976. At that time, petitioner estimated the expenses incurred during 1975 relative to the investigation as follows:

Indirect costs absorbed within organization unit (in house costs)

|  |  |  |
|---|---|---|
| a. | Corporation information services | $440,000 |
| b. | Department of science | 322,000 |
| c. | Other staff units | 67,000 |
| d. | Corporate management | 42,000 |
|  | Total indirect costs | 871,000 |

Direct labor costs

|  |  |  |
|---|---|---|
| a. | Intercompany transfers | $15,599 |
| b. | Consultants and temporary services | 1,556 |
| c. | Legal fees | 101,704 |
| d. | Special rewards to employees | 70,000 |
|  | Total direct labor costs | 188,859 |

Equipment and supplies

|  |  |  |
|---|---|---|
| a. | Absorbed within department of Science | $14,000 |
| b. | Communications | 4,000 |
| c. | Office supplies | 18,000 |
| d. | Miscellaneous | 350 |
| e. | Computer charges | 37,000 |
| f. | Travel expenses | 7,000 |
|  | Total equipment and supplies | 80,350 |

Total petitioner's estimated investigation-related expenses 1,140,209

SCO reimbursed petitioner for one-half of the 1975 estimated investigation related expenses, $570,105, during June 1976. The amount of the expenses incurred by petitioner relative to the investigation that were reimbursed by SCO were not deducted on petitioner's 1975 Federal income tax return.

## C. *Product Liability Insurance*

Petitioner and its worldwide subsidiaries purchased product liability insurance under a blanket policy. SCO was charged for and paid to petitioner a portion of the product liability insurance premium. In addition, SCO established a reserve for self-insurance to cover the possibility of product liability losses not covered by insurance. The total product liability insurance premiums and reserve for insurance paid or accrued by SCO with respect to 1974 was $557,000 and with respect to 1975 was $567,000. The total product

liability insurance premiums and reserve for insurance paid or accrued by petitioner with respect to its worldwide operations in 1974 was $1,970,000 and in 1975 was $2,061,000.

Petitioner determined that 65 percent of the insurance premiums associated with SCO's products should be allocated to and paid by petitioner because petitioner bore the risk as the entity which innovated the products and performed the underlying research. Based upon extensive studies which concluded that the primary cause of liability of pharmaceutical companies was defective research or allegations relative to errors in research, 65 percent of the product liability insurance was deemed to be an expense of petitioner and was not reimbursed by SCO.

D. *Pending Lawsuits*

During 1974, there were pending against petitioner and/or SCO 195 lawsuits for damages allegedly resulting from the use of products manufactured by petitioner or one of its affiliates. Based upon the alleged dates of injury, 25 such lawsuits involved products definitely manufactured and sold by SCO. An additional 11 such lawsuits involved products which may have been manufactured and sold by SCO. The legal fees and related litigation expenses incurred by petitioner during 1974 in connection with the 25 lawsuits definitely involving products manufactured by SCO were $45,432.90. The legal fees and related litigation expenses incurred by petitioner during 1974 in connection with the 11 lawsuits which may have involved products manufactured and sold by SCO were $14,362. Said legal fees and litigation expenses do not include internal corporate legal department expenses. One of the 25 pending lawsuits definitely involving products manufactured and sold by SCO was settled during 1974 by the payment to the plaintiff of $2,750.

During 1975, there were pending against petitioner and/or SCO 191 lawsuits for damages allegedly resulting from the use of products manufactured by petitioner or one of its affiliates. Based upon the alleged dates of injury, 42 such lawsuits involved products definitely manufactured and sold by SCO. An additional 21 such lawsuits involved products

which may have been manufactured and sold by SCO. The legal fees and related litigation expenses incurred by petitioner during 1975 in connection with the 42 lawsuits definitely involving products manufactured by SCO were $74,923.46. The legal fees and related litigation expenses incurred by petitioner during 1975 in connection with the 21 lawsuits which may have involved products manufactured and sold by SCO were $13,427.37. Said legal fees and litigation expenses do not include internal corporate legal department expenses. Two of the lawsuits that may have or did involve products manufactured and sold by SCO were settled in 1975 by the payment to the respective plaintiffs of a total of $22,000.

During 1974 and 1975, legal services provided by petitioner on behalf of SCO were not separately billed but rather were considered to be part of the administrative services provided on behalf of SCO. SCO paid legal fees to the law firm of McConnell, Valdes, Kelley, Sifre, Griggs & Ruiz-Suria, San Juan, Puerto Rico, for legal services and advice related to tax, corporate, real estate, contract, labor, and litigation matters. The amount of such fees paid by SCO in 1974 was $20,760 and in 1975 was $29,500. SCO also paid an additional $2,700 to other law firms during 1974 and 1975. Petitioner incurred legal expenses of $661,311 and $903,012 in 1974 and 1975, respectively.

On December 4, 1967, petitioner filed suit in U.S. District Court, Eastern District of New York, against Generic Formulae, Inc., and William Broder alleging infringement by defendants of U.S. patent No. 2,659,732 relating to the active ingredients in the Banthine and Pro-Banthine lines of products. Following the assignment by petitioner to SCO of legal title to that patent, SCO was added as a plaintiff in this suit. In February 1970, the U.S. District Court, Eastern District of New York, issued a final consent judgment in favor of petitioner and SCO. During the years 1969 through 1975, neither petitioner nor SCO filed or pursued any other legal action relating to infringement of patents, trademarks, copyrights, or other intangible property rights relating to SCO's products.

## X. *Accounting and Administration*

### A. *SCO's Finance and Accounting Department*

As of December 31, 1974, and December 31, 1975, SCO maintained a finance and accounting department with 27 and 32 employees, respectively. SCO's finance and accounting department (i) maintained SCO's general and subsidiary ledgers and other records of original entry, (ii) monitored SCO's accounts payable and paid expenses of SCO, (iii) monitored SCO's accounts receivable and monitored collection of outstanding customer accounts, (iv) maintained SCO's payroll records and paid SCO's employees, and (v) prepared financial reports of SCO's operations including balance sheets, income statements, variance reports, and calculations of source of income. SCO paid fees of $53,984 to Arthur Andersen & Co. for audit, tax, and related services during 1974 and 1975.

### B. *Petitioner's Information Systems Department*

Petitioner's information systems department provided centralized computer systems resources to petitioner and its subsidiaries, including SCO. These resources included computer programming, systems design, and computer operations. Throughout 1974 and 1975, SCO maintained in the central computer system its order entry system, a lot control system, and its accounts receivable records. During 1974, SCO began to maintain its inventory control system in the central computer. Also during 1974, SCO's tablet weighing system was integrated with the central computer. During August 1975, SCO began to maintain its general ledger in the central computer. Communications between SCO and the central computer were via a leased telephone line. SCO did not have any computer programming personnel. During 1974 and 1975, SCO was billed directly by petitioner's information services department for computer programming services rendered on its behalf.

### C. *Payment for Administrative Services*

Among the types of administrative services performed by petitioner on behalf of SCO were (i) purchasing assistance, (ii) materials handling and receiving assistance, (iii) engineer-

ing assistance, (iv) equipment maintenance assistance, (v) accounting assistance including computerized accounting, (vi) legal assistance including product liability litigation, (vii) treasury assistance including advice and assistance relating to portfolio investments, and (viii) personnel development and employee benefits assistance.

No itemization of administrative activities performed by petitioner on behalf of SCO was maintained in 1974 and 1975. Rather, during the years 1974 and 1975, SCO paid petitioner an administrative fee equal to 3 percent of SCO's sales of its products in the United States. The amount of the administrative fee paid by SCO to petitioner with respect to 1974 and 1975 was $3,304,000 and $3,989,000, respectively. These fees were billed to SCO on a monthly basis.

Petitioner incurred general and administrative expenses of $26,282,000 and $33,660,000 in 1974 and 1975, respectively. The total general and administrative expenses of petitioner and its consolidated subsidiaries in 1974 and 1975 were $69,963,000 and $85,628,008, respectively.

## XI. *Financial Results of Petitioner's and SCO's Operations*

### A. *Petitioner's Acquisitions*

Prior to July 29, 1966, petitioner and its consolidated subsidiaries engaged exclusively in the manufacture and sale of pharmaceutical products and related chemicals. Beginning in 1966, petitioner undertook a program to diversify its operations through corporate acquisitions. Set forth below is a partial list of petitioner's U.S. acquisitions during the years 1966 through 1975.

| Company acquired | Year of acquisition |
|---|---|
| Nuclear-Chicago Corp. | 1966 |
| Curtis Breeding Service, Inc | 1968 |
| Medidata Sciences, Inc | 1968 |
| Buchler Instruments, Inc | 1970 |
| Will Ross, Inc. | 1973 |
| Oxford Laboratories | 1974 |
| Tecna Corp | 1974 |

Following 1966, petitioner also formed subsidiaries and thereby embarked in new lines of business in the United States, as follows:

| Subsidiary | Year business commenced |
|---|---|
| Searle Reference Laboratories | 1970 |
| Searle Leasing Corp | 1970 |
| Searle Diagnostics, Inc | 1971 |
| Searle Educational Systems | 1971 |

## B. *Sales Statistics*

Total sales (excluding intercompany sales) and net income before taxes of petitioner and its consolidated subsidiaries for the years 1960 through 1975, as reflected in its annual reports, are set forth below (000's omitted). The following sales figures are those reported in the years in question and do not reflect any restatements of prior years' financial results to account for the impact of acquisitions.

| Year | Total consolidated sales | Net income before taxes |
|---|---|---|
| 1960 | $36,907 | $15,111 |
| 1961 | 44,778 | 20,143 |
| 1962 | 56,626 | 28,484 |
| 1963 | 71,417 | 38,430 |
| 1964 | 86,526 | 47,837 |
| 1965 | 88,970 | 44,161 |
| 1966 | 113,465 | 43,424 |
| 1967 | 132,707 | 51,078 |
| 1968 | 147,724 | 54,512 |
| 1969 | 163,936 | 56,113 |
| 1970 | 201,459 | 50,560 |
| 1971 | 226,891 | 49,585 |
| 1972 | 271,878 | 53,388 |
| 1973 | 471,681 | 79,565 |
| 1974 | 621,310 | 90,864 |
| 1975 | 711,800 | 93,297 |

Petitioner's U.S. sales of all products for the years 1960 through 1975 were as follows (000's omitted):

| Year | U.S. sales |
|---|---|
| 1960 | $30,633 |
| 1961 | 36,494 |
| 1962 | 46,048 |
| 1963 | 59,036 |
| 1964 | 70,116 |
| 1965 | 70,721 |

| Year | U.S. sales |
|---|---|
| 1966 | Not available |
| 1967 | $102,432 |
| 1968 | 109,655 |
| 1969 | 109,312 |
| 1970 | 102,868 |
| 1971 | 77,165 |
| 1972 | 66,365 |
| 1973 | 241,580 |
| 1974 | 288,416 |
| 1975 | 311,856 |

The worldwide pharmaceutical net sales of petitioner and its consolidated subsidiaries for the years 1960 through 1975 are set forth below (000's omitted).

| Year | Approximate worldwide pharmaceutical sales |
|---|---|
| 1960 | $36,907 |
| 1961 | 44,778 |
| 1962 | 56,626 |
| 1963 | 71,417 |
| 1964 | 86,526 |
| 1965 | 88,970 |
| 1966 | 94,200 |
| 1967 | 107,021 |
| 1968 | 114,812 |
| 1969 | 126,428 |
| 1970 | 131,967 |
| 1971 | 151,002 |
| 1972 | 178,437 |
| 1973 | 217,151 |
| 1974 | 252,420 |
| 1975 | 306,864 |

Petitioner's approximate U.S. pharmaceutical sales, including intercompany sales, for the years 1960 through 1975 are set forth below (000's omitted):

| Year | Approximate U.S. pharmaceutical sales |
|---|---|
| 1960 | $30,633 |
| 1961 | 36,494 |
| 1962 | 46,048 |
| 1963 | 59,036 |
| 1964 | 70,116 |
| 1965 | 70,721 |
| 1966 | 73,243 |
| 1967 | 81,700 |
| 1968 | 80,809 |

|        | Approximate U.S.<br>pharmaceutical sales |
|--------|------------------------------------------|
| Year   |                                          |
| 1968   | $80,809                                  |
| 1969   | [1]85,779                                |
| 1970   | [1]79,918                                |
| 1971   | [2]47,520                                |
| 1972   | [2]30,240                                |
| 1973   | [2]31,698                                |
| 1974   | [2]38,234                                |
| 1975   | [2]46,734                                |

[1]During 1969 and part of 1970, SCO sold all of its pharmaceutical products to petitioner for resale to unrelated parties.

[2]Includes resales by petitioner of products purchased from SCO.

Petitioner's consolidated tax returns reflect that the cost of goods sold with respect to its total sales for 1974 and 1975 were as follows:

| Year | Cost of goods sold |
|------|--------------------|
| 1974 | $22,999,952        |
| 1975 | 26,820,602         |

Petitioner's purchases of pharmaceutical products from SCO for the years 1974 and 1975 were as follows (000's omitted):

| Year | Petitioner's<br>purchases from SCO |
|------|------------------------------------|
| 1974 | $1,602                             |
| 1975 | 2,179                              |

SCO's total net sales and net income before tax for each of the years 1969 through 1975 were as follows (000's omitted):

| Year | Net sales | Net income<br>before tax |
|------|-----------|--------------------------|
| 1969 | $5,084    | $2,258                   |
| 1970 | 20,352    | 10,331                   |
| 1971 | 61,165    | 32,208                   |
| 1972 | 93,055    | 49,835                   |
| 1973 | 103,720   | 60,419                   |
| 1974 | 114,784   | 74,560                   |
| 1975 | 138,044   | 72,240                   |

SCO reported de minimis U.S. Federal income tax liabilities during the years 1970-75.

## C. *SCO's Operations*

SCO reported on its Puerto Rican tax returns that the amounts of net income shown below were subject to SCO's tax exemptions for the periods listed:

| Period | Pharmaceutical manufacturing (case No. SL-1531) | Chemical manufacturing (case No. 71-57-1-8) |
|---|---|---|
| 8/01/69 - 7/31/70 | $8,710,315 | 0 |
| 8/01/70 - 7/31/71 | 24,543,858 | 0 |
| 8/01/71 - 7/31/72 | 40,133,014 | [1]$2,159,033 |
| 8/01/72 - 7/31/73 | 47,586,413 | 3,222,495 |
| 8/01/73 - 7/31/74 | 52,717,604 | 2,510,226 |
| 8/01/74 - 12/31/74 | 26,513,478 | 1,610,324 |
| 1/01/75 - 12/31/75 | 64,500,266 | 5,608,016 |
| Total | 264,704,948 | 15,110,094 |

[1]Began in November 1971.

On its Puerto Rican tax return for the period beginning August 1, 1973, through July 31, 1974, SCO reported net sales attributable to pharmaceutical manufacturing of $106,282,676. SCO also reported the following amounts for the following financial categories relative to pharmaceutical manufacturing for this same period:

| Category | Amount |
|---|---|
| Cost of sales | $14,005,914 |
| Purchases | 10,646,929 |
| Direct wages | 2,133,005 |
| Other cost | 2,737,775 |
| Gross profit | 91,776,762 |
| Net operating profit | 52,717,604 |

On its Puerto Rican tax return for the period beginning August 1, 1974, through December 31, 1974, SCO attributed $50,180,844 in sales to its pharmaceutical manufacturing activities. SCO also attributed the following amounts to the following financial categories relative to pharmaceutical manufacturing for this same period:

| Category | Amount |
|---|---|
| Cost sales | $6,359,411 |
| Purchases | 4,512,761 |
| Direct wages | 639,381 |
| Other cost | 1,664,939 |
| Gross profit | 43,821,433 |
| Net operating profit | 26,513,478 |

For the period beginning August 1, 1974, and ending December 31, 1974, SCO's purchases represented 66 percent of its manufacturing cost and SCO's direct wages represented 9 percent of its manufacturing cost attributable to pharmaceutical manufacturing activities.

On its Puerto Rican tax return for the period January 1, 1975, through December 31, 1975, SCO attributed $134,873,806 in sales to its pharmaceutical manufacturing activities. SCO also attributed the following amounts to the following financial categories relative to pharmaceutical manufacturing for this same period:

| Category | Amount |
| --- | --- |
| Cost of sales | $20,740,328 |
| Purchases | 14,983,540 |
| Direct labor | 2,819,967 |
| Other cost | 2,743,698 |
| Gross profit | 114,133,478 |
| Net operating profit | 64,500,266 |

For the period beginning January 1, 1975, through the period ended December 31, 1975, SCO's purchases represented 73 percent of its manufacturing cost and SCO's direct wages were 14 percent of its manufacturing cost attributable to pharmaceutical manufacturing operations. On its Puerto Rican tax return for the period January 1975, through December 31, 1975, SCO attributed approximately 90 percent of its net sales to pharmaceutical manufacturing operations and 10 percent to chemical manufacturing operations.

D. *Investment of SCO's Funds*

Petitioner's treasury department developed written guidelines for the type of investments in which SCO's funds should be placed. These guidelines were reviewed by petitioner's senior management and final authority for investments rested with the treasurer of petitioner.

As of December 31, 1974, SCO had invested approximately $10 million in U.S. and Government bonds, $104 million in Euro-dollar deposits, $10 million in corporate notes to third parties, $15 million in Canadian bonds, and approximately $9 million in U.S. or Government certificates. As of December 31, 1974, SCO had an additional $43 million

invested in short-term certificates of deposits. SCO's total investments as of December 31, 1974, were ápproximately $200 million. In the year 1974, SCO earned in excess of $15 million in interest income on its financial investments.

As of December 31, 1975, the total amount of SCO's investments was approximately $260 million. SCO had in excess of $149 million invested in long-term securities, including approximately $10 million invested in Canadian corporate bonds, $15 million invested in Canadian governmental notes, in excess of $105 million invested in Eurodollar deposits in England, in excess of $10 million invested in corporate notes in Switzerland, and in excess of $8.7 million invested in Puerto Rican securities. SCO had approximately $43.8 million invested in short-term securities, including $10 million invested in Bahamian banks, in excess of $28 million invested in Canadian banks, and an additional $5.5 million invested in English securities.

## E. *Petitioner's Operations*

Petitioner's U.S. pharmaceutical sales of $80,809,000 for the year 1968, the year immediately preceding the transfer of intangibles to SCO, declined to $38,234,000 and $46,734,000 in the years 1974 and 1975, respectively. This decline in sales represents a percentage decline of 52.7 and 42.2 for the years 1974 and 1975, respectively, as compared to 1968. Petitioner's taxable income declined from $44,641,890 in 1968 to ($9,804,837) and ($23,119,451) for the years 1974 and 1975, respectively. This decrease represents a total decline of 122 percent and 152 percent for 1974 and 1975, respectively, as compared to 1968. Large U.S. pharmaceutical companies, exclusive of petitioner averaged operating profits that were 18 percent of their sales in 1974 and 17 percent of their sales in 1975.

## XII. *Respondent's Proposed Adjustments*

### A. *Notice of Deficiency*

On June 8, 1979, respondent timely issued a notice of deficiency to petitioner relative to its 1974 and 1975 taxable years in which he determined deficiencies of $29,157,111 and $28,678,504, respectively in Federal income taxes. On Sep-

tember 4, 1979, petitioner timely filed a petition with this Court seeking a redetermination of those deficiencies. On May 6, 1982, we severed from this case all issues other than the propriety of respondent's allocations under section 482 of gross income and related business expenses to petitioner from SCO. With regard to section 482, respondent determined that petitioner engaged in transactions with SCO relating to the development, manufacture, sale, and distribution of pharmaceutical products wherein petitioner provided intangibles and valuable services for which it was not adequately compensated at arm's-length terms. Accordingly, respondent determined that the following amounts of gross income and additional business expense deductions were required to be allocated to petitioner in order to prevent evasion of taxes and to clearly reflect the incomes of petitioner and SCO:

|  | 1974 | 1975 |
|---|---|---|
| Gross income allocated | $92,718,000 | $110,314,000 |
| Related business expense deductions allocated | 38,980,000 | 46,678,000 |
| Net income allocation | 53,738,000 | 63,636,000 |

B. *Amendment to Answer*

On June 2, 1982, we granted respondent's motion for leave to file an amended answer. In his amended answer, respondent conceded that the amount of the deficiency for the taxable year 1974 should be reduced to $19,413,557. The parties subsequently stipulated on April 12, 1983, that the severed issue involving the deduction of an amortizable bond premium relating to a subsidiary of petitioner is no longer in controversy.

As a corollary to the allocations of gross income and deductions to petitioner, respondent has further asserted in the notice of deficiency and amended answer that because of the allocations under section 482 SCO failed in 1975 to satisfy the percentage of gross income requirements of section 931 and, therefore, is required to join with petitioner in filing a consolidated tax return for that year. In effect, this determination subjects all SCO's 1975 income remaining after the section 482 allocation to U.S. Federal income tax, resulting in an increased deficiency for that taxable year. In

the amended answer, respondent withdrew his earlier assertion that SCO failed to similarly qualify under section 931 in 1974.

## OPINION

### Introduction

This proceeding is a companion case to *Eli Lilly & Co. v. Commissioner*, 84 T.C. 996 (1985), on appeal (7th Cir., Nov. 12, 1986) (hereinafter referred to as *Eli Lilly*).[13] Like *Eli Lilly*, the record in this case is voluminous and the parties took extreme and polar positions.

While *Eli Lilly* and the case here under consideration both concern respondent's allocations of income from petitioners' respective wholly owned Puerto Rican subsidiaries to the parent corporations under the authority of section 482 and therefore present certain similar issues, there are significant differences between the two cases. Unlike *Eli Lilly*, this is not a pricing case. In *Eli Lilly*, *supra* at 1129, the sales in issue were made by the Puerto Rican subsidiary to its domestic U.S. parent. In this proceeding, the vast majority of SCO's sales (97 percent) were made to unrelated drug wholesalers at prevailing wholesale prices. Respondent does not contend to the contrary.[14] Also, we are not asked to decide whether prices paid by SCO to foreign affiliates of petitioner for raw materials were at arm's length because respondent has not alleged otherwise. However, the two cases do present the common issues of whether the subsidiary corporation owns the intangibles transferred under section 351 for purposes of applying section 482 and, if so, whether respondent abused his discretion by allocating to petitioner substantially all of the income attributable to that intangible property. We turn now to those issues.[15]

---

[13] A decision was entered in *Eli Lilly & Co. and Subsidiaries v. Commissioner* (docket No. 5113-76) on Aug. 19, 1986, and a Notice of Appeal to the U.S. Court of Appeals for the Seventh Circuit from the decision of this Court was filed by petitioners on Nov. 12, 1986.

[14] Thus, we do not consider the regulations under sec. 482 which deal with the methods of determining arm's-length prices with respect to intercompany sales of tangible property. Sec. 1.482-2(e), Income Tax Regs.

[15] We have adopted neither petitioner's nor respondent's exact wording of the issues but rather have formulated what we consider to be a more precise phrasing of the questions presented.

*Issue 1. Ownership of Intangibles for Section 482 Purposes*

This case concerns respondent's application of section 482 to allocate to petitioner income attributable to the use of income-producing intangibles transferred to a wholly owned subsidiary corporation in prior section 351 nonrecognition transactions. Respondent argues that no business purpose existed for the transfers of these intangible assets by petitioner to SCO and, therefore, an allocation under section 482 is required to prevent the avoidance of taxes. Moreover, respondent argues that the substantial income shifting which resulted from the transfers requires the application of section 482 in order to place petitioner and SCO in the position of unrelated parties dealing at arm's length and to correct the distortion of petitioner's income caused by the transfers. In essence, respondent's allocations of more than 92 percent of SCO's gross income from operations for the 1974 and 1975 taxable years ignore the transfer of the intangibles to SCO and allocates all SCO's net income derived from such intangibles to petitioner, with the exception of a token amount intended to compensate SCO solely for its function as a "contract manufacturer."[16]

In sharp contrast, it is petitioner's position that the complete legal and beneficial ownership of the intangibles was transferred to SCO for bona fide business reasons in valid section 351 nonrecognition transactions during 1969-71, several years prior to the taxable years in issue. Accordingly, petitioner argues that all income derived from the use of the transferred property properly belongs to SCO as the owner of the intangibles. Therefore, petitioner concludes, respondent's allocation of SCO's income to it under section 482 is in error.

A. *Summary of the Facts*

Although we have made what we consider to be exhaustive findings of fact, our findings represent but a summary of the even more extensive findings requested by the parties. For purposes of facilitating our discussion in the opinion, the following is a brief synopsis of the essential facts.

---

[16]Respondent's allocations allow SCO to retain income equal to its manufacturing costs plus 30 percent of those costs.

During the taxable years in issue, petitioner and its subsidiaries engaged in the invention, development, manufacturing, marketing, and sale of ethical and proprietary pharmaceutical products. SCO was organized as a wholly owned subsidiary of petitioner on January 13, 1969, for valid business reasons and to take advantage of the benefits provided by section 931 as well as the tax incentives provided by the Commonwealth of Puerto Rico. During 1974 and 1975, SCO was engaged in the manufacture and sale of ethical pharmaceutical products in Puerto Rico.

In 1968, petitioner was in need of additional manufacturing facilities to service its U.S. pharmaceutical business and, after ruling out other options, decided to establish manufacturing operations in Puerto Rico. After SCO's incorporation on January 13, 1969, petitioner leased 60,000 square feet of a building in Hato Rey on February 28, 1969, and an additional 20,000 square feet on July 1, 1970. These leasehold interests were assigned to SCO on July 1, 1970.

After study, petitioner selected five of its seven major product lines for transfer to SCO: (1) Aldactone/Aldactazide; (2) Banthine/Pro-Banthine; (3) Lomotil; (4) Flagyl; and (5) oral contraceptives. These product lines consisted of old well-established products that had been sold by petitioner in the United States for many years and were highly profitable, selling in 1968 at prices ranging from 4 to 20 times the direct cost of their manufacture. They were each protected by patents at the time of their transfer to SCO and each was strongly identified with a recognized and well-established trademark.

The Commonwealth of Puerto Rico granted two basic tax exemptions to SCO with respect to its operations during the years 1969 through 1975. By virtue of these grants, SCO was exempt from all Puerto Rican income tax on its qualified income, real and personal property tax, license fees, and excise or other municipal taxes during the years in issue.

During the years 1969 through 1971, petitioner and SCO entered into six agreements providing for the transfer by petitioner to SCO of its interest in patents, trademarks, technical data, licenses, and copyrights relating to Aldactone/Aldactazide, Banthine/Pro-Banthine, Flagyl,

Lomotil, Serenace, and Ovulen/Demulen. Upon entering into these agreements, SCO became the holder of legal title to the transferred intangibles.

From August 1969 until approximately October 1, 1970, SCO sold the products it manufactured to petitioner. In September and October 1970, SCO began to sell its products directly to unrelated wholesalers in the United States and entered into agreements with each of its more than 400 drug wholesaler customers. The agreements provided that title to SCO's products would pass to the customer upon delivery to a common carrier in Puerto Rico.

During 1974 and 1975, approximately 97 percent of SCO's sales were made by SCO directly to unrelated customers, primarily the independent drug wholesalers. Generally, SCO's independent wholesale customers were also customers of petitioner as well as of most other pharmaceutical companies.

Effective September 1, 1970, petitioner and SCO entered into a marketing agreement whereby petitioner agreed to provide marketing and sales promotion services on behalf of SCO. The fee for these services was equal to the greater of (1) 25 percent of SCO's net sales to customers in the United States or (2) petitioner's cost of providing such services to SCO plus 25 percent of such cost.

During 1974 and 1975, petitioner maintained a marketing and sales administration and customer service staff in Skokie, Illinois, as well as a field sales force operating throughout the United States. Petitioner's marketing staff and field sales force marketed its own pharmaceutical products and provided marketing services to SCO under the Marketing Agreement. The term "marketing services" was defined to include sales representation, sales administration, professional education, market and promotion planning, and advertising.

Petitioner's principal method of marketing ethical pharmaceutical products involved the direct contact, or detailing, method. In addition, petitioner's marketing operations included printed advertising and the distribution of literature, promotional activities at conventions and medical schools, and other activities. During 1974 and 1975, petitioner's sales force consisted of approximately 405 sales

representatives, 37 district sales managers, 6 regional sales managers, and a national sales director.

The principal activity of petitioner's sales representatives during 1974 and 1975 was calling on physicians. The purpose of such visits was to explain the function of pharmaceutical products and to deliver descriptive materials and samples. A typical sales representative saw between five and seven physicians each working day and spent an average of 3 to 5 minutes with each one. The balance of the sales representative's time was spent contacting retail pharmacies, wholesalers, hospitals, and clinical pharmacies to check on product stock and to urge the customers to maintain supplies of petitioner's and SCO's products. In 1974 and 1975, petitioner's sales representatives made a total of 764,521 and 769,482 calls, respectively, in connection with petitioner's and SCO's products.

In addition to the selling function, petitioner's marketing staff also performed other marketing and sales administration services on behalf of SCO, such as aligning sales territories, administering salaries, and training salesmen. The marketing staff also developed and scheduled advertising and sales material, provided sales forecasts and long-range market planning, and insured that all marketing materials complied with Federal, State, and local laws. In the area of advertising, petitioner's marketing staff dealt directly with advertising agencies and was responsible for media approval. As of December 31, 1975, petitioner had 67 employees on its marketing staff in Skokie.

In 1974 and 1975 SCO paid petitioner marketing fees of $27,522,000 and $33,243,000, respectively, computed on the basis of 25 percent of SCO's net U.S. sales, since that figure exceeded petitioner's cost of performance plus 25 percent in those years. Petitioner's annual marketing expenses relative to SCO's products were $11,123,000 in 1974 and $14,861,000 in 1975.

In addition, SCO paid marketing fees to G.D. Searle Inter-American Co. of $232,000 in 1974 and $311,000 in 1975, and $40,000 to Searle Caribbean in 1975 with respect to their marketing of SCO's products in Puerto Rico. SCO also paid marketing expenses of $3,512,000 in 1974 and $5,589,000 in 1975 to certain unrelated parties for such

items as advertising space in journals, services of advertising agencies, and expenses of professionals speaking at symposia. Such promotion was arranged by petitioner's employees in accordance with the Marketing Agreement. SCO also paid petitioner for sample packaging expenses based upon cost in the amounts of $2,540,000 in 1974 and $2,402,000 in 1975.

The pharmaceutical industry is research intensive and most, if not all, leading pharmaceutical firms including petitioner make extensive investments in research and development in order to create new products to market. During 1970 through 1975, the worldwide pharmaceutical research of petitioner and its consolidated subsidiaries was directed toward seven general therapeutic areas. These included the study of cardiovascular-renal diseases, gastrointestinal disorders, sexual disorders and reproduction, immunology and inflamatory diseases, infectious diseases, metabolic diseases, and research on the central nervous system. Petitioner also conducted pharmaceutical research in the area of disease progression and therapeutic control. This research involved efforts to refine the manufacturing process of steroids, such as the raw materials used in the manufacture of Aldactone, Aldactazide, Ovulen, and Demulen. Petitioner's research ultimately resulted in obtaining U.S. patents on a microbiological process to provide the basic steroid chemicals used as early intermediates in the manufacture of spironolactone, in lieu of intermediates from barbasco root. However, during 1974 and 1975, all Aldactone and Aldactazide products manufactured by SCO used intermediates derived from barbasco root.

There is a clear correlation in the pharmaceutical industry between extensive research and development expenditures and the introduction of new ethical products. However, in economic terms, a specific investment made in research and development necessarily involves a substantial degree of risk. In general, petitioner performed research on approximately 10,000 new drug compounds in order to isolate 1 compound which would ultimately be marketed. The average time span for taking a new drug compound from initial identification through the regulatory process to FDA ap-

proval was 8 years during the period 1969 through 1975. Petitioner's approximate cost of development of an ethical pharmaceutical product that obtained FDA approval during the period 1969 through 1975 was $50 million. This cost included the amounts expended on products that did not successfully complete the regulatory review process to the market place.

Pharmaceutical firms typically patent their newly discovered chemical compounds in order to exclude competing firms from marketing these compounds. For a period of 17 years following the issuance of a new-composition-of-matter patent, U.S. patent law grants the owner of that patent the right to exclude others from making, having made, using, or selling the invention throughout the United States, including Puerto Rico. Thus, the value of a patent lies in the exclusion of competitors from the market.

Patented pharmaceutical compounds must be submitted to the FDA to obtain its approval prior to their marketing in interstate commerce. The owner of a new-composition-of-matter patent may grant to others by sale, license, or otherwise the right under the patent to make, use, or sell the invention.

During 1974 and 1975, petitioner maintained a pharmaceutical, chemical, and biochemical research, development, and control facility in Skokie, Illinois, and Searle U.K. maintained a facility in High Wycombe, England. Petitioner and Searle U.K. engaged in research and product development activities relating to their own pharmaceutical products and those of petitioner's other subsidiaries. These activities benefited petitioner and its worldwide subsidiaries and affiliates, including SCO.

The member firms of the Pharmaceutical Manufacturer's Association invested 11.7 percent and 11.6 percent, respectively, of their sales of pharmaceutical products in research and development during 1974 and 1975. Petitioner and its consolidated subsidiaries invested 13.1 percent and 11.8 percent, respectively, of world-wide pharmaceutical sales dollars in pharmaceutical research in those same years. During 1974 and 1975, petitioner incurred research and development expenses at its Skokie facility of $24,203,000 and $27,672,000, respectively. These amounts also include

expenses attributable to pharmaceutical and chemical quality control and regulatory affairs. In addition, these amounts include biochemical research and development activity expenses of $96,000 in 1974 and $2,437,000 in 1975. The pharmaceutical research and development expenditures of petitioner and its consolidated subsidiaries for the years 1974 and 1975 were $33,020,000 and $36,228,000, respectively.

In 1974 and 1975, petitioner's pharmaceutical research and development related expenses represented 15.9 percent and 13.8 percent, respectively, of the combined phrmaceutical sales by petitioner and SCO to third parties. Petitioner invested 63 percent and 54 percent, respectively, of its U.S. pharmaceutical sales dollars in research and development in those same years. Petitioner's investment in pharmaceutical research and development activities exceeded its cost of goods sold in 1974 and was approximately 95 percent of its cost of goods sold in 1975.

SCO maintained at its Caguas, Puerto Rico, facilities a pharmaceutical technology laboratory and a chemical development laboratory. Three employees of SCO in pharmaceutical technology and eight in chemical development engaged in process trouble shooting and process improvement regarding SCO's products. In 1974 and 1975, the research and development expenses of SCO, generally consisting of reimbursement to petitioner, represented approximately 1 percent of SCO's net sales in each year.

Prior to the introduction into interstate commerce of any new drug, a "new drug application" (NDA) must be approved by the Food and Drug Administration. The ability to obtain NDA's for new drug products is a critical part of the research and development function of large pharmaceutical companies. Since 1962, NDA's are required to contain scientific data which demonstrate both the safety and effectiveness of the drug. After NDA approval, significant changes in manufacturing, labeling, and packaging necessitate the submission and approval of an NDA supplement prior to their implementation.

The submission and review of an NDA is a lengthy and difficult process. During 1974 and 1975, an accepted average in the pharmaceutical industry was that 1 drug out of

every 10 submitted for clinical testing would obtain NDA approval. Prior to 1974, petitioner filed and gained approval of 15 NDA's relating to SCO's products. All animal and human testing, as well as all correspondence associated with the preparation of these NDA's was performed or contracted by petitioner or one of its subsidiaries other than SCO. Petitioner filed no NDA's during 1974 and 1975.

At the time each of SCO's products was transferred to it, it was necessary for petitioner to file an NDA supplement with the FDA. At the time SCO established its chemical operations at Caguas, Puerto Rico, and again when it moved its pharmaceutical manufacturing operation from its leased facility in Hato Rey to Caguas, it was necessary for petitioner to file additional NDA supplements. Petitioner also conducted studies and filed periodic reports with the FDA with respect to its own and SCO's products. Other NDA supplements were filed by petitioner with respect to SCO's products during 1969 through 1975 dealing with various matters such as changes in expiration dates and labeling and package inserts. During 1974 and 1975, petitioner also filed 10 "investigational new drug applications" (IND's), 4 of which related to SCO's products.

All NDA supplements and IND's filed with respect to SCO's products during 1969 through 1975 were filed by employees of petitioner. Petitioner was the holder and owner of all NDA's related to SCO's products.

In addition to the regulatory affairs services performed by petitioner relative to SCO's products, petitioner also performed the following services for SCO: (i) Development of new dosage forms, (ii) development of combinations of SCO's products with other drugs, (iii) development of improved chemical and pharmaceutical processes and formulations for existing products, (iv) long-term toxicology studies, and (v) stability testing.

SCO maintained a laboratory in its Caguas facilities for the purpose of developing and improving its chemical and pharmaceutical manufacturing procedures. None of the modifications and improvements developed by SCO's chemical development group required the filing of an NDA supplement.

SCO paid petitioner $902,000 in 1974 and $1,278,000 in 1975 for research and development services including charges for time spent by petitioner's regulatory affairs department during those years.

During 1975 and 1976, the FDA conducted a major investigation of certain preclinical research conducted by petitioner from January 1, 1968, through July 1975. A portion of such research had been paid for by SCO. As part of the investigation, FDA teams were at Skokie from October 6 through December 19, 1975. The FDA team selected for detailed review various studies relating to seven products of which three, Aldactone, Flagyl, and Ovulen, were SCO's products.

The possible administrative sanctions which could have resulted from the FDA's investigation ranged from changes in the labeling of the products to ultimate removal of the product from the market. Any negative findings by the FDA could have adversely affected sales of the specific product. Accordingly, petitioner gave high priority to the FDA's investigation and formed a task force responsible for coordinating activities relative to the investigation. Petitioner estimated its expenses incurred during 1975 relative to this investigation to be $1,140,209. SCO reimbursed petitioner for one-half of these expenses, $570,105, during June 1976.

Petitioner and its subsidiaries purchased product liability insurance under a blanket policy. Petitioner determined that 65 percent of the insurance premiums associated with SCO's products should be allocated to and paid by petitioner because petitioner bore the risk as the entity which developed the products and performed the underlying research. The total product liability insurance cost paid or accrued by petitioner with respect to its worldwide operations was $1,970,000 in 1974 and $2,061,000 in 1975. SCO's cost for product liability insurance premiums under petitioner's policy was $557,000 in 1974 and $567,000 in 1975.

Among the types of administrative services performed by petitioner on behalf of SCO were (i) purchasing assistance, (ii) materials handling and receiving assistance, (iii) engineering assistance, (iv) equipment maintenance assistance, (v) accounting assistance including computerized accounting,

(vi) legal assistance including product liability litigation, (vii) treasury assistance including advice and assistance relating to portfolio investments, and (viii) personnel development and employee benefits assistance.

No itemization of administrative activities performed by petitioner on behalf of SCO was maintained in 1974 and 1975. Rather, SCO paid petitioner an administrative fee equal to 3 percent of SCO's net sales of its products in the United States. The administrative fees paid by SCO to petitioner with respect to 1974 and 1975 were $3,304,000 and $3,989,000, respectively.

Petitioner incurred general and administrative expenses of $26,282,000 and $33,660,000 in 1974 and 1975, respectively. The total general and administrative expenses of petitioner and its consolidated subsidiaries in 1974 and 1975 were $69,963,000 and $85,628,008, respectively.

SCO's total net sales and net income for the taxable years before the Court were as follows:

| Year | Net sales | Net income |
|------|-----------|------------|
| 1974 | $114,784,000 | $74,560,000 |
| 1975 | 138,044,000 | 72,240,000 |

Petitioner had U.S. pharmaceutical sales of $80,809,000 in 1968, the year immediately preceding the transfer of the intangibles to SCO. Those sales declined to $38,234,000 and $46,734,000 in the years 1974 and 1975, respectively. Petitioner's taxable income declined from $44,641,890 in 1968 to ($9,804,837) in 1974 and ($23,119,451) in 1975.

B. *Background of Relevant Provisions*

This case arises in the context of an array of complex statutory provisions. We shall begin by examining this statutory framework.

1. *Tax Incentives for U.S. Corporations Operating in Puerto Rico*

a. *Sections 931 and 936*

The predecessor of section 931 was first enacted as section 262 of the Revenue Act of 1921, Pub. L. 67-98, 92 Stat. 227. The purpose of section 262 was to stimulate investment and business activity by corporations and indi-

viduals in the possessions of the United States by exempting from Federal tax income earned in the possessions provided that a certain level of business activity was maintained. That section was ultimately reenacted as section 931 of the Internal Revenue Code of 1954 and remained in effect without any material change throughout 1974 and 1975, the taxable years here in issue. As we noted in *Eli Lilly*,

The congressional intent for section 931 and its predecessors consistently has been the encouragement of American business investments in possessions of the United States. American companies operating in the possessions originally were subjected to double taxation by the imposition of both the Federal corporate income tax and the taxes levied by the possessions governments. Section II of the Tariff Act of 1913, ch. 16, 38 Stat. 166; Revenue Act of 1918, ch. 18, 40 Stat. 1058. Congress perceived that the tax burden so created placed American businesses at a competitive disadvantage when compared with their British and French counterparts, which were not subject to taxation on the profits earned abroad unless they were paid back to the home company. Congress consequently enacted section 931 and its predecessors to remove that competitive disadvantage and to encourage American business activity in the U.S. possessions. H. Rept. 350, 67th Cong., 1st Sess. 1 (1921), 1939-1 C.B. (Part 2) 168, 174. [84 T.C. 996, 1110 (1985).]

In pertinent part, section 931 provided as follows during the taxable years in issue:

SEC. 931. INCOME FROM SOURCES WITHIN POSSESSIONS OF THE UNITED STATES.

(a) GENERAL RULE.—In the case of citizens of the United States or domestic corporations, gross income means only gross income from sources within the United States if the conditions of both paragraph (1) and paragraph (2) are satisfied:

(1) 3-YEAR PERIOD.—If 80 percent or more of the gross income of such citizen or domestic corporation (computed without the benefit of this section) for the 3-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such taxable year as may be applicable) was derived from sources within a possession of the United States; or

(2) TRADE OR BUSINESS.—If—

(A) in the case of such corporation, 50 percent or more of its gross income (computed without the benefit of this section) for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States.

In general, section 931 permitted corporations to exclude possession source income if at least 80 percent of their

gross income for the required period was derived from sources within the possession and if at least 50 percent of their gross income was derived from the active conduct of a trade or business within the possession. This exclusion, in conjunction with the fact that dividends received by a domestic corporation from its wholly owned possession subsidiary were not eligible for the intercorporate dividends-received deduction by virtue of section 246(a)(2)(B), resulted in the amassing by corporations of large amounts of income which were not repatriated to the United States.

Section 936 was enacted in 1976 to encourage investment of possession source income in the United States.[17] That section essentially transformed the section 931 exemption for corporations into an equally favorable tax credit system by eliminating the tax exemption and instead permitting the U.S. parent corporation to elect a special tax credit to offset the Federal tax on its wholly owned subsidiary's possession-source income. It is clear that Congress was aware of the favorable tax benefits provided by section 931 and intended to retain such tax benefits by its enactment of section 936. The Senate Finance Committee and the House of Representatives Committee on Ways and Means stated as follows in virtually identical reports:

> The special exemption provided (under sec. 931) in conjunction with investment incentive programs established by possessions of the United States, especially the Commonwealth of Puerto Rico, have [sic] been used as an inducement to U.S. corporate investment in active trades and businesses in Puerto Rico and the possessions. Under these investment programs little or no tax is paid to the possessions for a period as long as 10 to 15 years and no tax is paid to the United States as long as no dividends are paid to the parent corporation.
>
> *Because no current U.S. tax is imposed on the earnings if they are not repatriated, the amount of income which accumulates over the years from these business activities can be substantial.* The amounts which may be allowed to accumulate are often beyond what can be profitably invested within the possession where the business is conducted. As a result, corporations generally invest this income in other possessions or in foreign countries either directly or through possessions banks or other financial institutions. In this way possessions corporations not only avoid U.S. tax on their earnings from businesses conducted in a possession, but also avoid U.S. tax on the income obtained from reinvesting their business earnings abroad.

---

[17]Tax Reform Act of 1976, Pub. L. 94-455, sec. 1051, 90 Stat. 1520, 1643 (1976).

*The committee after studying the problem concluded that it is inappropriate to disturb the existing relationship between the possessions investment incentives and the U.S. tax laws because of the important role it is believed they play in keeping investment in the possessions competitive with investment in neighboring countries.* The U.S. Government imposes upon the possessions various requirements, such as minimum wages requirements and requirements to use U.S. flagships in transporting goods between the United States and various possessions, which substantially increase the labor, transportation and other costs of establishing business operations in Puerto Rico. Thus, without significant local tax incentives that are not nullified by U.S. taxes, the possessions would find it quite difficult to attract investments by U.S. corporations.

[S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 315-316; see also H. Rept. 94-658 (1975), 1976-3 C.B. (Vol. 2) 945, 946-947. Emphasis added; fn. refs. omitted.]

In the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324, however, Congress enacted new provisions dealing specifically with the issue before us involving the tax-free transfer of intangibles to a possessions corporation for taxable years beginning on or after January 1, 1983. In essence, Congress adopted respondent's litigating position in this case. However, we emphasize that no inference can be drawn from those new provisions and the fact of their enactment can have no effect on our decision herein. See H. Rept. 97-760 (Conf.) (1982), 1982-2 C.B. 600, 617 n. 1.

b. *Puerto Rican Tax Incentives*

In 1948, Puerto Rico embarked on a program to encourage economic development in the Commonwealth through private enterprise. Popularly known as Operation Bootstrap, this program provided tax exemptions to U.S. possessions corporations. Industrial Tax Exemption Act of 1948, P.R. Laws Ann. tit. 13, secs. 221-238 (1955). In addition to providing a total exemption from Puerto Rican corporate income taxes for a period of years, the legislation also provided exemptions from certain municipal and property taxes, excise taxes, and license fees. In general, these tax exemptions were available for a corporation manufacturing items not produced on a commercial scale in Puerto Rico prior to 1947.

The 1948 Act was reenacted in 1954 and an additional 10-year exemption for new business was provided. Indus-

trial Incentive Act of 1954, P.R. Laws Ann. tit. 13, secs. 241-251 (1977). In 1963, in response to pressure from investors for further extensions of the industrial incentives, the tax exemptions were liberalized and expanded to provide new exemption grants for periods ranging from 10 to 25 years. Industrial Incentive Act of 1963, P.R. Laws Ann. tit. 13, secs. 252-252j (1977). In 1978, Puerto Rico's total tax exemption program was changed into a partial tax exemption program. Industrial Incentives Act of 1978, Act No. 26 of June 2, 1978.

SCO was granted two tax exemptions by the Commonwealth of Puerto Rico during the years 1969 through 1975. Consequently, during the taxable years in issue, SCO was exempt from all Puerto Rican income tax on its qualified income (income from its manufacturing activities and certain investment income), municipal, and Commonwealth taxes on real and personal property, license fees, and excise or other municipal taxes.

### 2. Nonrecognition Provision of Section 351

Section 351, which provides for the nonrecognition of gain or loss upon the transfer of property to a controlled corporation, states in relevant part as follows:

SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

Section 351 had its origin in the Revenue Act of 1921, 42 Stat. 230. Prior to that time the transfer of assets to a corporation in exchange for its stock was a taxable event.

The basic philosophy underlying section 351 is that a transfer of appreciated or depreciated property to a corporation controlled by the transferor is merely a change in the form of ownership. Thus, there should be no recognition of gain or loss at that time but rather deferred until subsequent sale or divestiture of property. *E.I. Du Pont de Nemours & Co. v. United States*, 200 Ct. Cl. 391, 471 F.2d 1211 (1973).

There are several other important consequences of a section 351 nonrecognition exchange. Under section 1032(a),[18] the transferee corporation also does not recognize gain or loss on the receipt of property in exchange for its stock. Under section 362(a)(1)[19] the transferor's basis in the transferred property is carried over and becomes the transferee corporation's basis in the property. As a corollary, the transferor's basis in the transferred property is substituted as the basis of the stock received in exchange under section 358(a)(1).[20]

During the establishment of SCO's operations, petitioner transferred to SCO at various times between 1969 and 1971 tangible and intangible property as contributions to its capital. The transferred intangible property consisted of patents, trademarks, copyrights, technical data, manufacturing know-how, and contract rights relating to certain of its major product lines.

Petitioner's transfers of these intangibles to SCO during 1969-71 clearly met the requirements for nonrecognition under section 351 and respondent does not contend otherwise. The intangibles qualify as "property" within the meaning of the statute. *Hooker Chemicals & Plastics Corp. v. United States*, 219 Ct. Cl. 161, 591 F.2d 652 (1979). The "control" test of section 368(c)[21] was met in that SCO was a wholly owned subsidiary of petitioner. Although petitioner

[18]SEC. 1032. EXCHANGE OF STOCK FOR PROPERTY.

(a) NONRECOGNITION OF GAIN OR LOSS.—No gain or loss shall be recognized to a corporation on the receipt of money or other property in exchange for stock (including treasury stock) of such corporation.

[19]SEC. 362. BASIS TO CORPORATIONS.

(a) PROPERTY ACQUIRED BY ISSUANCE OF STOCK OR AS PAID-IN SURPLUS.—If property was acquired on or after June 22, 1954, by a corporation—

(1) in connection with a transaction to which section 351 (relating to transfer of property to corporation controlled by transferor) applies, or

(2) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer.

See sec. 1.362-1(a), Income Tax Regs.; see also sec. 1032(b).

[20]SEC. 358. BASIS TO DISTRIBUTEES.

(a) GENERAL RULE.—In the case of an exchange to which section 351 * * * applies —

(1) NONRECOGNITION PROPERTY.—The basis of the property permitted to be received under such section without the recognition of gain or loss shall be the same as that of property exchanged * * *

[21]"Control" is defined by sec. 368(c) as being "the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation."

did not receive additional shares of SCO's stock in exchange for each transfer of intangible property, such formality is not required in the case of a wholly owned corporation. *American Mfg. Co. v. Commissioner*, 55 T.C. 204, 221 (1970); Rev. Rul. 64-155, 1964-1 C.B. (Part 1) 138. Thus, petitioner recognized no gain or loss upon its transfers of the intangibles and SCO became the legal owner of such intangibles after the transfers.

C. *Section 482 and Its Inter-Relationship With Sections 351 and 931*

1. *Scope of Respondent's Authority Under Section 482*

Section 482 had its origin in Regulation 41, articles 77 and 78 of the War Revenue Act of 1917, ch. 63, 40 Stat. 300, as a provision to allow the Commissioner to require related corporations to file consolidated returns. It reappeared as section 240(d) of the Revenue Act of 1921, ch. 136, 42 Stat. 260, as part of the provisions liberalizing the consolidated return rules and permitted the Commissioner to consolidate the accounts of affiliated corporations "for the purpose of making an accurate distribution or apportionment of gains, profits, income, deductions, or capital between or among such related trades or business." Section 240(d) of the Revenue Act of 1921 was successively reenacted as section 240(d) of the Revenue Act of 1924, ch. 234, 43 Stat. 288, and as section 240(f) of the Revenue Act of 1926, ch. 27, 44 Stat. 46, both of which permitted taxpayers to request the Commissioner to consolidate the accounts of related businesses.

Section 45 of the Revenue Act of 1928, ch. 852, 45 Stat. 806, gave the predecessor of section 482 independent status by eliminating the taxpayer's power to invoke the section and emancipating it from the consolidated return provisions. The language in the new section 45 was essentially the same as that contained in the present section 482. The legislative history of the provision indicated that:

Section 45 is based upon section 240(f) of the 1926 Act, broadened considerably in order to afford adequate protection to the Government made necessary by the elimination of the consolidated return provisions of the 1926 Act. The section of the new bill provides that the Commissioner may, in the case of two or more trades or businesses

owned or controlled by the same interests, apportion, allocate, or distribute the income or deductions between or among them, as may be necessary in order to prevent evasion (by the shifting of profits, the making of fictitious sales, and other methods frequently adopted for the purpose of "milking"), and in order clearly to reflect their true tax liability. [H. Rept. 2, 70th Cong., lst Sess. (1927), 1939-1 C.B. (Part 2) 395; see also S. Rept. 960, 70th Cong., lst Sess. (1928), 1939-1 C.B. (Part 2) 426.]

During the taxable years in issue, section 482 provided in its entirety as follows:[22]

SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.
    In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any such organizations, trades, or businesses.

As relevant here, this statute gives respondent broad authority to allocate gross income, deductions, credits, or allowances between or among commonly controlled corporations on two alternate bases; to prevent the evasion of taxes or in order clearly to reflect the income of such corporations. *Spicer Theatre, Inc. v. Commissioner*, 346 F.2d 704, 706 (6th Cir. 1965), affg. 44 T.C. 198 (1964); *Paccar, Inc. v. Commissioner*, 85 T.C. 754, 787 (1985); *Foster v. Commissioner*, 80 T.C. 34, 142 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985). As defined in section 1.482-1(a)(3), Income Tax Regs., the term "controlled" is very broad and includes "any kind of control, direct or indirect, whether legally enforceable, and however exercisable or exercised."

The purpose of section 482, as provided in section 1.482-1(b)(1), Income Tax Regs., is:

to place a controlled taxpayer on a tax parity with an uncontrolled taxpayer, by determining, according to the standard of an uncontrolled

---

[22]Sec. 482 was recently upheld as a constitutionally valid delegation of legislative power in *Foster v. Commissioner*, 80 T.C. 34, 142 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985). See also *Asiatic Petroleum Co. v. Commissioner*, 79 F.2d 234 (2d Cir. 1935), affg. 31 B.T.A. 1152 (1935), where the predecessor of sec. 482 was held to be constitutional in the face of a challenge on due process grounds.

taxpayer, the true taxable income from the property and business of a controlled taxpayer. The interests controlling a group of controlled taxpayers are assumed to have complete power to cause each controlled taxpayer so to conduct its affairs that its transactions and accounting records truly reflect the taxable income from the property and business of each of the controlled taxpayers. If, however, this has not been done, the taxable incomes are thereby understated, the district director shall intervene, and, by making such distributions, apportionments, or allocations as he may deem necessary of gross income, deductions, * * * or of any item or element affecting taxable income, between or among the controlled taxpayers constituting the group, shall determine the true taxable income of each controlled taxpayer. *The standard to be applied in every case is that of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer.* [Emphasis added.]

Thus, the Commissioner is empowered by section 482 to examine transactions between controlled entities to determine whether they would have been consummated on the same terms in an arm's-length negotiation between strangers and to make an allocation when they fail to meet that standard. *Local Finance Corp. v. Commissioner*, 407 F.2d 629, 632 (7th Cir. 1969), affg. 48 T.C. 773 (1967). See also *Ciba-Geigy Corp. v. Commissioner*, 85 T.C. 172, 221 (1985); *Huber Homes, Inc. v. Commissioner*, 55 T.C. 598, 605-606 (1971).

Respondent's determinations under section 482 must be sustained absent an abuse of discretion. *Wisconsin Big Boy Corp. v. Commissioner*, 452 F.2d 137, 140 (7th Cir. 1971), affg. 52 T.C. 1073, 1092 (1969); *Paccar, Inc. v. Commissioner, supra* at 787; *Spicer Theatre, Inc. v. Commissioner*, 44 T.C. 198, 206 (1964), affd. 346 F.2d 704, 706 (6th Cir. 1965); *Grenada Industries, Inc. v. Commissioner*, 17 T.C. 231, 255 (1951), affd. 202 F.2d 873 (5th Cir. 1953). The taxpayer must meet a heavier than normal burden of proof and demonstrate that respondent's determinations are arbitrary, capricious, or unreasonable in order for us to redetermine the deficiency.[23] *Foster v. Commissioner*, 80 T.C. at 143; *Ach v. Commissioner*, 42 T.C. 114, 125-126 (1964), affd. 358 F.2d 342 (6th Cir. 1966). Whether or not respondent has exceeded or abused his discretion in making

---

[23] The normal burden of proof on the taxpayer in a Tax Court proceeding is to "make a prima facie showing that the Commissioner committed the errors alleged in the petition and to overcome the proofs submitted on behalf of the Commissioner." *Lyon v. Commissioner*, 1 B.T.A. 378, 379 (1925). Rule 142(a), Tax Court Rules of Practice and Procedure.

allocations under section 482 is a question of fact. *Paccar, Inc. v. Commissioner, supra* at 787; *American Terrazzo Strip Co. v. Commissioner,* 56 T.C. 961, 971 (1971).

A section 482 allocation to prevent the evasion of taxes is "primarily intended to prevent the artificial shifting or milking of profits." *Eli Lilly, supra* at 1115. Thus, a section 482 allocation by respondent will be upheld where the challenged transaction was arranged solely to avoid taxes and without a valid business purpose. E.g., *Asiatic Petroleum Co. v. Commissioner,* 79 F.2d 234 (2d Cir. 1935), affg. 31 B.T.A. 1152 (1935); *Northwestern National Bank of Minneapolis v. United States,* an unreported case (D. Minn. 1976, 38 AFTR 2d 76-1400, 76-1 USTC par. 9408), affd. 556 F.2d 889 (8th Cir. 1977).

Even in the absence of tax avoidance motives, respondent may make allocations under section 482 among related parties in order to prevent distortion of income. *Eli Lilly & Co. v. United States,* 178 Ct. Cl. 666, 372 F.2d 990, 999 (1967). This clear reflection of income standard is applicable when income earned by one party is shifted to a related party or when a challenged transaction results in an artificial mismatching of a party's income and expenses. *Baldwin-Lima-Hamilton Corp. v. United States,* 435 F.2d 182 (7th Cir. 1970), affg. in part and revg. and remanding in part an unreported District Court decision; *Rooney v. United States,* 305 F.2d 681, 683 (9th Cir. 1962), affg. 189 F. Supp. 733 (N.D. Cal. 1960); *Central Cuba Sugar Co. v. Commissioner,* 198 F.2d 214 (2d Cir. 1952), revg. and remanding on this issue 16 T.C. 882 (1951).

## 2. *Section 482 Allocations Involving Nonrecognition Transfers*

We must first decide whether SCO should be considered the owner of the intangibles transferred to it by petitioner for purposes of also being considered the owner of the income derived from such intangibles during the years in issue. As noted, respondent does not dispute the validity of the section 351 transfers to the extent that no gain or loss was realized by the corporations and that SCO holds legal title to the intangibles. Respondent alleges, however, that he has the authority under section 482 to disregard the

legal ownership of the intangibles and to reallocate the income and related business expenses attributable to the intangibles back to petitioner in order to prevent the evasion of taxes or clearly to reflect petitioner's income.

Section 1.482-1(d)(5), Income Tax Regs., specifically provides that section 482 may be applied in situations involving section 351 transfers.

(5) Section 482 may, when necessary to prevent the avoidance of taxes or to clearly reflect income, be applied in circumstances described in sections of the Code (such as section 351) providing for nonrecognition of gain or loss. See, for example, *National Securities Corp. v. Commissioner*, 137 F. 2d 600 (3d Cir. 1943), cert. denied 320 U.S. 794 (1943).

Respondent argues that petitioner's failure to exact arm's-length consideration from SCO for the transferred intangibles resulted in the avoidance of taxes or failure to clearly reflect petitioner's income which permits the section 482 allocations made in the notice of deficiency.

Petitioner argues that respondent's allocations under section 482 which preempt or ignore nonrecognition transfers are relatively few in number and have been upheld by the courts only in certain narrow factual situations, none of which is present in the case before us. Moreover, petitioner argues that because the intangibles were validly transferred to SCO in nonrecognition transactions, the "arm's length" standard of section 1.482-1(b)(1), Income Tax Regs., was satisfied and, therefore, respondent is not authorized to allocate income from the "property and business" of SCO to the petitioner.

*National Securities Corp. v. Commissioner*, 137 F.2d 600 (3d Cir. 1943), affg. 46 B.T.A. 562 (1942), is the seminal case in which what is now section 482[24] was applied in the context of a section 351 transaction for the purpose of preventing the evasion or avoidance of taxes.[25] In each of these cases, property was transferred in a nonrecognition transaction and subsequently was disposed of by the transferee. It was found that the sole purpose of the

---

[24]Although some of the cases discussed herein arose when present sec. 482 and other relevant provisions were denominated as other code sections, hereinafter for simplicity's sake we will refer to them in their current incarnation.

[25]The terms tax evasion and tax avoidance are used interchangeably for purposes of sec. 482. *Foster v. Commissioner*, 80 T.C. 34, 158 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985).

transfer was to achieve tax consequences on the disposition of the property by the transferee that were more favorable than those that could have been achieved by a disposition by the transferor. See, e.g., *Southern Bancorp. v. Commissioner*, 67 T.C. 1022, 1027 (1977); *Northwestern National Bank of Minneapolis v. United States*, an unreported case (D. Minn. 1976, 38 AFTR 2d 76-1400, 76-1 USTC par. 9408), affd. 556 F.2d 889, 891-892 (8th Cir. 1977). But see *Ruddick Corp. v. United States*, 226 Ct. Cl. 426, 643 F.2d 747 (1981), on remand 3 Cl. Ct. 61 (1983), affd. without published opinion 732 F.2d 168 (Fed. Cir. 1984).

In *National Securities Corp.*, the parent corporation transferred shares of stock in an unrelated corporation to its subsidiary in exchange for additional shares of the subsidiary's stock in a nonrecognition exchange. The parent corporation's basis in the stock was approximately $140,000 but the fair market value of the stock at the time of the exchange was only $8,500. The taxpayer (the subsidiary corporation) sold the stock at the end of the transfer year for $7,175 and reported a loss of $133,202 on the sale. The parent corporation had already realized a net capital loss for that year in excess of the amount deductible and, therefore, could not have derived a tax benefit from the loss on the sale if it had sold the depreciated stock itself.

In the notice of deficiency, the Commissioner disregarded the nonrecognition transfer of the stock entirely and allocated under section 482 the entire loss on the sale to the parent corporation. At trial, however, the Commissioner conceded that the subsidiary corporation was entitled to deduct the portion of the loss sustained subsequent to the nonrecognition transfer, thus recognizing the validity of the transfer itself. The Board of Tax Appeals and the Court of Appeals for the Third Circuit upheld the Commissioner's allocation of the loss from the taxpayer to the parent corporation for the portion of the loss sustained before the transfer.

The appellate court in *National Securities Corp.* described the conflicting relationship of section 482 to section 351 as follows:

Section [482] is directed to the correction of particular situations in which the strict application of the other provisions of the act will result in a

distortion of the income of affiliated organizations. In every case in which the section is applied its application will necessarily result in an apparent conflict with the literal requirements of some other provision of the act. If this were not so Section [482] would be wholly superfluous. We accordingly conclude that the application of Section [482] may not be denied because it appears to run afoul of the literal provisions of Sections [351 and 362] if the Commissioner's action in allocating under the provisions of Section [482] the loss involved in this case was a proper exercise of the discretion conferred upon him by the section. [137 F. 2d at 602.]

Although the Court of Appeals in *National Securities Corp.* states that the Commissioner made the allocation in order to clearly reflect income, it is obvious that the case also involved a tax-avoidance situation in that the court found that there was no valid business purpose for the transfer. *National Securities Corp. v. Commissioner*, 137 F.2d at 602. Moreover, it seems axiomatic that in all tax-avoidance type cases arising under section 482, respondent's allocation will have been made also because in his view income was not clearly reflected. See *Eli Lilly*, 84 T.C. at 1119; *Southern Bancorp. v. Commissioner*, 67 T.C. 1022, 1027 (1977).

The second type of cases in which section 482 has been applied in the context of nonrecognition transactions are those cases in which the classic symptoms of tax evasion are not present yet respondent concludes that the taxpayer's income is, nevertheless, not clearly reflected. In both *Central Cuba Sugar Co. v. Commissioner*, 198 F.2d 214 (2d Cir. 1952), revg. and remanding on this issue 16 T.C. 882 (1951), and *Rooney v. United States*, 305 F.2d 681 (9th Cir. 1962), affg. 189 F. Supp. 733 (N.D. Cal. 1960), the taxpayers transferred a planted crop, together with other assets, to a newly formed corporation in exchange for stock in a nonrecognition exchange. The profit from the sale of the crop was reported as income by the new corporations and the respective taxpayers deducted the expenses incurred in growing the crop prior to its transfer. As a result, the transferor taxpayer in each situation sustained a net operating loss. In each case, the appellate court upheld the Commissioner's allocation of all the expenses of raising the crop from the taxpayer to the transferee corporation and, in effect, treated the transferee corporation as if it had

performed the planting and incurred the expenses of growing the crop. In neither situation did respondent challenge the validity of the transfer itself.

In both *Central Cuba Sugar* and *Rooney*, the appellate courts rejected the taxpayers' arguments that section 482 was inapplicable when a nonrecognition provision was involved. The Court of Appeals for the Second Circuit in *Central Cuba Sugar* also summarily dismissed the contention that the lack of a tax evasion motive for the nonrecognition reorganization transfer prevented the application of section 482. Rather, the court noted that the statutory language "clearly to reflect the income" was an independent reason for allocation under section 482. 198 F.2d at 215.

The court further found that the Commissioner did not abuse his discretion and that denying the transferor corporation the claimed expense deductions for growing the transferred crop was entirely proper. It noted that section 482 had its genesis in the consolidated return provisions and that—

consolidation would have shown the income which accrued during the fiscal year for the enterprise as a whole. Allocation, likewise, should be able to dissolve the fiction that it was unprofitable; Congress, in adopting [the predecessor of section 482] certainly intended it as a device of comparable utility. The present statute was designed to deny the power to shift income or deductions arbitrarily among controlled corporations, and to place such corporations rather on a parity with uncontrolled concerns. * * * In the case at bar, had the taxpayer sold its assets, including a crop of sugar about to be harvested, in an arm's-length transaction, the temporarily invested expenses would have been recouped as part of the purchase price. * * * But in a sale for stock between related corportions, no such income is recorded and the accounts of the transferor cannot properly reflect the true income status of the enterprise as a going concern. Hence to achieve "the rough matching of expenses and income previously attained," * * * allocation of the expenses to the concern which is to profit by them is the only alternative * * * [198 F.2d 214, 216 (2d Cir. 1952); citations and section refs. omitted.]

### 3. *Application of Section 482 to Petitioner and SCO*

The facts of the case before us do not fit neatly into either of the above-discussed groups of cases in which courts have upheld respondent's allocations under section 482 in the context of a nonrecognition transfer. Although

respondent argues that SCO was created solely for tax-avoidance reasons, we are convinced from our review of the facts that substantial independent business purposes existed for SCO's creation and for the transfers of the intangibles. Petitioner was in need of additional manufacturing and related facilities at the time SCO was organized, and facilities were leased in Puerto Rico. While it is possible that such facilities could have been acquired or built in Skokie or Lake County, Illinois, or elsewhere in the 50 States, as respondent argues, we do not think it appropriate for this Court to substitute its judgment for that of corporate management in locating manufacturing sites.

Undoubtedly, tax considerations were also a major concern as petitioner expressly admits. Petitioner was aware that several competing pharmaceutical firms had located operations in Puerto Rico and consequently had lower effective tax rates and hence a possible competitive edge. Locating SCO in Puerto Rico enabled petitioner to take advantage of the congressionally sanctioned tax incentives of section 931 as well as the Puerto Rican tax exemptions and the lower labor costs available there. It is well established that taking advantage of tax benefits made available by Congress does not constitute tax avoidance. *Eli Lilly, supra* at 1120. *Achiro v. Commissioner*, 77 T.C. 881, 895 (1981). Moreover, it was Congress' express purpose to encourage American business investments in U.S. possessions by its enactment of section 931. In *Barber-Greene Americas, Inc. v. Commissioner*, 35 T.C. 365 (1960), we held that the organization of a subsidiary to take advantage of the Western Hemisphere Trade Corporation provisions of sections 921 and 922 did not constitute tax avoidance. We stated:

When the Congress offered certain tax benefits as an inducement to United States corporations to engage in foreign trade, it was to be expected that some corporations would seek to avail themselves of these benefits. The creation of a subsidiary to carry on the business in the Western Hemisphere area of an existing domestic corporation does not constitute tax avoidance within the meaning of [the predecessor of section 269], * * * and there seems to be no good reason why the deliberate organizing of such a corporation's business and sales procedures to meet the other conditions specified by the legislation and thereby to qualify for the tax benefits offered should be regarded as tax

avoidance. Otherwise the purpose of organizing a subsidiary would be lost and the congressional objective would not be carried out.

It has repeatedly been stated that taxpayers have the right so to arrange their affairs that their taxes shall be as low as possible, *Gregory v. Helvering*, 293 U.S. 465 (1935); that one is not obliged to pursue a course of action giving rise to a greater tax liability if another is open which will give rise to a lesser liability, *Fruit Belt Telephone Co.*, 22 B.T.A. 440 (1931), * * * and that what a taxpayer did, rather than what he might have done, determines his liability. *Seminole Flavor Co.*, 4 T.C. 1215, 1230 (1945). * * *

[35 T.C. at 386.]

Thus, unlike the *National Securities Corp.* line of cases where assets were transferred to a subsidiary corporation solely for tax-avoidance purposes, a substantial business purpose is present in the facts before us. Notwithstanding respondent's attempt to cast a haze of impropriety over petitioner's tax planning, such motives do not negate or supercede that valid business purpose. Indeed, it is a rare and naive taxpayer that does not take the tax laws into consideration when structuring complex transactions.

We recognize that the case before us also has substantial dissimilarities from that line of cases typified by *Central Cuba Sugar* and *Rooney*. In these cases the Court was concerned with what it considered the artificial separation of crop income from the expenses of growing that crop in a single year. While the transfers of the crops in these cases were motivated by valid business reasons as were the transfers of the intangibles by petitioner to SCO,[26] it was the subsequent dispositions of the transferred property itself in *Central Cuba Sugar* and *Rooney* that triggered respondent's allocations under section 482 because it was that event which produced the income.

Petitioner makes much of our comment in *Foster v. Commissioner*, 80 T.C. at 156, that section 482 and section 1.482-1(d)(5), Income Tax Regs., do not apply to the nonrecognition transfer, itself, but rather to the subsequent

---

[26]Despite the holding of the Court of Claims in *Ruddick Corp. v. United States*, 226 Ct. Cl. 426, 643 F.2d 747 (1981), on remand 3 Cl. Ct. 61 (1983), affd. without published opinion 732 F.2d 168 (Fed. Cir. 1984), the weight of authority recognizes that respondent may make allocations under sec. 482 in the face of a nonrecognition provision in order to clearly reflect income even in the absence of tax avoidance motives. See *Eli Lilly & Co. v. Commissioner*, 84 T.C. 996, 1121 n. 57 (1985). Sec. 482 "contemplates alternative and independent bases for its application." *Foster v. Commissioner*, 80 T.C. at 157.

taxable disposition of the property previously acquired in the nonrecognition transaction. We stated:

> By creating an exception to the general rule that an exchange of property is a taxable event, section 351 in effect repealed the "incorporation tax," the burden on business readjustments which Congress sought to eliminate by the enactment of that section. Neither section 482 nor section 1.482-1(d)(5), Income Tax Regs., reinstates that tax because those sections do not apply to the nonrecognition transaction itself. Rather, they apply to the subsequent, taxable disposition of property previously acquired in the nonrecognition transaction. They do not interfere with business readjustments and thus do not violate the policy inherent in section 351. * * *

Petitioner would have us conclude from this statement that section 482 is not applicable to the facts herein because the intangibles transferred to SCO were not thereafter disposed of by SCO but rather were retained by it. However, *Foster* did not consider the transfer of intangible property but rather dealt solely with a nonrecognition transfer and subsequent sale of tangible property. The import of this comment was that section 482 did not reinstate the incorporation tax by applying to the transfer itself but rather only applies when income is derived from the transferred property.

In the case before us the intangibles themselves have been retained by SCO. An intangible asset of the sort before us is a unique type of property whose value generally is not realized from its sale but rather from its continuing use in business to produce a product for sale. Indeed it is the very ownership, retention and use of these assets in the context of its manufacturing operation that creates the income and related business expenses that respondent seeks to allocate from SCO to petitioner. The sales by SCO of the products represented by the intangibles were contemplated by petitioner prior to the transfer of the intangibles to SCO and indeed were a primary motivation for the transfers.

We have found that the transfers of the intangibles by petitioner to SCO during the years 1969-71 were made for valid business purposes. Therefore, ownership of these intangibles, both in form and substance, was vested in SCO prior to the years in issue. Accordingly, we find and hold that respondent may not ignore the ownership of these

intangibles by allowing SCO only a return on its manufacturing function and allocating substantially all of the income and related business expenses to petitioner during the taxable years 1974 and 1975. Thus, respondent's allocations in the notice of deficiency made under the authority of section 482 were based on an erroneous characterization of the facts and, therefore, are unreasonable. See *American Terrazzo Strip Co. v. Commissioner*, 56 T.C. 961, 973 (1971).

Our inquiry does not end here, however. As we have noted, a bona fide business purpose for a transaction is not, in and of itself, a complete defense to a reallocation under section 482. Although we have found that SCO owned the intangibles in form and substance during the years in issue and that, therefore, respondent abused his considerable discretion under section 482 by failing to recognize the transfer of the intangibles and treating SCO as merely a contract manufacturer, we must still determine whether some allocation is appropriate under section 482 to clearly reflect petitioner's income during 1974 and 1975.[27]

*Issue 2. Was Petitioner's Income Clearly Reflected During 1974 and 1975.*

Even though petitioner has met its burden of proving that respondent's allocation in the notice of deficiency was unreasonable we still must determine from the record before us the proper allocations, if any, under section 482 of income and expenses between SCO and petitioner. *Eli Lilly*, *supra* at 1132; see *Nat Harrison Associates, Inc. v. Commissioner*, 42 T.C. 601, 617 (1964); *Ach v. Commissioner*, 42 T.C. 114, 126-127 (1964), affd. 358 F.2d 342 (6th Cir. 1966). As we stated in *Nat Harrison*, "this Court may allocate income under the statute in a manner the evidence before us demonstrates to be correct and * * * respondent's allocation need not be approved or disapproved *in toto.*" 42 T.C. at 617-618. See also *Baldwin-Lima-Hamilton Corp. v. United States*, 435 F.2d 182, 187 (7th Cir. 1970), revg. and

---

[27]It is petitioner's position that if we hold that SCO owned the intangibles during the years in issue then the only relevant question under sec. 482 is whether an arm's-length price was paid for the services rendered by petitioner during 1974 and 1975. We do not agree. We believe the remaining sec. 482 issue is whether petitioner's income was clearly reflected in the taxable years before the Court as a result of those prior transfers of intangibles.

remanding in part 69-1 USTC par. 9269, 24 AFTR 2d 69-5090 (N.D. Ill. 1969).

Despite our division of cases applying section 482 in the context of nonrecognition transfers into two general categories for discussion purposes, the common factor in both lines of cases is that the nonrecognition transfers of property ultimately resulted in the distortion of the taxpayer's income or, to more closely use the statutory language, resulted in the lack of a clear reflection of income. While in *National Securities Corp.* there also existed no business purpose for the transfer of the stock, it was the resulting distortion of income when the stock was sold (i.e., the income realizing event) that triggered respondent's allocation under section 482, not the nonrecognition transfer itself. Moreover, we do not read these cases as being the final word on the application of section 482 in the context of nonrecognition transfers or somehow circumscribing the precise fact patterns which must exist in order to permit an allocation under this section. While it is true that section 482 is not often applied in the context of nonrecognition transfers, it does not follow that the final word has been written on the subject or that the circumstances in which such cases can arise has been cast in concrete.

As we have noted, section 1.482-1(d)(5), Income Tax Regs. expressly states that respondent has the authority to apply section 482 in circumstances providing for nonrecognition of gain or loss when necessary to prevent the avoidance of taxes or to clearly reflect income. While the mere existence of a section 351 transfer does not, in and of itself, permit a section 482 allocation by respondent, we must determine whether in the case before us the transfers of intangibles to SCO and the subsequent use of those intangibles in SCO's operations caused a distortion of petitioner's income during 1974 and 1975.

Section 1.482-2(d)(1)(i), Income Tax Regs., deals specifically with the transfer of intangible property and provides in pertinent part as follows:

(d) *Transfer or use of intangible property.*—(1) *In general.* (i) * * * where intangible property or an interest therein is transferred, sold, assigned, loaned, or otherwise made available in any manner by one member of a group of controlled entities (referred to in this paragraph as

the transferor) to another member of the group (referred to in this paragraph as the transferee) for other than an arm's length consideration, *the district director may make appropriate allocations to reflect an arm's length consideration for such property or its use.* * * *

Section 1.482-2(d)(2)(i), Income Tax Regs., defines arm's-length consideration as follows:

(2) *Arm's length consideration.* (i) *An arm's length consideration shall be in a form which is consistent with the form which would be adopted in transactions between unrelated parties under the same circumstances.* To the extent appropriate, an arm's length consideration may take any one or more of the following forms: (a) royalties based on the transferee's output, sales, profits, or any other measure; (b) lump-sum payments; or (c) any other form, including reciprocal licensing rights, which might reasonably have been adopted by unrelated parties under the circumstances, provided that the parties can establish that such form was adopted pursuant to an arrangement which in fact existed between them. * * *

The critical inquiry then is "whether the transaction in question would have been similarly effected by unrelated parties dealing at arm's length." *Ciba-Geigy Corp. v. Commissioner*, 85 T.C. 172, 221 (1985).

As is customary in the pharmaceutical industry, petitioner spent vast sums of money over a period of many years on the research and development of the pharmaceutical products represented by the intangibles transferred to SCO. In return for the intangibles and other property transferred during 1969-71, petitioner received all of SCO's stock which was, in theory and for corporate accounting purposes, worth exactly the same as the property transferred. Under section 362(a)(1), petitioner's basis in SCO's stock was carried over from its basis in the transferred assets.

Prior to the transfers of the intangibles, petitioner itself manufactured and sold the products represented by the intangibles and received the considerable income generated thereby. In the years following the transfers, including the taxable years in issue, SCO manufactured the pharmaceutical products and received all the income generated by their sale. Petitioner received no amounts attributable to its prior ownership of the underlying intangibles but rather received only payment for the services it rendered to SCO in the

areas of marketing, administration, and regulatory compliance.

We have found that petitioner has met its burden of proving that respondent's allocation of substantially all of SCO's net income to petitioner was unreasonable because SCO was a viable entity which owned the intangibles during the years in issue as well as manufactured the pharmaceutical products. However, it does not follow that petitioner (which had massive and continuing required expenses for research and development common to all large pharmaceutical firms), had it been dealing at arm's length with an unrelated corporation, would have transferred its major income-producing assets in exchange merely for stock (albeit of equal value) and the right to perform and be compensated for marketing, administration, and regulatory compliance services.[28]

The intangibles transferred to SCO represented products accounting for approximately 80 percent of petitioner's profits and sales. In an arm's-length situation, it would be the height of corporate mismanagement to transfer the lion's share of the corporation's income-producing assets to another corporation solely for non-income producing stock and the right to perform compensated services for the transferee corporation. Thus, while petitioner received in exchange stock of "equal value" to the intangibles transferred, we are unable to conclude that petitioner received arm's-length consideration for the transfer of its intangibles within the meaning of section 1.482-2(d)(1)(i), Income Tax Regs. The result is a distortion of petitioner's income in the taxable years before us, which would not have occurred if the transaction had been carried out between unrelated parties.

The object of section 482 is to arrive at the true net income of each controlled taxpayer by applying the standard of an uncontrolled taxpayer dealing at arm's length with another uncontrolled taxpayer. Sec. 1.482-1(b)(1), Income Tax Regs. If petitioner herein had transferred the intangibles in issue (which were responsible for producing

---

[28]Respondent's argument that petitioner must be compensated for its research and development expenses is, we believe, more properly a part of the larger question of whether petitioner's income was clearly reflected during the years at issue.

the bulk of its income) to an unrelated entity, undoubtedly it would have received in exchange a lump-sum payment or, what is more likely, a substantial share of the profits or royalty to compensate it for its loss of income from the sales of the products.[29] See *Nat Harrison Associates, Inc.*, 42 T.C. 601, 621-622 (1964).

A remark by the Court of Appeals for the Second Circuit in *Central Cuba Sugar* on this point is instructive:

In the case at bar, had the taxpayer sold its assets, including a crop of sugar about to be harvested, in an arm's-length transaction, the temporarily invested expenses would have been recouped as part of the purchase price. But in a sale for stock between related corporations, no such income is recorded and the accounts of the transferor cannot properly reflect the true income status of the enterprise as a going concern. * * * [198 F.2d 214, 216 (2d Cir. 1952); citations and section refs. omitted.]

Petitioner argues vigorously that the arm's-length standard of section 1.482-1(b)(1), and section 1.482-2(d)(1), Income Tax Regs., cannot be applied in the context of a nonrecognition transaction because such a transaction cannot, by its very definition, take place between unrelated taxpayers, and that any distortion which results was contemplated and authorized by Congress. We specifically rejected this argument in *Eli Lilly*, *supra* at 1127-1129, and concluded that the taxpayer's failure to receive arm's-length consideration as defined in section 1.482-2(d)(2)(i), Income Tax Regs., resulted in the distortion of its income during the years in issue. As the Court of Appeals for the Third Circuit in *National Securities Corp. v. Commissioner*, stated:

In every case in which [section 482] is applied its application will necessarily result in an apparent conflict with the literal requirements of some other provision of the act. If this were not so [section 482] would be wholly superfluous. [137 F.2d at 602.]

In *Northwestern National Bank of Minneapolis v. United States*, an unreported case (D. Minn. 1976, 38 AFTR 2d 76-1400, 76-1 USTC par. 9408), affd. 556 F.2d 889 (8th Cir.

---

[29]It may be that petitioner, if dealing at arm's length with an unrelated party, would not have transferred these intangibles under any circumstances. However, after concluding that SCO is indeed the owner of the intangibles, we must begin with the premise that the transaction was, in fact, consummated. The only question then is whether petitioner's income was clearly reflected during 1974 and 1975.

1977), the parent corporation bank claimed a charitable contribution of stock which it had received from its subsidiary in the form of an upstream dividend. Respondent reallocated the charitable contribution deduction to the subsidiary under section 482. The U.S. District Court specifically rejected the bank's argument that, because payment of a dividend by a subsidiary corporation to its parent can never take place between unrelated taxpayers, no arm's-length standard exists by which income distortion can be measured under section 482. On appeal, the Court of Appeals for the Eighth Circuit affirmed. On this point it stated:

There is nothing in the language of section 482 or its corresponding regulations that is inconsistent with applying section 482 to transactions between subsidiary corporations that might not occur in similar form between unrelated taxpayers. * * * The purpose behind the dividend distribution was to obtain a tax advantage not available in an arm's-length transaction. The transaction was made possible solely on the basis of appellant's relationship with and control of [its subsidiary], and the end result was a distortion of the respective net incomes of both parent and subsidiary corporations. Section 482 was designed specifically to correct such distortions. * * *

It should be noted that the distortion was not caused by the upstream dividend alone; intercorporate dividends do not automatically trigger section 482 reallocation. The dividend was simply the vehicle by which assets were moved to the parent corporation, which was in a better position to enjoy the deduction that would accrue from the previously planned contribution. Since such a strategy would be unavailable to an uncontrolled taxpayer, the Commissioner did not abuse his discretion in reallocating the deduction back to the subsidiary, the true donor under the standard of an uncontrolled taxpayer. See Treas. Reg. sec. 1.482-1(b)(1).

[556 F. 2d at 891-892; (fn. refs. and citations omitted.]

See also *Foster v. Commissioner*, 80 T.C. 34, 149-150 (1983), affd. on this issue 756 F.2d 1430 (9th Cir. 1985). The distortion of income that the Court found was that the parent corporation's taxable income was reduced below what it would have been if the charitable contribution deduction had not been shifted and, correspondingly, the subsidiary's income was greater than it would have been.

We find a similar distortion of income in the facts before us. One of the purposes of the transfers of intangibles to SCO was to obtain a tax advantage not available in an

arm's-length transaction with an unrelated party. If petitioner had not transferred the intangibles to SCO, it would have continued to receive the significant income from the sales of the product lines represented by the intangibles, without any additional effort on its part. After the transfers, it received no income from the sale of the products themselves, but rather received only compensation for services it provided to SCO. The fact that a business purpose existed for SCO's creation, and the transfers of the intangibles to it, does not negate the fact that the transfers resulted in a distortion of petitioner's income in the taxable years before us.[30] Thus, we conclude that on these facts an allocation under section 482 is appropriate to clearly reflect petitioner's income.

There is little hard evidence from which we can determine what consideration petitioner would have demanded had the transactions under scrutiny here taken place between unrelated parties dealing at arm's length. It is respondent's position that if petitioner and SCO had dealt at arm's length, SCO's income in connection with the products it manufactured would have been limited to a profit on its manufacturing activities. We have held that this position is unreasonable because the ownership of the intangibles was validly transferred to SCO. ·

Section 1.482-2(d)(2)(ii), Income Tax Regs., provides as follows:

(ii) In determining the amount of an arm's length consideration, the standard to be applied is the amount that would have been paid by an unrelated party for the same intangible property under the same circumstances. Where there have been transfers by the transferor to unrelated parties involving the same or similar intangible property under

---

[30]This Court has long recognized that sec. 482 operates as an exception to the annualized accounting rule despite petitioner's protestations to the contrary. In *G.U.R. Co. v. Commissioner*, 41 B.T.A. 223 (1940), affd. 117 F.2d 187 (7th Cir. 1941), the taxpayer argued that the Commissioner should not be allowed to utilize the predecessor of sec. 482 to attack an acquisition which had taken place in a prior taxable year. To this the Board of Tax Appeals responded:

"And certainly it can not be supposed that section [482] loses its effect because the taxpayers upon whom it was designed to operate have divided their transaction so that its various phases cover different taxable periods. So to construe the provision would amount to charting an obvious course for its avoidance and would suggest that in the *Asiatic Petroleum Co.* proceeding a contrary result would have been reached had the foreign affiliate sold the stock in a later year. No such inference can be drawn from that case and the opposite is apparent from its language. [*G.U.R. Co. v. Commissioner*, 41 B.T.A. at 226-227.]"

the same or similar circumstances the amount of the consideration for such transfer shall generally be the best indication of an arm's length consideration.

Petitioner points out that in the case of Flagyl and Lomotil, certain of the intangible assets transferred to SCO in relation to those two products had been originally acquired by petitioner from unrelated parties through licensing agreements. The compensation paid by petitioner for that intangible property consisted of a royalty of 10 percent and 8 percent of net sales for exclusive rights under the Flagyl and Lomotil patents, respectively. Petitioner argues that this evidence establishes that an unrelated party would not have paid more than a royalty in this range for the intangible property transferred to SCO.

We do not concur. While we agree that a royalty would be the likely form that an arm's-length consideration would take in the circumstances before us (sec. 1.482-2(d)(2)(i), Income Tax Regs.), we do not believe these licensing agreements are comparable to the transfer of the intangibles here at issue, within the meaning of section 1.482-2(d)(2)(ii), Income Tax Regs. The licensing agreements were entered into with a French pharmaceutical company in the case of Flagyl, and a Belgian pharmaceutical company in the case of Lomotil. Even though a pharmaceutical compound is patented in the United States, it must be also submitted to the FDA to obtain approval to market the compound in interstate commerce. In the case of these two pharmaceutical compounds, petitioner obtained the regulatory approval to market them in the United States. In addition, petitioner developed the manufacturing know-how required to commercially manufacture the products. Foreign pharmaceutical firms, having obtained U.S. patents for newly discovered chemical compounds often enter into licensing agreements with U.S. pharmaceutical firms which are capable of obtaining NDA approval for the compounds and successfully marketing those compounds in the U.S. market. However, because of the difficulty of the regulatory approval process, only a small fraction of patented pharmaceutical products are ultimately marketed for sale in the United States.

In contrast, the intangibles petitioner transferred to SCO are significantly more valuable than those mere licensing agreements. The regulatory approvals for the products transferred to SCO had already been obtained at great effort and expense by petitioner. Moreover, the market for the products was already established and petitioner's marketing and sales force and administrative departments stood ready to provide services to SCO.[31] In other words, SCO was able to reap the benefits from the sale of these products through a mechanism set in motion years earlier by petitioner. All of the products transferred were highly profitable both before and after their transfer.

The patents and other extremely valuable intangibles transferred to SCO by petitioner were of little value to SCO without the marketing and administrative services provided by petitioner because SCO was unable to provide such services for itself. Moreover, because petitioner was the holder of the NDA's, without its services in the regulatory area SCO could not have sold its products. The NDA's, even though not readily transferable, were also extremely valuable assets, without which the other intangibles were of diminished value.

Much of the expert evidence presented pertains to the parties' attempt to value the services provided by petitioner despite the absence of comparable marketing agreements.[32] We would find no reason to doubt the reasonableness of SCO's payment for the services themselves,[33] as long as such payment was made in the context of an additional royalty payment as arm's-length consideration under section 482 for the transfer of the intangibles. Arm's-length consideration for section 482 purposes is that which results in a clear reflection of income. The determination of the proper payment to petitioner for services rendered by it is but part

---

[31]As petitioner, itself, stated on brief,

"Each product was well established, enjoying a reputation among physicians for efficacy, safety and ease of administration. As such, these products practically sold themselves and marketing the products consisted principally of reminding physicians of the products' strengths."

[32]It is clear that there exists no sufficiently similar transaction involving an unrelated party. See sec. 1.482-2(d)(2)(ii), Income Tax Regs.

[33]Indeed, the evidence presented by the parties relating to the value of the services provided by petitioner to SCO produces the bizarre result of petitioner's referring to its marketing staff as mediocre and relatively unskilled while respondent portrays them as outstanding and compliments the quality, importance, and effectiveness of petitioner's staff.

of the larger question of whether petitioner's income was clearly reflected during 1974 and 1975. Thus, whether our allocation herein is considered an additional payment for services or for intangibles that were not transferred[34] or as a royalty payment for the intangibles themselves, the result is the same.

Using our best judgment based on a consideration of the entire record before us and mindful of the factors set forth in section 1.482-2(d)(2)(iii), Income Tax Regs., to the limited extent they are applicable, we conclude that an allocation of 25 percent of SCO's total net sales in 1974 and 1975 or $28,696,000 and $34,511,000, respectively, is appropriate to clearly reflect petitioner's income in those years. To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[34]Respondent argues that petitioner was not compensated for intangibles it owned in 1974-75 such as the NDA's, research, and regulatory approval capabilities and specialized marketing expertise.